UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD J. ISOLDE, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No.  3:15-CV-2093 |
| Plaintiff, | § § | <u>CLASS ACTION</u> |
| vs. | § § | |
| TRINITY INDUSTRIES, INC., TIMOTHY R. WALLACE and JAMES E. PERRY, | § § § | |
| Defendants. | § § § | |
| | § | <u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Trinity Industries, Inc. ("Trinity" or the "Company"), as well as media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Trinity publicly traded securities between February 16, 2012 and April 29, 2015, inclusive (the "Class Period"), against Trinity and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against Trinity and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases and filings with the SEC and in oral statements to the media, securities analysts and investors.

2.      Trinity manufactures transportation, construction and industrial products.  The Company's products include tank and freight railcars, inland hopper and tank barges, highway guardrail and safety products, ready-mix concrete, and other products.  Trinity also leases railcars and other products.  The Company markets its products in the United States and internationally.

3.      On April 21, 2015, an article was published on *Bloomberg News*, stating that the U.S. Justice Department ("DOJ") was conducting a criminal investigation into the Federal Highway Administration's ("FHWA") continued support of Trinity's highway guardrail system and that the Company had engaged in cost-cutting alterations to its ET-Plus System guardrails ("ET-Plus"), which compromised the safety of its units, which were linked to at least eight deaths.

4.      As a result of this news, the price of Trinity stock plummeted $3.43 per share to close at $32.82 per share on April 22, 2015, a one-day decline of over 9% on volume of nearly 8.8 million shares.[1]

5.      Subsequently, on April 24, 2015, Trinity confirmed that it was the target of a DOJ investigation.

---

[1]      All share prices have been adjusted to reflect the Company's June 2014 2-for-1 stock split.

6.      On this news, the price of Trinity stock fell $4.66 per share, to close at $28.70 per share, a one-day decline of nearly 14% on volume of nearly 13.6 million shares.

7.      Then, on April 29, 2015, *Bloomberg News* reported that Trinity had received a subpoena from the DOJ regarding "its allegedly defective guardrail safety system" and that the DOJ sought "documents from 1999 and later regarding Trinity's guardrail end terminals."

8.      As a result of this news, the price of Trinity stock dropped another $0.98 per share to close at $27.09 per share on April 30, 2015, a one-day decline of 3.5% on volume of 4.1 million shares.

9.      As a result of defendants' false statements, Trinity securities traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending the Company's stock price down 46% from its Class Period high and causing economic harm and damages to class members.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

12.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Trinity has its headquarters in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE stock market.

## THE PARTIES

14.     Plaintiff Richard J. Isolde purchased Trinity publicly traded securities during the Class Period as set forth in the attached certification and was damaged thereby.

15.     Defendant Trinity is a diversified industrial company that owns businesses providing products and services to the energy, transportation, chemical and construction sectors.  Trinity's principal executive offices are located at 2525 Stemmons Freeway Dallas, Texas 75207-2401.  Trinity's common stock trades on the NYSE under the ticker symbol "TRN."

16.     Defendant Timothy R Wallace ("Wallace") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Board.

17.     Defendant James E Perry ("Perry") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO") and Senior Vice President.

18.     The defendants referenced above in ¶¶16-17 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that caused the prices of Trinity securities to be artificially inflated during the Class Period.

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Trinity's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them

but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Trinity. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Trinity publicly traded securities was a success, as it: (i) deceived the investing public regarding Trinity's prospects and business; (ii) artificially inflated the prices of Trinity publicly traded securities; (iii) caused plaintiff and other members of the Class (as defined below) to purchase Trinity publicly traded securities at artificially inflated prices.

## SCIENTER ALLEGATIONS

21.    During the Class Period, the defendants had the motive and opportunity to commit the alleged fraud. Defendants also had actual knowledge of the misleading statements they made and/or acted in reckless disregard of the true information known to them at the time. In doing so, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Trinity securities during the Class Period.

## BACKGROUND

22.    Trinity is a diversified industrial company that, through its operating subsidiaries, provides products and services to the energy, transportation, chemical, and construction sectors. Trinity's businesses provide industrial products and services ranging from railcars, barges, storage containers, and aggregates to highway products, structural wind towers, railcar parts, and railcar leasing and management services. Trinity operates through five principal business segments: the Rail

- 5 -

Group, the Railcar Leasing and Management Services Group, the Inland Barge Group, the Construction Products Group, and the Energy Equipment Group.

23.    One of the Company's significant products in its Construction Products Group has been the manufacture and sale of its highway guardrail end terminal product called the ET-Plus. The ET-Plus is a patented, energy-absorbing, guardrail end terminal system designed by engineers at the Texas A&M Transportation Institute. The ET-Plus was designed to be used on the termination of w-beam barriers on the shoulder or median of a roadway. Trinity has long claimed that the ET-Plus "'is an NCHRP Report 350 Test Level 2 and Test Level 3 compliant cable anchored system and is acceptable for use on the National Highway System.'"

24.    The ET-Plus has been manufactured under license, marketed and sold by Trinity Highway Products, LLC, a wholly owned subsidiary of the Company, since at least 1999. The ET-Plus has historically typically been purchased by state transportation departments and highway construction contractors for use along roadways and medians. The federal government, in turn, helps state transportation departments purchase approved highway products, including Trinity's end terminal.

25.    As designed, the ET-Plus was supposed to absorb and dissipate the energy of a vehicular impact. Upon impact the guardrail was to be extruded through the head and flattened out into a ribbon, thus absorbing the majority of the errant vehicle's energy without severe impact forces that would result in life threatening injuries.

26.    Between 2002 and 2005, Trinity senior executives covertly modified the ET-Plus's energy-absorbing end terminal, a steel fixture mounted on the end of a guardrail to cushion the impact of a crashing car, without telling the FHWA, making the product more dangerous – sometimes fatally so. Instead of acting like a shock absorber, the revised version jammed up and behaved more like a giant spear that impaled vehicles in head-on collisions.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

27.     On February 15, 2012, after the market closed, Trinity issued a press release announcing its fourth quarter and full year 2011 financial results.  The Company reported net income of $56.1 million, or $0.70 diluted earnings per share ("EPS"), and revenue of $941.5 million for the fourth quarter ended December 31, 2011.  Additionally, the Company reported net income of $142.2 million, or $1.77 diluted EPS, and revenue of $3.1 billion for the full year ended December 31, 2011.  The press release stated in pertinent part:

> "Our companies are responding well as economic conditions change," said Timothy R. Wallace, Trinity's Chairman, CEO and President.  "We continue to see consistent demand for railcars that resulted in a $2.1 billion increase in order backlog during 2011 for our railcar manufacturing companies.  Our Rail Group achieved operating leverage associated with higher shipment volumes during the fourth quarter, while our Railcar Leasing and Management Services Group was successful in selling railcars from its lease fleet due to strong secondary market demand. I am pleased with the ability of our Inland Barge Group to quickly recover from the effects of the Missouri flood and finalize the flood's financial impact before the end of the year."

28.     On February 16, 2012, Trinity filed its Form 10-K with the SEC for the fourth quarter and full year 2011.  The Form 10-K included the same results previously reported in the Company's February 15, 2012 press release and contained signed certifications by defendants Wallace and Perry.  The Form 10-K stated in part:

> Our highway products businesses are leading U.S. manufacturers of highway products. We manufacture guardrail, crash cushions, and other protective barriers. The Federal Highway Administration, which determines which products are eligible for federal funds for highway projects, has approved most of our products as acceptable permanent and construction zone highway hardware according to requirements of the National Cooperative Highway Research Program.

> Our crash cushions and other protective barriers include multiple proprietary products manufactured through various product license agreements with certain public and private research organizations and inventors.  We hold patents and are a licensee for certain of our guardrail and end-treatment products, which enhances our competitive position for these products.

29.     On April 25, 2012, Trinity issued a press release announcing its first quarter 2012 financial results.  The Company reported net income of $52.9 million, or $0.66 diluted EPS, and revenue of $925.3 million for the first quarter ended March 31, 2012.  The press release stated in part:

> "I am pleased with our consolidated financial performance in the first quarter," said Timothy R. Wallace, Trinity's Chairman, CEO and President.  "Our revenues increased by 46% over the same period in 2011 and our net income increased by 119%.  Our strong first quarter results were driven by a significant increase in railcar shipments compared to last year, along with improved profitability and a higher level of railcar sales from the Railcar Leasing business.  In addition, deliveries in our Inland Barge Group increased during the quarter compared to the prior year. While all of our business segments reported increases in revenues for the first quarter of 2012 compared to the same quarter last year, our Energy Equipment Group's operating performance during the quarter reflects continued challenges in our structural wind towers business.  The balance of our business segments reported increases in operating margins due to higher volumes and improved operating leverage."

30.     On April 26, 2012, Trinity filed its Form 10-Q with the SEC for the first quarter of 2012.  The Form 10-Q included the same results previously reported in the Company's April 25, 2012 press release and contained signed certifications by defendants Wallace and Perry.

31.     On July 25, 2012, the Company issued a press release announcing its second quarter 2012 financial results.  The Company reported net income of $67.8 million, or $0.84 diluted EPS, and revenue of $1.02 billion for the second quarter ended June 30, 2012.  The press release stated in part:

> "I am pleased with our accomplishments during the second quarter and the overall rate of growth that we are experiencing in our company, both in terms of growing top-line and bottom-line results," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "During the second quarter, our businesses continued to perform well as they responded to various conditions within their respective markets."
>
> Mr. Wallace continued, "During the second half of 2012, we are repositioning a portion of our production capacity to meet the growing demand for products serving the oil, gas, and chemicals industries.  These products are well aligned with our core competencies.  The repositioning will include, among other things, the conversion of certain facilities from manufacturing wind towers to railcars. These

initiatives will enhance our ability to meet market demand and achieve additional operating leverage in the future. As we shift a portion of our production capacity to pursue these opportunities, there are multiple variables that can influence the timing of events pertaining to quarterly financial results. As a result, the earnings guidance we are providing is for the second half of 2012, rather than quarterly guidance."

32.     On July 26, 2012, the Company filed its Form 10-Q with the SEC for the second quarter of 2012. The Form 10-Q included the same results previously reported in the Company's July 25, 2012 press release and contained signed certifications by defendants Wallace and Perry.

33.     On October 24, 2012, the Company issued a press release announcing it third quarter 2012 financial results. The Company reported net income of $63.2 million, or $0.80 diluted EPS, and revenue of $937.5 million for the third quarter ended September 30, 2012. The press release stated in part:

> "I am pleased with our third quarter 2012 results, which represent the Company's eighth consecutive quarter of combined year-over-year revenue and earnings growth," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "During the quarter, our portfolio of businesses performed well, especially those serving the North American oil, gas, and chemical industries."
>
> "We made solid progress during the quarter leveraging our manufacturing flexibility to reposition a portion of our production capacity to meet growing demand in these industries," Mr. Wallace continued. "During the short term, repositioning requires up-front investment and causes operating inefficiencies that will impact results through the end of this year. In the long term, our repositioning enhances our ability to better serve our customers. Our outlook for 2013 remains optimistic. We are anticipating long production runs, resulting in additional operating leverage in our businesses that support the oil, gas, and chemical industries."

34.     On October 25, 2012, Trinity filed its Form 10-Q with the SEC for the third quarter of 2012. The Form 10-Q included the same results previously reported in the Company's October 24, 2012 press release and contained signed certifications by defendants Wallace and Perry.

35.     On February 20, 2013, the Company issued a press release announcing its fourth quarter and full year 2012 financial results. The Company reported net income of $71.3 million, or $0.90 diluted EPS, and revenue of $1.0 billion for the fourth quarter of 2012. Additionally, the

Company reported net income of $255.2 million, or $3.19 diluted EPS, and revenue of $3.8 billion

for the fiscal year ended December 31, 2012.  The press release stated in part:

> "I am pleased with our strong financial results for the fourth quarter and our overall performance during 2012," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "We have worked diligently over the past decade to position our company to perform well through a variety of economic conditions. Trinity's competency in manufacturing flexibility provides us the ability to redirect a portion of our manufacturing resources towards select areas that have strong demand levels for our products. In 2012, we achieved significant growth in consolidated revenues and earnings despite continuing uncertainty within some areas of the economy."

> "During 2013, we will continue to invest resources to position our company to pursue opportunities for infrastructure-related products that support the growing needs in the energy, chemical, transportation, and construction industries," Mr. Wallace continued. "At this point, we have been successful in obtaining order backlogs in several of our major businesses that will provide long production runs for products serving these industries."

36.     On February 21, 2013, Trinity filed its Form 10-K with the SEC for the fourth quarter

and fiscal year 2012.  The Form 10-K included the same results previously reported in the

Company's February 20, 2013 press release and contained signed certifications by defendants

Wallace and Perry.  The Form 10-K also announced that the Company was a defendant in a False

Claims Act lawsuit, stating in pertinent part:

> Our highway products businesses are leading U.S. manufacturers of guardrail, crash cushions, and other protective barriers. The Federal Highway Administration, which determines product eligibility for cost reimbursement using federal funds, has approved many of our products as eligible for cost reimbursement based on requirements set forth by the National Cooperative Highway Research Program. Our crash cushion, protective barrier, and guardrail products include multiple proprietary products manufactured under license from certain public and private research organizations and inventors and Company-held patents. We sell highway products in Canada, Mexico, and all 50 states in the U.S. We compete against several national and regional guardrail manufacturers.  We also export our proprietary highway products to more than 60 countries worldwide.

> *     *     *

> **Note 18. Commitments and Contingencies**

> *     *     *

In a related matter, on January 28, 2013, the Company was advised that the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled <u>JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT</u>, Case 2:12-cv-00089-JRG. Although the Company has not received service of process in this litigation, it has obtained a copy of the complaint. Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval, ostensibly related to the ET-Plus, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus plus treble civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend Mr. Harman's allegations which will likely result in certain legal expenses. We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.

37.     On April 30, 2013, the Company issued a press release announcing its first quarter 2013 financial results. The Company reported net income of $79.1 million, or $0.99 diluted EPS, and revenue of $932.9 million for the first quarter ended March 31, 2013. The press release stated in part:

"I am pleased with our strong financial results for the first quarter," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "Our performance was positively impacted by our ability to align our manufacturing capacity with the strong demand for our products that serve the oil, gas, and chemical industries. Our employees are doing an outstanding job of converting production capacity to meet customer needs for products that support these industries. Demand for railcars that serve the oil, gas, and chemical industries in North America surged during the first quarter contributing to a record backlog for the Rail Group of $5.1 billion. We achieved additional operating efficiencies during the quarter, most noticeably in the Rail Group. Our Energy Equipment Group continued to show solid improvement during the first quarter as our wind towers facilities operated at more efficient levels than last year."

38.     On May 1, 2013, Trinity filed its Form 10-Q with the SEC for the first quarter of 2013. The Form 10-Q included the same results previously reported in the Company's April 30,

2013 press release and contained signed certifications by defendants Wallace and Perry.  The Form

10-Q stated in pertinent part:

> As previously reported, in a related matter, on January 28, 2013, the
> Company was advised that the United States filed a "Notice of Election to Decline
> Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March
> 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall
> Division styled <u>JOSHUA HARMAN, on behalf of the UNITED STATES OF
> AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC.,
> DEFENDANT</u>, Case 2:12-cv-00089-JRG. Although the Company has not received
> service of process in this litigation, it has obtained a copy of the complaint. Mr.
> Harman alleges that the Company presented false or fraudulent claims, records or
> statements to the United States to obtain payment or approval, ostensibly related to
> the ET-Plus, and seeks damages equaling the cost to recall and replace all
> installations of the ET-Plus plus treble civil penalties, costs, and interest. The
> Company notes that since its introduction in 2000, including all improvement
> modifications thereafter, the ET-Plus has satisfied the testing criteria required by the
> governing National Cooperative Highway Research Program Report 350 and the
> product approval requirements of the Federal Highway Administration. The
> Company intends to vigorously defend against Mr. Harman's allegations which will
> likely result in certain legal expenses. We do not believe that a loss is probable nor
> can a range of losses be determined. Accordingly, no accrual or range of loss has
> been included in the accompanying consolidated financial statements.

39.     On July 31, 2013, the Company issued a press release announcing its second quarter

2013 financial results.  The Company reported net income of $84.0 million, or $1.06 diluted EPS,

and revenue of $1.1 billion for the second quarter ended June 30, 2013.  The press release stated in

part:

> "As reflected by our consolidated results, Trinity maintained its positive
> momentum during the second quarter, and we expect this trend to continue
> throughout the year," said Timothy R. Wallace, Trinity's Chairman, CEO, and
> President. "Our Rail Group, Energy Equipment Group, and Construction Products
> Group each recorded solid operating results compared to prior quarters. I am pleased
> with their results.  We continued to receive orders for products that serve the oil, gas,
> and chemical industries. The amount of backlog visibility we have in our major
> businesses provides us opportunities to continue to generate additional operating
> efficiencies.  Our outlook for the future remains positive."

40.     On August 1, 2013, Trinity filed its Form 10-Q with the SEC for the second quarter

of 2013.  The Form 10-Q included the same results previously reported in the Company's July 31,

2013 press release and contained signed certifications by defendants Wallace and Perry.  The Form

10-Q stated in pertinent part:

> As previously reported, in a related matter, on January 28, 2013, the Company was advised that the "United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled <u>JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT</u>, Case 2:12-cv-00089-JRG. Although the Company did not receive service of process with respect to the Original Complaint, the Company was served with Mr. Harman's Amended Complaint on May 17, 2013. Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval, ostensibly related to the ET-Plus, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus plus treble civil penalties, costs, and interest. The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration. The Company intends to vigorously defend against Mr. Harman's allegations which will likely result in certain legal expenses. We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.

41.     On October 30, 2013, the Company issued a press release announcing its third quarter

2013 financial results.  The Company reported net income of $99.6 million, or $1.26 diluted EPS,

and revenue of $1.1 billion for the third quarter ended September 30, 2013.  The press release stated

in part:

> "The Company sustained its positive momentum during the quarter, reporting record net income and EPS and extending consecutive year-over-year growth in quarterly revenues and net income to twelve quarters," said Timothy R. Wallace, Trinity's Chairman, CEO, and President. "This is a tremendous accomplishment, and I am very proud of the hard work and talent of our people over the last several years to align our manufacturing capacity with the strong demand for our products that serve the oil, gas, and chemical industries."

> Mr. Wallace continued, "During the quarter, the Rail Group maintained its record $5.1 billion backlog. I am pleased that our structural wind towers business increased its backlog and now has production visibility through 2015. The amount of backlog visibility we have in our major businesses provides opportunities to continue to generate additional operating efficiencies. In addition, our portfolio of businesses remains well-positioned to serve the fast-growing North American oil, gas, and

chemical industries, and we are prepared to respond to demand increases in other industries should broader economic activity improve. Our solid financial position, combined with our extended backlogs, enhances our confidence to seek new growth opportunities for our portfolio of diversified industrial businesses."

42.     On October 31, 2013, Trinity filed its Form 10-Q with the SEC for the third quarter of 2013. The Form 10-Q included the same results previously reported in the Company's October 30, 2013 press release and contained signed certifications by defendants Wallace and Perry.

43.     On February 19, 2014, the Company issued a press release announcing its fourth quarter and full year 2013 financial results. The Company reported net income of $112.8 million, or $1.44 diluted EPS, and revenue of $1.3 billion for the fourth quarter ended December 31, 2013. Additionally, the Company reported net income of $375.5 million, or $4.75 diluted EPS, and revenue of $4.4 billion for the year ended December 31, 2013. The press release stated in part:

> "I am pleased with our strong financial results for the fourth quarter and our overall performance during 2013," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "We achieved a number of key financial milestones, reporting record revenues, net income and earnings per share for both the fourth quarter and the full year. I am very proud of our people, whose capabilities and hard work enabled us to realign a portion of our manufacturing capacity to serve customers for products in the oil, gas, and chemical industries. During 2013, we announced two transactions with institutional investors desiring to invest in a portfolio of leased railcars, RIV 2013, a $1 billion railcar investment partnership, and Element Financial, through a $2 billion program agreement. I expect these transactions will continue to create value for the Company."

> Mr. Wallace added, "During 2014, we will continue to invest resources to position our company to pursue opportunities for infrastructure-related products that support the growing needs in the energy, chemical, transportation, and construction industries. We have a great deal of positive momentum occurring within Trinity."

44.     On February 20, 2014, Trinity filed its Form 10-K with the SEC for the fourth quarter and full year 2013. The Form 10-K included the same results previously reported in the Company's February 19, 2014 press release and contained signed certifications by defendants Wallace and Perry.

45.     On April 29, 2014, the Company issued a press release announcing its first quarter 2014 financial results.  The Company reported net income of $226.4 million, or $2.85 diluted EPS, and revenue of $1.5 billion for the first quarter ended March 31, 2014.  The press release stated in part:

> "The Company sustained its positive momentum during the first quarter, reporting a record level of net income and EPS that exceeded prior record levels by a wide margin," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "During the first quarter, all of our business groups improved their results, increasing both operating profit and margin compared to the prior year. Since the fourth quarter of 2010, we have been successful in extending year-over-year growth in revenue and net income. These are tremendous accomplishments, and I am very proud of our people, whose capabilities and hard work enabled us to realign our manufacturing capacity to meet strong demand for our products and services that support the oil, gas, and chemicals industries."

> Mr. Wallace added, "I am pleased with the value we are creating from the strategic railcar leasing transactions we have completed over the last year. Our leasing platform provides the Company with a tremendous amount of financial flexibility, creating capital available to invest across our portfolio of businesses and grow through acquisitions. During the first quarter of 2014, we acquired the assets of three manufacturing companies that provide us with important competencies as we grow our presence in the energy markets. We will continue to invest resources to position our company for continued growth."

46.     On April 30, 2014, Trinity filed its Form 10-Q with the SEC for the first quarter of 2014.  The Form 10-Q included the same results previously reported in the Company's April 29, 2014 press release and contained signed certifications by defendants Wallace and Perry.

47.     On July 29, 2014, the Company issued a press release announcing its second quarter 2014 financial results.  The Company reported net income of $164.2 million, or $1.01 diluted EPS, and revenue of $1.5 billion for the second quarter ended June 30, 2014.  The press release stated in part:

> "I am pleased with our strong results for the second quarter and our ability to build upon the positive momentum occurring within Trinity over the last several years," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "Consolidated revenues increased 39% year-over-year and net earnings nearly doubled, outpacing revenue growth by a wide margin.  The amount of operating

leverage we obtained and the record $6.5 billion backlog in our major businesses at the end of the second quarter were impressive."

Mr. Wallace added, "We believe this momentum and the investments we have made in 2014 position us well.  Our recently announced agreement to acquire the assets of Meyer Steel Structures is expected to close in the third quarter, subject to regulatory approval. Meyer's strong engineering reputation, manufacturing capabilities, and products with high steel content align well with Trinity's existing competencies and offer opportunities to create additional value.  The acquisition will broaden Trinity's product portfolio and supports our vision of being a premier, diversified industrial company."

48.     On July 30, 2014, Trinity filed its Form 10-Q with the SEC for the second quarter of 2014.  The Form 10-Q included the same results previously reported in the Company's July 29, 2014 press release and contained signed certifications by defendants Wallace and Perry.  The Form 10-Q stated in pertinent part:

As previously reported, on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled <u>Joshua Harman, on behalf of the United States of America, Plaintiff/Relator ("Mr. Harman") v. Trinity Industries, Inc., Defendant</u>, Case 2:12-cv-00089-JRG. Although the Company did not receive service of process with respect to the Original Complaint, the Company was served with Mr. Harman's Amended Complaint on May 17, 2013. The trial began on July 14, 2014 and ended in a mistrial on July 18, 2014. The case is expected to be retried in the fall of 2014. Mr. Harman alleges the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the product in order for such purchasers to obtain payment or approval (eligibility for Federal-aid reimbursement) related to the Company's ET-Plus guardrail end-terminal system. Mr. Harman is seeking damages equaling the amount the United States paid in federal-aid reimbursement for ET-Plus systems from March 6, 2006 to December 31, 2013, less the value of the ET-Plus systems received, trebled, plus civil penalties. Mr. Harman's most recent damage model calculates this amount at approximately $775.7 million exclusive of attorney's fees, costs, and interest. The Company intends to vigorously defend itself against Mr. Harman's allegations which will result in certain legal expenses.

Since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus system has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration ("FHWA"). As affirmed in a Memorandum dated June 17, 2014, the FHWA advised its Division Administrators, Directors of Field Services, Federal Lands Division Engineers, and Safety Field that "The Trinity ET-Plus with 4-inch guide channels became eligible

for Federal reimbursement under FHWA letter CC-94 on September 2, 2005. In addition, the device is eligible for reimbursement under FHWA letters CC-94A and CC-120. Staff confirmed the reimbursement eligibility of the device at heights from 27 3/4 inches to 31 inches. An unbroken chain of eligibility for Federal-aid reimbursement has existed since September 2, 2005 and the ET-Plus continues to be eligible today." This Memorandum is available on the FHWA's web site at:

> http://safety.fhwa.dot.gov/roadway_dept/policy_guide/road_hardware/memo_etplus_wbeam.cfm

Based upon the unbroken chain of eligibility of the ET-Plus system for Federal-aid reimbursement, we do not believe that a loss is probable or that a range of reasonably possible losses exists. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.

49.     On October 12, 2014, the *New York Times* published an article reporting that at least three states had banned the use of guardrail heads manufactured by Trinity.  A few days later, after the close of trading on October 14, 2014, the *New York Times* published an article reporting that Virginia had threatened to remove guardrails sold by Trinity unless it performed additional safety tests.

50.     On October 20, 2014, a jury found that Trinity had deliberately withheld information from the U.S. government about cost-saving changes made to its highway guardrail system that made it more dangerous, ruling the Company defrauded the government by $175 million.  The verdict was the result of the whistleblower lawsuit brought by Joshua Harman, which claimed that Trinity made secret design changes that transformed one of its products into a potentially lethal highway hazard, falsely passing off the product as eligible for federal funding.

51.     On October 20, 2014, *Bloomberg News* published an article entitled "Guardrail Maker's Secret Changes Defrauded Government," which stated in part:

> Trinity Industries Inc. duped the U.S. government by hiding changes to its guardrail systems, a jury found, exposing the company to $1 billion in liability and sending shares plummeting at a time when several states are scrutinizing the safety of the company's products.
>
> The verdict comes as scrutiny of Trinity's ET-Plus device intensifies across the country after it's been blamed for multiple deaths. The Federal Highway

Administration this month asked all states to start submitting information on crashes involving the ET-Plus to the agency's safety office.

The agency, which approves products for use on federal highways, will evaluate the findings of the case and "consider whether it affects the continued eligibility of the ET-Plus," Brian Farber, a spokesman for the Department of Transportation, said in an e-mail after yesterday's verdict by jurors in Marshall, Texas federal court.

About a decade ago, Trinity changed the design of the ET-Plus, according to a whistleblower lawsuit filed by competitor Joshua Harman. Instead of acting as a crash cushion, it can seize up and impale vehicles that hit the end of a guardrail, Harman claimed. The company didn't disclose the changes to the federal government as required and the guardrails remained eligible for federal reimbursements, according to Harman's lawyers.

Jurors deliberated for about 3 1/2 hours before finding the guardrail maker cheated the government of $175 million.

\*       \*       \*

Damages to be awarded against the company will be tripled and added to a penalty to be determined by the judge, with total liability possibly reaching $1 billion, a company lawyer said in May. The company had $934 million in cash and equivalents available as of June 30, according to financial reports. The $525 million jury verdict is the third biggest in the U.S. this year.

52.    Subsequently on October 20, 2014, Trinity issued a press release entitled "Statement by Trinity Industries, Inc.," which stated in part:

Earlier today a jury in the U.S. District Court for the Eastern District of Texas returned a verdict against Trinity Industries, Inc. in a False Claims Act case. The jury awarded $175 million in damages.

The Company respects the jury's decision. However, Trinity believes the decision cannot and will not withstand legal scrutiny. The Company strongly believes the courts will affirm its position.

53.    After this news, the price of Trinity stock fell $4.45 per share, to close at $31.63 per share on October 20, 2014, a one-day decline of 12% on volume of 12.8 million shares. This was the biggest one-day drop in more than five years.

54.    On October 24, 2014, Trinity issued a press release entitled "Trinity Highway Products to Stop Shipments of ET-Plus® System." The press release stated in part:

Trinity Highway Products, LLC announced today that it will stop the shipment of the ET-Plus® System until additional crash testing can be completed.

The Federal Highway Administration (FHWA) recently requested additional crash testing of the ET-Plus® System in support of its ongoing evaluation of the ET-Plus® System. The Company will continue working with FHWA related to further testing and will stop shipment of the product until requested testing is completed.

"In light of FHWA's request, the right thing to do is to stop shipping the product until the additional testing has been completed," said Gregg Mitchell, President, Trinity Highway Products, LLC. "We have confidence in the ET-Plus® System as designed and crash tested by Texas A&M Transportation Institute. It has met all tests previously requested by FHWA. We take the safety of the products we manufacture very seriously." Gregg Mitchell said.

55.    On October 28, 2014, the Company issued a press release announcing its third quarter 2014 financial results.  The Company reported net income of $149.4 million, or $0.90 diluted EPS, and revenue of $1.56 billion for the third quarter ended September 30, 2014.  The press release stated in part:

"During the third quarter, Trinity generated record revenues and its 17th consecutive quarter of year-over-year growth in net earnings," said Timothy R. Wallace, Trinity's Chairman, CEO and President.  "Our major businesses reported a record combined backlog valued at more than $7.1 billion at the end of the third quarter, representing 15% growth year-over-year.  I continue to be impressed with our team of people and the amount of operating leverage they are obtaining.  Their capabilities and hard work have enabled us to realign our manufacturing capacity to meet strong demand for our products and services that support the North American energy renaissance."

Mr. Wallace added, "In addition to reporting strong financial results during the quarter, we made continued progress toward achieving our vision of being a premier, diversified industrial company.  This progress is demonstrated by the more than $700 million we have committed to acquisitions in our Energy Equipment Group thus far in 2014. The integration of Meyer Steel Structures, which closed in August, is progressing smoothly."

56.    On October 29, 2014, Trinity filed its Form 10-Q with the SEC for the third quarter of 2014.  The Form 10-Q included the same results previously reported in the Company's October 28, 2014 press release and contained signed certifications by defendants Wallace and Perry.  The Form 10-Q stated in pertinent part:

We previously reported that on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act ("Act") complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division ("District Court") styled <u>Joshua Harman, on behalf of the United States of America, Plaintiff/Relator v. Trinity Industries, Inc., Defendant</u>, Case 2:12-cv-00089-JRG. Mr. Harman alleged the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the Company's ET-Plus® System, a highway guardrail end-terminal ("ET-Plus"), in order for such purchasers to obtain federal-aid reimbursement for payments made on such purchases. On October 20, 2014 a trial of this case concluded with a jury verdict stating that the Company and its subsidiary, Trinity Highway Products, LLC, "knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million. Additionally, the District Court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The District Court has the discretion to establish the civil penalty amount between $5,500 and $11,000 per violation. In this regard, the Relator contended during trial that certain invoices submitted to purchasers of the ET-Plus certified that the product was accepted by the Federal Highway Administration ("FHWA") and was therefore eligible for federal-aid reimbursement. Based on Relator's damages model in this respect, the range of possible civil penalties is $5,500 (if the District Court determines there has been a single violation) to $184 million (if the District Court determines that each invoice for the product was a violation).

The District Court has not yet entered a final judgment or determined a civil penalty amount. While the Company believes the District Court does not have the evidence required under the law to quantify civil penalties, the range of loss in this case, based on the jury's verdict and Mr. Harman's damage model for civil penalties, is $525 million to $709 million, exclusive of attorney's fees, costs, and interest.

\*       \*       \*

On October 21, 2014, the FHWA advised the Company that in light of the jury's finding the Company must perform additional crash testing of the ET-Plus to support the FHWA's ongoing evaluation of ET-Plus performance. On October 24, 2014, the Company issued a press release stating that it will stop shipments of the ET-Plus until additional crash testing of the ET-Plus can be completed. Prior to the Company's press release, certain states had either removed the ET-Plus from their respective qualified products list or suspended further purchases of the ET-Plus pending the outcome of the FHWA-requested crash tests. The state of Virginia is also evaluating a potential recall of all ET-Plus products installed on Virginia roadways. Other states could take similar or different actions. While the financial impacts of such actions are currently unknown, they could be material. The Company is working with the FHWA to develop a plan for performing the requested crash testing and analysis.

\*       \*       \*

The Company is currently defending a number of product liability lawsuits in several different states that are alleged to involve the ET-Plus. These cases are diverse in light of the randomness of collisions in general and the fact that each accident involving roadside devices such as an ET-Plus, or any other fixed object along the highway has its own unique facts and circumstances. Report 350 recognizes that performance of even the most carefully researched roadside device is subject to physical laws and the crash worthiness of vehicles.   While the Company is vigorously defending these lawsuits, the recent verdict in the Harman matter may affect the ultimate outcome in one or more of these cases. Moreover, the Company expects the recent verdict, coupled with the media attention the verdict has generated, will prompt the plaintiff's bar to seek out vehicle accident victims involved in collisions with an ET-Plus as potential clients, which may result in additional product liability lawsuits being filed against the Company. The Company carries general liability insurance to mitigate the impact of adverse verdict exposures in these cases.

57.     On December 12, 2014, *Bloomberg News* reported that, according to two guardrail industry professionals, in order to address the allegedly lethal flaw, Trinity began making yet another undisclosed version of the system.

58.     On February 18, 2015, the Company issued a press release announcing its fourth quarter and full year 2014 financial results.  The Company reported net income of $138.2 million, or $0.86 diluted EPS, and revenue of $1.7 billion for the fourth quarter of 2014.   Additionally, the Company reported net income of $678.2 million, or $4.19 diluted EPS, and revenue of $6.2 billion for the year ended December 31, 2014.  The press release stated in part:

> "During 2014, we utilized the strengths of our integrated business model to achieve record financial results, with all of our business segments reporting higher revenue and profit," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "Our Rail Group received a record number of orders in 2014, and its $7.2 billion order backlog provides significant production visibility. Our Leasing Group achieved record financial results in 2014 and generated strong earnings and cash flow from strategic railcar leasing transactions completed during the year. We invested over $700 million in acquisitions within our Energy Equipment Group, which added complementary product lines that provide long-term growth opportunities."

59.     On February 19, 2015, Trinity filed its Form 10-K with the SEC for the fourth quarter and full year ended December 31, 2014.  The Form 10-K included the same results previously

reported in the Company's February 18, 2015 press release and contained signed certifications by

defendants Wallace and Perry.  The Form 10-K stated in pertinent part:

> We previously reported that on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act ("Act") complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division ("District Court") styled <u>Joshua Harman, on behalf of the United States of America, Plaintiff/Relator v. Trinity Industries, Inc., Defendant</u>, Case 2:12-cv-00089-JRG. Mr. Harman alleged the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the Company's ET-Plus® System, a highway guardrail end-terminal ("ET Plus"), in order for such purchasers to obtain Federal-aid reimbursement for payments made on such purchases. On October 20, 2014 a trial of this case concluded with a jury verdict stating that the Company and its subsidiary, Trinity Highway Products, LLC, "knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million. Additionally, the District Court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The District Court has the discretion to establish the civil penalty amount between $5,500 and $11,000 per violation. In this regard, the Relator contended during trial that certain invoices submitted to purchasers of the ET Plus certified that the product was accepted by the Federal Highway Administration ("FHWA") and was therefore eligible for Federal-aid reimbursement. Based on Relator's damages model in this respect, the range of possible civil penalties is $5,500 (if the District Court determines there has been a single violation) to $184 million (if the District Court determines that each invoice for the product was a violation).

> The District Court has not yet entered a final judgment or determined a civil penalty amount. While the Company believes the District Court does not have the evidence required under the law to quantify civil penalties, the total range of loss in this case, based on the jury's verdict and Mr. Harman's damage model for civil penalties, is $525 million to $709 million, exclusive of attorney's fees, costs, and interest.

*      *      *

> On October 21, 2014, in light of the jury's finding, the FHWA requested that the Company perform eight (8) additional crash tests of the ET Plus to support the FHWA's ongoing evaluation of ET Plus performance. The eight tests were comprised of four tests at a guardrail height of 27 3/4" and four tests at a guardrail height of 31". On October 24, 2014, the Company issued a press release stating that it will stop shipments of the ET Plus until additional crash testing of the ET Plus was completed. The requested tests were conducted in December 2014 and January 2015, in accordance with Report 350 at Southwest Research Institute, an FHWA-approved

and independent research facility. Report 350 sets forth the performance evaluation criteria applicable to the ET Plus and many other roadside safety features used on U.S. highways. The ET Plus extruder heads tested in all eight tests were randomly selected by the FHWA from inventory at the California Department of Transportation. These extruder heads were representative of what is in use on U.S. and Canadian highways.

60.     On April 21, 2015, *Bloomberg News* published an article entitled "U.S. Opens Criminal Probe Into Highway Guardrails Alleged to Turn Into Spears on Impact," which stated in part:

> The U.S. Justice Department is conducting a criminal investigation into the use of a highway guardrail system linked to at least eight deaths, according to people familiar with the matter, signaling a new wave of potential woes for manufacturer Trinity Industries Inc.

61.     As a result of this news, the price of Trinity stock plummeted $3.43 per share to close at $32.82 per share on April 22, 2015, a one-day decline of over 9% on volume of nearly 8.8 million shares.

62.     Subsequently, on April 24, 2015, Trinity confirmed that it was the target of a DOJ investigation.

63.     On this news, the price of Trinity stock fell $4.66 per share, to close at $28.70 per share, a one-day decline of nearly 14% on volume of nearly 13.6 million shares.

64.     Then, on April 29, 2015, *Bloomberg News* published an article entitled "Trinity Gets Subpoena in Probe of Guardrail Safety Device." The article reported that Trinity had received a subpoena from the DOJ regarding "its allegedly defective guardrail safety system." The article further stated in part:

> The subpoena, issued by U.S. Attorney Carmen Ortiz in Boston, seeks documents from 1999 and later regarding Trinity's guardrail end terminals, which are designed to absorb the impact of a crash, the company said in a regulatory filing. The subpoena, which Trinity said it received on April 28, comes one week after Bloomberg News first reported a federal criminal investigation involving the company's ET-Plus guardrail system.

- 23 -

65.     As a result of this news, the price of Trinity stock dropped another $0.98 per share to close at $27.09 per share on April 30, 2015, a one-day decline of 3.5% on volume of 4.1 million shares.

66.     As a result of defendants' false statements, Trinity securities traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending the Company's stock price down 46% from its Class Period high and causing economic harm and damages to Class members.

## LOSS CAUSATION/ECONOMIC LOSS

67.     During the Class Period, defendants made false and misleading statements by misrepresenting the safety of Trinity's guardrail systems and engaged in a scheme to deceive the market.  Defendants' conduct artificially inflated the prices of Trinity securities and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations were disclosed to market participants, the prices of Trinity securities plummeted, as the prior artificial price inflation came out of the securities.  As a result of their purchases of Trinity securities during the Class Period, plaintiff and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

68.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Trinity securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

69.     At all relevant times, the market for Trinity securities was efficient for the following reasons, among others:

(a)     Trinity stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Trinity filed periodic public reports with the SEC; and

(c)     Trinity regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

70.     Many (if not all) of defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

71.     Trinity's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

72.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Trinity who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions

underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Trinity publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE and there are over 155 million shares of Trinity stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Trinity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.     Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; and (iv) whether defendants' statements and/or omissions artificially inflated the prices of Trinity securities and the extent and appropriate measure of damages.

76.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

79.     Plaintiff incorporates ¶¶1-78 by reference.

80.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Trinity securities during the Class Period.

82.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Trinity securities.  Plaintiff and the Class would not have purchased Trinity securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

83.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Trinity publicly traded securities during the Class Period.

### COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

84.     Plaintiff incorporates ¶¶1-83 by reference.

85.     During the Class Period, defendants acted as controlling persons of Trinity within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Trinity, the Individual Defendants had the power and ability to control the actions of Trinity and its employees.  Trinity controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 19, 2015

THE LAW OFFICE OF BALON B. BRADLEY
BALON B. BRADLEY, Bar No. 02821700


_____
*s/ Balon B. Bradley*
BALON B. BRADLEY

5473 Blair Road, Suite 100
Dallas, TX  75231
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON
NATHAN R. LINDELL
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Trinity.docx