UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD J. ISOLDE, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:15-cv-02093-K **(CONSOLIDATED)** |
| Plaintiff, | § § | <u>CLASS ACTION</u> |
| vs. | § § | Judge Ed Kinkeade |
| TRINITY INDUSTRIES, INC., TIMOTHY R. WALLACE, JAMES E. PERRY and GREGORY B. MITCHELL, | § § § § | |
| Defendants. | § § § | |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

1139665_1

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................. 9

III.   THE PARTIES .......................................................................................... 9

    A.   Lead Plaintiffs ............................................................................... 9

    B.   Defendants ................................................................................... 10

IV.    FACTUAL BACKGROUND .................................................................. 12

    A.   Trinity's Construction Products Group ....................................... 13

    B.   The FHWA's Regulation of Highway Products .......................... 13

    C.   Trinity's Guardrail End Terminal ............................................... 16

        1.   The ET-2000 ..................................................................... 16

        2.   The ET-Plus ...................................................................... 17

    D.   Trinity's Secret Modifications to the ET-Plus ............................ 18

    E.   Trinity Hides the Modifications and Fails to Crash Test the Secretly Modified ET-Plus ........................................................... 20

    F.   Trinity Falsely Represents that the Secretly Modified ET-Plus Is FHWA Approved .......................................................... 22

    G.   Serious – and Fatal – Problems Arise with Trinity's Secretly Modified ET-Plus Units ............................................... 23

    H.   A Whistleblower Discovers the Secret Modifications to the ET-Plus, and Trinity's Manipulation of the Regulatory Process Continues ................................. 25

        1.   The Secretly Modified ET-Plus Is Discovered .............. 25

        2.   Trinity Continues to Mislead the Public and Downplay the Secret Modifications to the ET-Plus ......................... 29

        3.   Harman Files a *Qui Tam* Lawsuit Against Trinity Under the False Claims Act, Which Ends in a Mistrial After Trinity Is Suspected of Witness Tampering .............. 33

    I.   The Truth Begins to Emerge Regarding Trinity's Fraudulent Scheme ................. 37

    J.   Trinity's Fraudulent Scheme Continues Following the Whistleblower Action Verdict ..................................................... 41

    K.   The DOJ Initiates a Criminal Investigation of Trinity ............... 51

**Page**

V.   DEFENDANTS' FALSE AND MISLEADING MATERIAL
     MISSTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .................... 53

     A.   Defendants' Affirmative Misstatements ................................................. 53

     B.   Defendants' Insider Trading Gave Rise to a Duty to Disclose the Secret
          Modifications to the ET-Plus ............................................................... 65

     C.   Defendants' Financial Statements Violated GAAP and SEC Disclosure
          Rules ................................................................................................. 65

          1.   GAAP Violations: ASC 450 ....................................................... 67

               a.   Defendants Violated ASC 450 by Failing to Adequately
                    Disclose Trinity's Litigation Exposure ............................ 69

               b.   Defendants Violated ASC 450 by Failing to Accrue a Loss
                    for the Whistleblower Action ........................................ 71

          2.   SEC Regulation S-K Item 303: Management's Discussion and
               Analysis .................................................................................. 72

               a.   Defendants' MD&A Failed to Adequately Disclose
                    Trinity's Financial Exposure to ET-Plus Litigation ......... 73

               b.   Defendants' MD&A Failed to Adequately Disclose the
                    Negative Business Impact of Trinity's Fraudulent
                    Modifications to the ET-Plus ........................................ 74

          3.   Defendants' Violations of GAAP and Item 303 Were Material ......... 75

VI.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 76

VII. LOSS CAUSATION ........................................................................................ 84

     A.   October 13, 2014: the *Times* Reveals Significant Details Regarding
          Defendants' Fraudulent Misconduct ..................................................... 85

     B.   October 20, 2014:  Coverage of the Whistleblower Action Reveals
          Additional Facts of Trinity's Fraud ....................................................... 86

     C.   October 23-24, 2014:  News Continues to Emerge Regarding the Fallout
          from Defendants' Fraud ...................................................................... 88

     D.   October 29, 2014:  Third Quarter 2014 Earnings Results Disclose Details
          Regarding the Fallout from Defendants' Fraud ....................................... 89

     E.   April 22, 2015: *Bloomberg* Announces the DOJ's Investigation of Trinity .......... 90

     F.   April 24, 2015:  Trinity Confirms the DOJ's Investigation ................................. 91

**Page**

VIII.    THE PRESUMPTION OF RELIANCE ...................................................... 92

IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ............................. 93

X.    CLASS ACTION ALLEGATIONS ....................................................... 93

XI.    CAUSES OF ACTION ................................................................ 95

XII.    PRAYER FOR RELIEF ............................................................... 97

XIII.    JURY DEMAND ...................................................................... 98

1139665_1

Lead Plaintiffs Plumbers and Pipefitters National Pension Fund ("Plumbers and Pipefitters"), United Association Local Union Officers & Employees' Pension Fund (the "UA Fund") and the Department of the Treasury of the State of New Jersey and its Division of Investment ("New Jersey") (collectively, Plumbers and Pipefitters, the UA Fund and New Jersey are hereinafter referred to as "Lead Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of their undersigned counsel. This investigation included, but was not limited to, review and analysis of: (i) public filings with the United States Securities and Exchange Commission ("SEC") made by Defendant Trinity Industries, Inc. ("Trinity" or the "Company"); (ii) research reports by securities and financial analysts; (iii) transcripts of Trinity's earnings conference calls and industry conferences; (iv) publicly available presentations by Trinity; (v) Trinity's press releases and media reports; (vi) Trinity's securities pricing data; (vii) consultations with relevant experts; (viii) documents and information from the records in related litigation; (ix) interviews of persons with knowledge relevant to the claims herein; (x) documents obtained through Freedom of Information Act requests; and (xi) other publicly available material and data identified herein. Counsels' investigation into the factual allegations contained herein is ongoing, and many of the relevant facts are known only by the Defendants[1] or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and/or discovery.

## I.   INTRODUCTION

1.      This is a federal securities class action brought on behalf of all persons who purchased or otherwise acquired Trinity's publicly traded common stock between February 16, 2012 and April 24, 2015, inclusive (the "Class Period"), and were damaged thereby (the "Class"). The claims asserted herein are alleged against Trinity, its Chief Executive Officer ("CEO") Wallace, its Chief

---

[1]   "Defendants" refers collectively to Trinity, Timothy R. Wallace ("Wallace"), James E. Perry ("Perry") and Gregory B. Mitchell ("Mitchell"). Wallace, Perry and Mitchell are collectively referred to herein as the "Individual Defendants."

Financial Officer ("CFO") Perry and the President of its wholly-owned subsidiary Trinity Highway Products, LLC ("THP"), Mitchell.  The claims in this action arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      The story here begins with what should be a benign process – regulatory approval for the modification of a highway safety product.  Defendants' conduct, however, was anything but benign.   Indeed, what began as a failure by Trinity to disclose and adequately test secret modifications it made to a previously approved safety product soon devolved into a years-long fraudulent scheme involving numerous false and misleading statements to investors.  The underlying facts are egregious, reportedly involving ***more than 40 deaths*** of innocent motorists, affirmative ***threats and acts of intimidation*** directed at an expert safety witness, the ***destruction of records*** and relevant testing evidence, a ***unanimous jury verdict imposing liability in excess of $660 million*** on Trinity for knowingly ***defrauding the federal government***, a multitude of ***personal injury and product liability lawsuits***, and a ***criminal investigation by the United States Department of Justice*** ("DOJ").  As the true facts concerning Defendants' misleading statements and omissions became known, those disclosures wiped out more than ***$2.8 billion*** in Trinity's market capitalization.

3.      Trinity is an industrial company based in Dallas, Texas.  The fraudulent conduct at issue here centrally concerns Trinity's design, manufacture and sale of highway guardrail systems and their constituent parts.  These products are sold to federal and state transportation departments to be installed on highways and roads throughout the United States.  One of the key components of this product line is the guardrail end terminal, which is attached at the beginning or end point of a guardrail and is designed to absorb the impact of a collision and redirect any vehicle that veers into it.  The terminal end is a critical component of highway safety, and Trinity's ET-Plus terminal end was one of its key highway safety products.

4.      Throughout the Class Period, Defendants intentionally misrepresented and omitted material facts concerning dangerous changes Trinity secretly made to the ET-Plus, the Company's fraudulent concealment and cover-up of those changes, and the massive liabilities and negative business impact created by Defendants' actions.   Specifically, Defendants' misstatements and

- 2 -

omissions to investors included, *inter alia*, Defendants': (i) failure to disclose changes to the ET-Plus, which made it more likely to cause death or serious bodily injury to motorists; (ii) repeated misrepresentations that the Company was in compliance with applicable regulations and had obtained valid approvals from the Federal Highway Administration (the "FHWA"); and (iii) materially misstated financial results and statements, which failed to disclose and/or accrue the massive, known and estimable financial exposure and liabilities Trinity incurred as a result of its fraudulent changes to the ET-Plus. These misstatements and omissions, which are detailed below in §V., *infra*, caused Trinity's stock to trade at artificially inflated prices throughout the Class Period, resulting in substantial damages to members of the Class when the truth was finally revealed in 2014 and 2015.

5. Defendants' misstatements and omissions were knowingly made with fraudulent intent. Indeed, throughout the Class Period, the Individual Defendants discussed, and made key decisions regarding, the details of their undisclosed and dangerous changes to the ET-Plus, and the liabilities and fallout that ensued. In fact, sworn testimony in related litigation confirms that they met frequently to discuss this fallout beginning in 2012. Based on such involvement, each of the Individual Defendants knew that their statements were false and omitted material facts. In addition, Defendants Wallace and Perry were motivated by and benefited from these omissions and misrepresentations through their own insider trading – with personal *sales of over $30 million* worth of Trinity common stock at inflated prices during the Class Period.

6. The story of Defendants' fraud traces back through the history of the ET-Plus. The ET-Plus, in its original formulation, was introduced to the market in January 2000 after having gone through the rigorous FHWA approval process, which required both testing of the product and detailed disclosures reflecting the product's specifications. In 2004 and 2005, Trinity made a number of surreptitious changes to the structural design of the ET-Plus, which were designed to reduce costs and increase sales revenues. The changes, described in more detail *infra*, included a reduction in the product's critical "guide channel" from five inches to four inches and alterations to the product's welds, exit gap, throat inlet and feeder channel. These changes had a dramatic impact on the safety profile of the ET-Plus, rendering the product much more likely to injure, and even kill, motorists in

- 3 -

the event of an accident.  Yet, Trinity failed to properly test the changes and affirmatively chose not to disclose them to the FHWA.

7.    Indeed, internal Trinity e-mails confirm that the Company planned from the start to implement the above structural changes "***with no announcement***" to the public or the FHWA.[2]  In fact, Trinity not only failed to "announce" the changes, but actually went out of its way to affirmatively conceal them.  In July 2005, for example, Trinity submitted an application to the FHWA for approval of an increase in the overall installation height for its ET-Plus.  This submission, however, repeatedly referred to the end terminal as a "standard" ET-Plus and ***failed to disclose in any way*** the structural changes made to the ET-Plus, despite the fact that the changes had already been implemented by that time – as Trinity would later admit.

8.    Trinity witnesses have also since admitted that the crash tests submitted in connection with the 2005 application were inadequate and not designed to evaluate the safety impact of the structural changes made to the ET-Plus.  Unsurprisingly, Trinity covered its tracks by ***discarding or destroying*** both the drawings reflecting the changes and the actual devices used in the tests.  Even worse, Trinity actually conducted five additional crash tests in 2005 and 2006, ***all of which failed***, but the Company ***never disclosed*** those tests to the FHWA or the public.  The modified ET-Plus's horrific safety record has since revealed, however, what Trinity knew when the ET-Plus failed the secret, undisclosed crash tests in 2005 and 2006: the Company's surreptitious design changes to the ET-Plus transformed the supposed "safety" component into a dangerous, deadly product that could impale vehicles upon impact.

9.    While sales of the secretly modified ET-Plus continued to expose motorists to dangerous injuries, Trinity was seeking to insulate its position in the terminal-end market.  In 2010, Trinity began to investigate whether a competitor, SPIG Industry ("SPIG"), was infringing on its ET-Plus patents.  SPIG is owned by Joshua Harman ("Harman" or the "Whistleblower"), who would eventually bring litigation against Trinity related to the undisclosed changes to the ET-Plus.  In September 2011, Defendant Wallace personally authorized Trinity to sue SPIG for alleged patent

---

[2]    Unless otherwise noted, all emphasis herein is added.

- 4 -

infringement.  During discovery in that litigation, Harman learned of the undisclosed changes to the ET-Plus and that those changes had not been submitted to, reviewed or approved by the FHWA.

10.     In January 2012, Harman met with Defendant Mitchell and Trinity's Senior Vice President of the Construction Products Group William McWhirter ("McWhirter"), and disclosed to them that he was aware of the secret ET-Plus modifications, and had connected those changes to numerous accidents where the ET-Plus had failed.  Eventually, in 2012 the SPIG patent litigation was resolved, with Defendant Wallace personally authorizing a confidential settlement.  Despite both Wallace and Mitchell's personal knowledge of and involvement with the SPIG patent litigation, and Harman's discovery of Trinity's secret modifications to the ET-Plus, Trinity failed to take any action to come clean and disclose the truth about its dangerous changes to the FHWA or investors. Instead, Defendants chose to double-down and embark on an aggressive scheme to defraud their investors and the general public.

11.     The Class Period begins shortly after these events, in February 2012, when Defendants began affirmatively misrepresenting and concealing material facts from the investing public regarding the dangerous changes Trinity had secretly made to the ET-Plus.  For example, from the outset of the Class Period, Defendants repeatedly misrepresented in their SEC filings that the ET-Plus "satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration," notwithstanding Defendants' knowledge that Trinity had manipulated the FHWA approval process by, among other things, failing to disclose to the FHWA: (i) the structural design changes made to the ET-Plus; (ii) the failed crash tests from 2005 and 2006; and (iii) that the test results submitted to the FHWA were not designed to assess, and could not assess, the safety of the undisclosed design changes.

12.     Defendants made other similar false statements throughout the Class Period, and repeatedly omitted from their statements to investors the true facts regarding the dangerous changes they had secretly made to the ET-Plus, and their fraudulent efforts to conceal and cover-up those changes.  In addition, instead of disclosing the massive liabilities and financial exposure the Company

- 5 -

was facing as a result of its fraudulent design changes to the ET-Plus – and accruing for liabilities the Company had, in fact, already incurred – Trinity accrued no reserves and failed to properly disclose its liabilities and financial exposure throughout the Class Period, violating Generally Accepted Accounting Principles ("GAAP") and SEC disclosure rules as a result.

13.     Defendants' statements and omissions were knowingly false and misleading based on, *inter alia*, their awareness of the ET-Plus's inadequate crash testing record, their participation in the SPIG patent case, personal meetings with Harman, weekly internal meetings to discuss problems related to the ET-Plus, and Defendants' knowledge throughout the Class Period that the problems created by their secret modifications to the ET-Plus would not be going away quietly.  In particular, by February 2012 at the latest, Defendants knew that Harman had approached the FHWA and provided the agency a detailed presentation of his findings regarding the changes to the ET-Plus and the multitude of serious and deadly accidents associated with its poor performance.  Shortly thereafter, Harman filed a *qui tam* action, in the name of the federal government, alleging that Trinity violated the False Claims Act by fraudulently selling the surreptitiously modified ET-Plus without regulatory approval (the "Whistleblower Action").  Even with this knowledge, Defendants took no corrective action and touted to investors the success of the Company's highway products business and Trinity's compliance with applicable safety guidelines.

14.     The record in the Whistleblower Action makes clear that Trinity also influenced the FHWA's failure to timely act on Harman's then-still secret discovery of changes to the ET-Plus.  Specifically, after reviewing Harman's presentation, Nicholas Artimovich ("Artimovich"), a highway engineer in the Office of Safety Technologies at the FHWA, e-mailed Trinity executives, stating that the presentation "provides some pretty good documentation that there are [ET-Plus terminal-ends] out there that do not conform to the crash tested designs.''  Artimovich also wrote that it was "***hard to ignore the fatal results***" associated with the secretly modified ET-Plus.  Shortly thereafter, Trinity exerted its influence and arranged for an "intimate" meeting between Artimovich and senior Trinity executives, including Defendant Mitchell, at a hotel in Florida.  In the aftermath of that meeting, the

1139665_1

FHWA and Artimovich *took no action* concerning the dangerous changes Trinity had secretly made to its ET-Plus product.

15.     This sequence of events makes clear that the FHWA never properly approved the secretly modified ET-Plus.  The proper testing was never done, and the documentation was – at best – incomplete and insufficient.  Only later scrutiny from Congress, the DOJ, state attorneys general, highway officials, and outside safety organizations ultimately cast a light on the FHWA's acquiescence to (and perhaps participation in) Trinity's fraud.  It is now clear that the FHWA was a captive regulator subject to inappropriately close relationships with, influence from and/or possible collusion with Trinity.

16.     Trinity's desperation to suppress the truth was demonstrated by the Company's conduct as the Whistleblower Action approached trial in July 2014.  Specifically, on the eve of trial, in July 2014, Defendant Mitchell *intimidated and threatened* a potential key witness, University of Alabama engineering professor, Dr. Dean Sicking ("Dr. Sicking"), who had invented the ET-Plus's predecessor product and who had sought to explain his concerns about the unsafe modifications to the ET-Plus to the FHWA.  When these tactics were revealed, Judge Rodney Gilstrap quickly declared a mistrial.

17.     Despite Trinity's best efforts to suppress the truth and intimidate a potential witness, the second trial in the Whistleblower Action, which took place in October 2014, revealed facts showing Trinity's fraudulent concealment of the changes to the ET-Plus, the dangerous effects of those changes, the lack of proper regulatory approval for the changes, and the fact that Trinity had consistently failed to properly disclose and accrue reserves for the liabilities associated with their wrongdoing.  Ultimately, as these facts, among others, were disclosed and the market learned the truth concerning Defendants' fraudulent scheme, investors were shocked and $2.8 billion in Trinity's market capitalization evaporated.

18.     The disclosures began when media scrutiny surrounding the second trial in the Whistleblower Action highlighted the massive problems and safety issues that Trinity had created.  On October 12, 2014, *The New York Times* (the "*Times*") reported on some of the above-outlined

- 7 -

failures of the FHWA in connection with its monitoring and enforcement of ET-Plus's approval with applicable safety guidelines, while also noting that three states had already banned the ET-Plus due to safety concerns and that the ET-Plus had been blamed for multiple deaths and numerous injuries.  On this news, Trinity's shares immediately declined by 8%, wiping out $323 million in market capitalization in one day.

19.    The news continued to get worse from there.  On October 20, 2014, after deliberating for just three hours, the jury in the Whistleblower Action returned a unanimous verdict for the plaintiff, finding that Trinity had affirmatively defrauded the U.S. government in the amount of *$175 million*, which damages were trebled under the False Claims Act for a total of *$525 million* (plus civil penalties and attorneys' fees, which later led to a final judgment in the amount of *$663 million*). Media scrutiny in connection with the jury verdict again exposed additional facts regarding Trinity's fraudulent scheme concerning the dangerous changes it had secretly made to the ET-Plus.  On this news, Trinity shares declined by nearly 13% on October 20, 2014, wiping out $694 million in market capitalization.

20.    The cascade of bad news continued for the balance of 2014 and into 2015, with media reporting on further state actions to ban the ET-Plus, and multiple congressional inquiries into the FHWA's actions and the safety of the ET-Plus.  This scrutiny caused Trinity to suspend sales of the ET-Plus, and also to reveal in its financial results for the third quarter of 2014 significant additional financial exposure as a result of the judgment in the Whistleblower Action.  Throughout all of this, however, Defendants continued to falsely reassure investors and deny any wrongdoing.

21.    Indeed, it was not until April 2015 that the full scope of Defendants' fraud came to light.  Specifically, on April 21, 2015 (after the markets closed) and April 24, 2015, respectively, it was reported, and then confirmed by Trinity, that the DOJ had launched a criminal investigation into, among other things, the ET-Plus and Trinity's relationship with the FHWA.  At the time, *Bloomberg News* ("*Bloomberg*") reported that "the most serious turn in Trinity's guardrail saga may be yet to come, adding the specter of criminal wrongdoing to previous allegations of fraud and deadly design changes."  In reaction to these reports, Trinity shares suffered massive declines on April 22 and 24,

- 8 -

2015, respectively, wiping out an aggregate of nearly $1.3 billion of the Company's market capitalization on those two dates.

## II.      JURISDICTION AND VENUE

22.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

23.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

24.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Trinity has its headquarters in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

25.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## III.     THE PARTIES

### A.      Lead Plaintiffs

26.      Lead Plaintiff Plumbers and Pipefitters is a multi-employer plan that manages the pension assets for its participants and their families.  Plumbers and Pipefitters is headquartered in Alexandria, Virginia.  Plumbers and Pipefitters purchased Trinity common stock during the Class Period and was damaged thereby, as demonstrated by the certification filed by Plumbers and Pipefitters in connection with its motion requesting appointment as lead plaintiff in this matter.

27.      Lead Plaintiff UA Fund is a multi-employer plan providing benefits to local union officers employed by constituent local unions of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada.  The UA Fund is headquartered in Annapolis, Maryland.  The UA Fund purchased Trinity common stock

during the Class Period and was damaged thereby, as demonstrated by the certification filed by the UA Fund in connection with its motion requesting appointment as lead plaintiff in this matter.

28.     Lead Plaintiff New Jersey manages public pension funds for the benefit of current and retired employees of the State of New Jersey.  New Jersey is headquartered in Trenton, New Jersey.  New Jersey purchased Trinity common stock during the Class Period and was damaged thereby, as demonstrated by the certification filed by New Jersey in connection with its motion requesting appointment as lead plaintiff in this matter.

**B.     Defendants**

29.     Defendant Trinity is a diversified industrial company that owns businesses providing products and services to the energy, transportation, chemical and construction sectors.  Trinity's principal executive offices are located at 2525 Stemmons Freeway, Dallas, Texas 75207-2401.  Trinity's common stock trades on the NYSE under the ticker symbol "TRN."

30.     Defendant Wallace is, and at all relevant times was, the Company's CEO, President, and Chairman of the Board.  Wallace has held these positions since 1999.  Wallace first joined the Company in 1975 and has held various management positions since then.  Wallace has been on Trinity's Board of Directors since 1992.  In its April 1, 2015 proxy statement, Trinity emphasized Wallace's "strong performance in a variety of roles, requiring a wide range of business and interpersonal skills," and further noted that "[h]e has provided excellent leadership to the Company in his current positions, exhibiting sound judgment and business acumen."  Before and throughout the Class Period, Wallace had direct and extensive knowledge of Trinity's fraudulent scheme to secretly make dangerous modifications to the ET-Plus, and to affirmatively conceal such changes – and their negative financial implications – from investors and the general public.  During the fiscal years included in the Class Period (2012-2015), Wallace received approximately $39 million in executive compensation and bonuses.  Wallace also engaged in insider sales of Trinity common stock during the Class Period at inflated prices, from which he received proceeds of $28 million.

31.     Defendant Perry is, and at all times throughout the Class Period was, the Company's CFO and Senior Vice President.  Perry has held these positions since 2010 and 2011, respectively.  In

his role as Senior Vice President and CFO, Perry supports the CEO on the strategic direction for the Company.  Perry maintains management responsibility for the Accounting, Finance, Treasury, Investor Relations, Business Development, Risk Management, Budgeting and Forecasting, and Information Technology functions, and he has worked closely with the Board of Directors throughout his career at Trinity.  Perry joined Trinity in 2004 and was appointed Corporate Treasurer in April 2005.  Perry was named a Vice President in 2006 and was promoted to Vice President, Finance and Treasurer in 2007.  Before and throughout the Class Period, Perry had direct and extensive knowledge of Trinity's fraudulent scheme to secretly make dangerous modifications to the ET-Plus, and to affirmatively conceal such changes – and their negative financial implications – from investors and the general public.  During the fiscal years included in the Class Period (2012-2015), Perry received approximately $10.6 million in executive compensation and bonuses.  Perry also engaged in insider sales of Trinity common stock during the Class Period at inflated prices, from which he received proceeds of $2.5 million.

32.    Defendant Mitchell is, and at all times throughout the Class Period was, the President of THP.  Mitchell has held the position of THP President since October 2010.  As the head executive officer of THP, Mitchell was responsible for furnishing false and misleading information for inclusion in Trinity's public statements throughout the Class Period.  Before and throughout the Class Period, Mitchell had direct and extensive knowledge of Trinity's fraudulent scheme to secretly make dangerous modifications to the ET-Plus, and to affirmatively conceal such changes – and their negative financial implications – from investors and the general public.  Mitchell testified at length about such topics during the Whistleblower Action discussed herein.

33.    Defendants Wallace, Perry and Mitchell are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that caused the prices of Trinity securities to be artificially inflated during the Class Period.

34.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Trinity's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional

1investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the misrepresentations and omissions set forth herein were thereby materially false and misleading.  The Individual Defendants are liable for the false and misleading material misstatements and omissions pleaded herein.

## IV.    FACTUAL BACKGROUND

35.    Defendants' campaign of fraud, misinformation, and concealment has a long and ignominious history.  In early 2005, Trinity secretly made significant modifications to its ET-Plus guardrail end terminal.  The modified ET-Plus was never properly crash tested, and its changes were never disclosed to federal regulators or approved for highway use.  Even worse, when Trinity finally crash tested the ET-Plus – again, in secret – the device failed five tests, but Trinity concealed the results from the government and the public.  Defendants misrepresented and failed to disclose the true facts concerning their changes to the ET-Plus and the massive adverse impact that Trinity suffered as a result.

36.    Even after Trinity knew that its secret, unapproved modifications to the ET-Plus and failure to properly crash test the product had been detected by Harman, and that he was alerting the FHWA to these issues, Trinity hid the truth from its investors.  Specifically, Defendants failed to disclose the dangerous changes they had secretly made to the ET-Plus and they falsely represented that Trinity's products were compliant with all applicable regulations and government standards.  In addition, Defendants filed financial statements and analyses throughout the Class Period that violated GAAP and failed to comply with SEC disclosure rules by failing to disclose and/or accrue the massive liabilities created by their fraud.  As the truth regarding the severity of this scandal became known, Trinity's investors lost $2.8 billion in market capitalization.

### A.    Trinity's Construction Products Group

37.    Trinity is an industrial company that provides products and services to the energy, transportation, chemical, and construction sectors.  Trinity's Construction Products Group, which includes wholly-owned subsidiary THP, manufactures and sells safety devices and parts used on America's roadways.  One of the key components of this product line is the ET-Plus highway guardrail end terminal.

38.    THP is a Delaware limited liability company ("LLC") based in Dallas, Texas, whose Members are Defendant Wallace, Defendant Perry and Trinity's Chief Legal Officer, S. Theis Rice ("Rice").[3]

39.    Trinity represents to the public that it is dedicated to manufacturing and selling only safe, high-quality roadway products.  On its website, Trinity states that it is "a recognized innovator of highway safety products" that "have been tested, approved, and accepted as meeting established federal and state safety guidelines."

40.    Trinity's business segments, including the Construction Products Group, are dependent on government contracts and procurement.  State transportation departments are the purchasers of Trinity's highway products, including the ET-Plus.  It is only after a highway product has been extensively tested by the manufacturer and vetted by the FHWA that a state transportation department will approve the purchase and installation of that product.  Similarly, state transportation departments have the ability to stop the purchase and installation of highway products.

### B.    The FHWA's Regulation of Highway Products

41.    The primary authorities involved in the regulation of highway products include the United States Department of Transportation ("DOT"), the FHWA, the National Cooperative Highway Research Program ("NCHRP"), and various state departments of transportation.  These organizations establish standards and specifications relating to the manufacture of products used on the state and national roadways.

---

[3]    For convenience, THP and its wholly-owned subsidiary, Trinity Highway Safety Products, Inc., may be referred to herein, collectively with their ultimate corporate parent, Trinity Industries, Inc., as "Trinity."

1139665_1

42.     The FHWA, along with other state and federal agencies, is charged with establishing the crashworthiness criteria for roadway products.  Between 1998 and 2010, new highway safety features were required to be tested according to NCHRP Report 350.[4]  NCHRP Report 350 provides detailed requirements regarding almost every parameter of the required tests, including, *inter alia*, how the tests are to be performed, requirements for test vehicles and test conditions, and the data to be collected from the tests.

43.     Pursuant to these standards, the information that must be submitted for FHWA approval is similarly regimented and "must fully identify: a) the feature(s) tested; b) the conditions and results of the testing; and, if acceptance is being sought for any variations in design or construction details or procedures from those covered in the documentation of the testing of the feature,; and c) the complete design, construction, and installation details and specifications for the version(s) of the feature for which acceptance is being sought."[5]

44.     The FHWA requires:  "[T]wo separate copies of a high-quality, reproducible, letter-size, engineering drawing or set of drawings showing all pertinent details and installation requirements of the version(s) of the feature for which acceptance is being sought are to be included with the request for acceptance."[6]

45.     Once a product is approved for use on the highways, its design specifications cannot be altered without additional testing and approval, which must be granted before the product may be used on the National Highway System.[7]  The FHWA considers a change to be "significant" where "an accredited testing laboratory concludes that it has the potential to affect the device's ability to meet

---

[4]   After January 1, 2011, new highway safety features were evaluated according to the American Association of State Highway and Transportation Officials' Manual for Assessing Safety Hardware ("MASH").

[5]   FHWA Policy Memorandums, Office of Engineering, July 25, 1997, http://www.fhwa.dot.gov/legsregs/directives/policy/ra.htm ("FHWA Policy Memo").

[6]   *Id.*

[7]   United States Department of Transportation, Federal Highway Administration, *Federal-Aid Reimbursement Eligibility Process for Safety Hardware Devices*, last modified Feb. 10, 2016, http://safety.fhwa.dot.gov/roadway_dept/policy_guide/road_hardware/acceptprocess/#s2b.

crash test[ing] criteria."[8]  In order to receive an updated FHWA eligibility letter, the manufacturer must, *inter alia*, conduct "full scale crash testing" and "provide a summary of each test considered critical and relevant to evaluate the modification(s), and the results of each test."[9]

46.     Even so-called "non-significant" modifications require a sizeable and highly technical submission, including an engineering analysis, to the FHWA for consideration and approval.  For example, the manufacturer "must provide supporting documentation describing the modification, including an engineering analysis of the crash testing conducted on the original hardware indicating that it is not significant."[10]

47.     To ensure compliance with its requirements, the FHWA's policy is to revoke acceptance of a feature if misrepresentations are made by the developer:  "Any deliberate misrepresentation or withholding of the conditions of FHWA's acceptance of a feature by the supplier of a feature will be cause for withdrawal of acceptance."[11]

48.     Compliance with FHWA regulations, including NCHRP 350, is a necessary prerequisite in order for manufacturers like Trinity to be eligible to have state or federal governments reimburse contractor-purchasers for purchases of the manufacturers' roadside safety products.  As a general matter, companies like Trinity provide certifications that accompany their products when sold, which affirm that the product being sold conforms to the unit that was tested and approved by the FHWA.  The contractor-purchasers who buy the roadside safety product from the manufacturer before installation must submit these compliance certifications as part of their ultimate invoice in order to receive payment from federal or state authorities.  Simply put, if a product is noncompliant, a manufacturer like Trinity will not be able to sell it because contractor-purchasers would never be able to get reimbursed for their costs.  And, as occurred with Trinity, fraudulently misrepresenting or concealing non-compliance can lead to massive liabilities and devastating effects.

---

[8]   *Id.*

[9]   *Id.*

[10]  *Id*.

[11]  *See* FHWA Policy Memo, *supra*, note.

### C.   Trinity's Guardrail End Terminal

49.   As highway safety devices, guardrails are intended to prevent vehicles from leaving the road at high risk areas.  However, the anchor points where the guardrail begins and ends can create a dangerous collision hazard for a vehicle that drifts off the road into the end of the guardrail.

50.   Guardrail end designs have evolved since the 1960s, beginning as blunt-end terminals, which often functioned as spears penetrating through a vehicle, and twist turn-down designs, which served as a downward ramp forcing a vehicle to rollover.  The current "W-beam" guardrail has an energy absorbing end that causes the end terminal rail to safely deform away from the vehicle.

#### 1.   The ET-2000

51.   In order to prevent collision hazards caused by vehicles impacting guardrail end terminals, Trinity's ET-2000 was designed to absorb kinetic energy generated upon vehicle impact by extruding (or flattening) the guardrail.  The design consisted of a guardrail extruder terminal, a cable assembly with cable anchor, a framework of W-beam steel guardrail panels, and variations of guardrail posts.  Pictured below is the ET-2000.



52.   Upon head-on impact, the guardrail extruder terminal is designed to move rearward along the guardrail, shearing or bending the posts and extruding the W-beam guardrail into a flattened ribbon, while bending the guardrail away from the colliding vehicle and traffic.  This process is intended to absorb the kinetic energy of the impact while bringing the vehicle to a controlled stop, and to avoid the spearing and rollover risks associated with prior end terminal designs.

53.     The ET-2000 was developed and patented by Texas Transportation Institute ("TTI"), a division of Texas A&M University ("Texas A&M").  Trinity paid TTI for an exclusive license to manufacture and sell the ET-2000.

54.     By letter dated August 22, 1995, the FHWA provided approval for Trinity's guardrail end terminal system, the "ET-2000."  Prior to Trinity seeking approval by the FHWA, the ET-2000 had been extensively and rigorously tested for safety, and those results were provided to the FHWA. After approval, the ET-2000 had strong sales and, overall, was considered to be a safe product. Vehicles that collided with the ET-2000 were safely brought to a stop, and no vehicle rollovers or spearing were reported.

### 2.     The ET-Plus

55.     In or around 1999, TTI redesigned the extruder head of the ET-2000 system.  The modified extruder head, the "ET-Plus," differed from the ET-2000 in the size and shape of its face plate and in the omission or reduction in size of several of its non-structural components.  Consistent with its intended purpose, the ET-Plus was narrower and almost 100 pounds lighter than the original ET-2000.  Pictured below is the ET-Plus.



56.     On December 17, 1999, TTI, on behalf of Trinity, submitted a letter to the FHWA requesting that the ET-Plus extruder head be accepted for use with the previously approved ET-2000 system.  The letter stated that the ET-Plus extruder head was redesigned "[t]o enhance system performance, make the system easier to install and maintain, and reduce mass and hence reduce the

initial impulse of the impacting vehicle." Trinity further stated that no changes were made to any of the other ET system components.

57.     In support of its written request for acceptance of the ET-Plus, Trinity provided the FHWA with copies of a TTI test report, dated December 1999, entitled "NCHRP REPORT 350 TEST 3-31 OF THE ET-2000 Plus," and copies of a videotape of that test. Trinity stated that the "end-on test with a 2000-kg pickup truck was the most critical to demonstrate acceptable performance of the modified extruder head, and that additional impacts at the end were not needed." Trinity also stated that since no other changes were made in the terminal anchor design, none of the side impacts in the NCHRP Report 350 test matrix were necessary.

58.     As tested, accepted, and manufactured, the extruder throat component of the ET-Plus had an exit gap of 1.3 inches or larger. Its feeder chute component's dimensions were 5 inches wide, with an exterior and interior height of 15 3/8 inches, and the length measured 37 inches.

59.     Based on FHWA staff review of the results of test 3-31, the FHWA accepted the ET-Plus for use on the National Highway System by letter dated January 18, 2000. The FHWA acceptance letter was ***expressly limited***, however, accepting changes only "in the size and shape of [the ET-2000] face plate and in the omission or reduction in size of several of its non-structural components."

60.     The original iteration of the ET-Plus performed well in the field and was not reported to experience any material problems or safety failures.

**D.      Trinity's Secret Modifications to the ET-Plus**

61.     In early 2005, without the involvement of any Trinity engineers, Trinity secretly made significant structural modifications to the ET-Plus design, including:

- Reducing the ET-Plus's guide channel width from 5 inches to 4 inches.

- Changing the placement and welding of the guide channels from a "butt weld" to a "fillet weld";

- Reducing the guide channel's height from 37.25 inches to 36.25 inches;

- Narrowing the exit gap from at least 1.5 inches to 1.0 inch;

- Lengthening the throat inlet from 4.0 inches to 4.375 inches; and

- Reducing the feeder channel height from 15.375 inches to 14.875 inches.

62.     The reduction in the guide channel width resulted in a significant cost savings for Trinity.  On November 9, 2004, THP President Stephen L. Brown ("Brown") sent an e-mail to Wade Malizia ("Malizia"), Vice President of Operations at THP, stating that Brown would "like to start pushing to ch[a]nge the ET to the 4″ channel" and asking "[h]ow much weight do we save/each and what would be the cost savings/each (assume $.25 steel)?"  Malizia responded that the result would be a savings of about $2.00 per ET-Plus.  Brown noted that if this estimate is correct, "[t]hat's $50,000/ year and $250,000 in 5 years by using the 4″ channel for the legs."  Brown further observed that "[f]or this money we ought to be able to consider some pendulum or sled testing, if that's what we need to convince TTI that we should roll this out."

63.     From the start, however, Trinity deliberately planned to conceal the changes from the FHWA and state agencies.  Indeed, in the same November 9, 2004 e-mail described above, Brown stated, "***I'm feeling that we could make this change with no announcement***."

64.     A press operator at the THP fabrication plant from 1997 to 2015, who was responsible for manufacturing parts of the ET-Plus system, said that Trinity employees knew that Trinity "changed the design to save money" and that Malizia "just made the changes and did no testing."

65.     The idea that Trinity would "make this change with no announcement" was wholly inconsistent with the Company's prior practice of submitting to the FHWA every contemplated product modification, no matter how large or small.  Indeed, Trinity's Brian E. Smith ("Smith"), Vice President of International Sales at THP, testified under oath that even the most minor modifications to Trinity's products – including picayune alterations like alternative anchorages and width of the diameter hole of various flanges throughout the ET-Plus system – were submitted for FHWA review.

66.     The change in the guide channel width was also motivated by Trinity's desire to increase revenues by increasing sales of replacement ET-Plus units.  The original ET-Plus could often be removed, repaired, and reused after an accident, but the redesigned ET-Plus often needed to be completely replaced under similar accident conditions.  As a result, customers were unable to repair

- 19 -

and reuse the ET-Plus, leaving customers with no recourse but to purchase a new unit from Trinity, thereby increasing the Company's sales revenue.

67.     By deliberately avoiding public disclosure of the changes to the ET-Plus, Trinity also saved costs by not having to incur the burden and expense of crash tests related to the modified product.

68.     Indeed, revenue boomed at THP in the years following the undisclosed modifications to the ET-Plus, increasing 38% from 2006 to 2008, driven in large part by increased ET-Plus sales.

**E.     Trinity Hides the Modifications and Fails to Crash Test the Secretly Modified ET-Plus**

69.     In the following months and years, Trinity continued to engage in a campaign of misdirection and outright concealment to keep the FHWA and the general public from learning about the Company's secret changes to the ET-Plus.  Even worse, Trinity had no records of successfully crash testing the modified ET-Plus and never disclosed numerous failed crash tests, placing the lives of innocent drivers in danger.

70.     In 2005, at or around the same time Trinity implemented the secret changes detailed above, Trinity sought FHWA approval to increase the ET-Plus guardrail's installation height from 27 inches to 31 inches.  As it had with numerous prior proposed changes, Trinity (working with TTI) submitted to the FHWA the details of the guardrail height increase in a July 2005 crash test report entitled "NCHRP Report 350 Testing of the ET-Plus for 31-Inch-High W-Beam Guardrail."  This report, however, failed to disclose any of the changes described in ¶61, *supra*.

71.     Specifically, the July 2005 report ***did not disclose*** that:  (1) the ET-Plus's guide channel had been reduced in width and height; (2) the weld style had been changed; (3) the exit gap had been narrowed; (4) the throat inlet was now longer; and (5) the feeder channel height had been reduced.  To the contrary, throughout the report, Trinity repeatedly referred to the end terminal as a "standard" ET-Plus.  Defendant Mitchell subsequently confirmed in sworn testimony that the July 2005 report's crash tests were meant only to test the new guardrail height and that Trinity ***did not disclose*** to the FHWA any of the secret structural changes to the ET-Plus terminal head in advance of the test.  Because the modifications were not disclosed to the FHWA, it was impossible for the

- 20 -

FHWA to approve them, and impossible for the FHWA to approve the covertly modified ET-Plus as eligible for federal-aid reimbursement.

72.    Despite there being no mention of the undisclosed modifications in the July 2005 report, Trinity later claimed that the secretly modified ET-Plus was, in fact, the end terminal used in the crash tests.  However, in a shocking violation of crash testing protocol, Trinity and TTI did not prepare or retain any drawings, photographs, or other evidence showing the structural dimensions of the end terminals, and none of the test units were kept.  In other words, Trinity sold hundreds of thousands of secretly modified ET-Plus units, which were installed on roadways all over the country, *without* ever having established the product's crashworthiness.

73.    To the contrary, and even more disturbingly, Trinity conducted five secret crash tests of the modified ET-Plus, all of which failed, but Trinity concealed the failed test results from the FHWA.  In fact, even though some of those tests were suggested by the FHWA, none of the results were provided to the regulator in response.  Specifically, over the course of 2005 and 2006, TTI used the modified ET-Plus extruder head in five full-scale tests of the ET-Plus system on a "flared" guardrail configuration (*i.e.*, the guardrail to which the ET-Plus was attached was bent away from the road at an angle of four to six degrees).  ***Each of these five tests failed***, as the extruder heads locked up and did not cause the guardrail to "ribbon" as intended.  But Trinity never disclosed the results of the failed tests to the FHWA.  Indeed, Trinity never publicly disclosed these failed tests in any way until compelled to do so during the trial in the Whistleblower Action nearly a decade later.

74.    Trinity's and TTI's sworn testimony regarding the failed "flare" tests is damning.  According to Dr. Roger Bligh ("Dr. Bligh") at TTI, the FHWA asked TTI and Trinity to conduct the "3-31" test (the critical pick-up truck test) on the flared configuration as part of the test protocol, but the modified ET-Plus failed so poorly during the "3-30" test (a test involving a smaller car) that TTI and Trinity never even attempted the 3-31 test.  Moreover, TTI and Trinity planned to conduct only two full-scale crash tests to evaluate the modified ET-Plus head.  But after the head failed those two tests, TTI and Trinity ran three more in an attempt to get a passing score.  All three of those tests failed as well.

- 21 -

75.     The Commonwealth of Virginia, which would later initiate its own *qui tam* case against Trinity,[12] expressed its shock and outrage at Trinity's efforts to conceal the truth in a court filing:

> Armed with knowledge of the five failed tests, Trinity continued to sell the new, modified ET-PLUS to the public while knowing that the product would fail and potentially cause devastating consequences if a person driving a vehicle on a highway hit an ET-PLUS at a low angle of 4-6 degrees.

76.     Trinity also continued telling purchasers of the product that the new, modified ET-Plus was approved for use by the FHWA and Virginia, even though it was not.  Indeed, Trinity had intentionally concealed the changes to the product and the five failed crash tests from the FHWA and Virginia, effectively depriving those regulating entities of any opportunity to offer a valid approval of the modified ET-Plus.

### F.     Trinity Falsely Represents that the Secretly Modified ET-Plus Is FHWA Approved

77.     From 2005 to 2012, the secretly modified ET-Plus was marketed and sold as an FHWA-compliant product, notwithstanding Trinity's knowing failure to ever notify the FHWA that: (1) several modifications had been made to the product, which made it significantly more dangerous; (2) the secretly modified ET-Plus had not been properly tested; and (3) Trinity had concealed failed test results.  In so doing, Trinity affirmatively represented to state governmental agencies that the ET-Plus met the performance and testing requirements of NCHRP Report 350, Test Level 3, and was therefore eligible for reimbursement from the federal government.

78.     For example, on January 8, 2007, Brown falsely certified to the Florida Department of Transportation that the ET-Plus "[has] met and continue[s] to meet the performance and testing requirements of NCHRP Report 350, Test Level 3," "[t]here have been no major 'design changes' that would affect the acceptance status with the FHWA," and "[t]he FHWA has accepted the use of each of these products for use on the National Highway System (NHS) as a TL-3 product when such use is requested by a highway agency, such as the Florida Department of Transportation."  The

---

[12]   *Commonwealth of Virginia ex rel. Harman v. Trinity Indus., Inc., et al.*, Case No. CL13-698 (Va. Cir. Ct.)

certification further indicated that "[w]e understand that if our product . . . changes we must notify the [Florida Department of Transportation] of these changes and will not distribute the changed product until Pro valuation has had a chance to review and re-approve the system for use on Florida projects."

79.     Trinity made similar representations in sales to private contractors that purchased and installed the ET-Plus on the roads of states that would eventually seek federal reimbursement.  For example, an invoice dated April 11, 2011, to a contractor in Virginia also contained a "Certificate of Compliance for **Trinity Industries, Inc**." for the "E.T. PLUS EXTRUDER TERMINAL" stating "NCHRP Report 350 Compliant."

80.     Similarly, on February 17, 2006, THP marketing representative Gwendolyn Samuels submitted a letter to the Vermont Agency of Transportation stating that the "ET-Plus . . . currently being furnished to the State of Vermont Agency of Transportation is identical in composition and test properties as approved by the Federal Highway Administration and the Vermont Agency of Transportation."

81.     In other instances, Trinity included statements with their bills of lading to the effect that their products were compliant with FHWA requirements.  For example, a July 21, 2009 shipment to the State of Arizona contained a "Certificate of Compliance for **Trinity Industries, Inc**." for the "E.T. PLUS EXTRUDER TERMINAL" stating "NCHRP Report 350 Compliant."

82.     Overall, for a period of nine years, Trinity submitted more than 16,000 false certifications and other reimbursement requests to state agencies around the country.

G.     **Serious – and Fatal – Problems Arise with Trinity's Secretly Modified ET-Plus Units**

83.     In the years following the covert modifications to the ET-Plus, the product's safety record declined sharply.  Hundreds of crashes and scores of deaths around the country have been linked to the modified ET-Plus.

84.     The modified ET-Plus had a narrower steel channel behind the rail head that frequently caused the rail head to become jammed, known as "throat lock," which in turn caused the long metal guardrail to act as a large metal spear, instead of curling to the side, ultimately piercing through the vehicle and severely injuring – or killing – the vehicle's occupants.

- 23 -

85.     Below are just a few examples of the many severe or fatal crashes involving the secretly modified ET-Plus: [13]

- Rebecca Dryer, 26, was driving her 2003 Pontiac Vibe on a Pennsylvania highway on May 24, 2009, when she swerved to avoid a motorcycle and crashed into an ET-Plus end terminal. The guardrail sliced through the driver's side door, amputating Dryer's right leg and crushing her lower extremities. She was pinned to her seat until emergency personnel could extricate her.[14]

- On the morning of December 17, 2008, Sabrena Carrier was driving her 2006 Honda Ridgeline on a highway in Tennessee when she became dizzy and her vision blurred. She missed a curve in the road and instead struck a guardrail with an ET-Plus end terminal. The guardrail impaled her torso, causing massive internal organ damage and multiple fractures. Carrier, who was 38, died five hours later.[15]

- Diabetic Lisamarie Antonicelli was driving her 2011 Nissan Versa on a Texas highway on September 1, 2012, when her blood sugar dropped. She lost control of the vehicle and veered left into a guardrail with an ET-Plus end terminal. The guardrail intruded into the right floorboard and continued into the passenger compartment, impaling Antonicelli. She is now a paraplegic.[16]

86.     As a result of such incidents, several personal injury and product liability lawsuits were filed against Trinity in the years following the secret modifications to the ET-Plus. By March 2014, at least 12 such lawsuits had been filed against Trinity. The lawsuits each claimed that the ET-Plus at issue in the vehicular accidents was unsafe, defective, unreasonably dangerous, non-conforming, and/or not approved as required by primary and regulatory government and industry agencies. Trinity was named as a defendant in each of the lawsuits. Trinity did not disclose any of these lawsuits to investors until October 29, 2014. As a result, Trinity's financial statements and SEC filings were materially false and misleading throughout the Class Period.

---

[13]   The Safety Institute Letter to Gregory Nadeau, Acting Administrator for the FHWA, Feb. 9, 2015, http://www.thesafetyinstitute.org/wp-content/uploads/2015/02/Guardrail-Comments-TSI-FINAL-010915-1.pdf. The Safety Institute, a 501(c)(3) non-profit organization dedicated to supporting evidence-based research and interventions aimed at reducing injuries and improving product safety, compiled the above descriptions

[14]   *Dryer v. Trinity Indus., Inc.*, No. 10843, Complaint (Pa. Ct. Common Pleas, Beaver Cty.).

[15]   *Estate of Carrier v. Tenn. Guardrail, Inc*., No. C13727 (M), Complaint (Tenn. Cir. Ct., Sullivan Cty.).

[16]   *Antonicelli v. Trinity Indus., Inc*., No. DC13-05900, Complaints (Tex. Dist. Ct., Dallas Cty.).

**H.    A Whistleblower Discovers the Secret Modifications to the ET-Plus, and Trinity's Manipulation of the Regulatory Process Continues**

**1.    The Secretly Modified ET-Plus Is Discovered**

87.    On September 2, 2011, Trinity and TTI jointly sued SPIG for alleged patent and trademark infringement in Virginia federal district court.  *See Trinity Indus., Inc., et al. v. SPIG Indus., LLC, et al.*, No. 1:11-cv-937 (E.D. Va., filed Sept. 2, 2011) (the "Patent Case").  SPIG is owned and operated by eventual whistleblower Harman.  The parties to the Patent Case engaged in extensive discovery and took the depositions of dozens of witnesses, including FHWA engineer Artimovich.  In his sworn deposition testimony, Artimovich confirmed that:  (i) Trinity had never submitted the ET-Plus modifications for FHWA approval; (ii) the 2005 guardrail height change crash test reports did not disclose the ET-Plus modifications or contain any specification drawings; and (iii) even at the in-person meeting with Artimovich on February 14, 2012, Trinity did not disclose the changes to the feeder channel length and height.

88.    During discovery in the Patent Case, the existence of the secret modifications to the ET-Plus was uncovered to SPIG, as well as the fact that they had never been disclosed to the FHWA.

89.    Defendants Wallace and Mitchell had direct knowledge of the revelations in the Patent Case, which included the secret modifications to the ET-Plus.  McWhirter also had direct knowledge of Trinity's handling of the Patent Case.  According to McWhirter's sworn testimony, Defendant Wallace personally authorized the filing of the Patent Case in 2011, was involved in handling the litigation, and authorized the settlement in 2012.  As a result, Wallace learned the full scope of Trinity's secret modifications to the ET-Plus that had not been disclosed to the FHWA.  McWhirter further testified that at that time Wallace and Mitchell participated in weekly meetings, ranging in length from 30 minutes to half-a-day, regarding the ET-Plus.

90.    On January 12, 2012, Harman blew the whistle to the FHWA's Artimovich, who was responsible for reviewing guardrail crash testing and compliance with NCHRP Report 350 in his capacity as program director for roadside hardware crashworthiness testing.  Specifically, Harman delivered to Artimovich a 100-page PowerPoint presentation entitled "Failure Assessment of Guardrail Extruder Terminals," which explained in painstaking detail the secret modifications to the

- 25 -

ET-Plus, including the undisclosed change from a 5-inch to a 4-inch guide channel, and how those modifications had resulted in numerous injuries and highway fatalities.

91.    Harman's presentation also detailed the other important modifications to the ET-Plus that Trinity had kept a secret from FHWA, as described in detail at ¶61, *supra*. The cumulative effect of these changes, when combined with the reduction in width of the guide channel, was to make it significantly more likely that the ET-Plus head would "lock" in an accident and fail to perform in the manner Trinity represented to the FHWA and the public that it would.

92.    Harman provided Artimovich and the FHWA with visual evidence of the real-world results of Trinity's failing guardrail heads, some of which is set forth herein. As explained *supra*, an ET-Plus head is supposed to "ribbon" the guardrail it is attached to, dissipating the force of impact and pushing the steel beam away from the passenger vehicle, as portrayed here:



93.    Harman's presentation demonstrated how Trinity's undisclosed modifications were in fact preventing the ET-Plus from accomplishing this core task. Harman had uncovered numerous examples of failed ET-Plus heads, which – as he documented in gruesome detail – transformed guardrails into deadly spears that entered the passenger cabin of the vehicles, causing catastrophic injuries to their passengers:



94.    Accordingly, as Harman demonstrated, the undisclosed design changes to the ET-Plus rendered the head far different – and far more dangerous – than the one that the FHWA approved in 2000 and was led to believe had been crash tested again in 2005.

95.    In light of the disclosure of the secret changes to the ET-Plus, and the often-deadly results of those changes, Artimovich contacted representatives of Trinity on January 24, 2012, and also forwarded a copy of Harman's PowerPoint presentation.  Harman's PowerPoint presentation was received by, *inter alia*, Defendant Mitchell, who immediately notified Trinity's general counsel.

96.    Also, on January 24, 2012, Harman met with McWhirter and Defendant Mitchell to reveal to Trinity that he had uncovered Trinity's secret modifications to the ET-Plus and documented numerous automobile accidents where the secretly redesigned ET-Plus had failed.  Instead of immediately contacting the FHWA with this information, Trinity continued to keep the unannounced modifications to the ET-Plus a secret, recklessly ignoring the risk to public safety caused by the failing terminal heads.

97.    In a February 2, 2012 e-mail to Trinity's Smith, who reported directly to Defendant Mitchell, Artimovich wrote that Harman's presentation "provides some pretty good documentation that there are extruder heads out there that do not conform to the crash tested designs.  Let me know what you think."  Smith was also one of the executives on the fateful 2004 e-mail where Trinity deliberately decided to modify the ET-Plus "with no announcement."

98.    According to Defendant Mitchell, Trinity's response to Harman's presentation and subsequent meeting with Trinity officials was "[a]ll hands on deck" – not in the sense that the

Company sought to thoroughly investigate and cure the problems identified in the presentation, but rather that Trinity's resources and top management would all be involved in developing a strategy to defend against and discredit such claims.

99.     One aspect of Trinity's "all hands on deck" response was to sue Harman in the United States District Court for the Eastern District of Texas, and later in the Northern District of Georgia, for alleged defamation (the "Defamation Lawsuits").  *See Trinity Indus., Inc. v. Harman*, No. 12-cv-46 (E.D. Tex., filed Jan. 30, 2012); *Trinity Indus., Inc. v. Harman*, No. 13-cv-252 (N.D. Ga., filed Jan. 23, 2013).

100.    The Defamation Lawsuits took issue with Harman's website (www.failingheads.com) and presentations to government regulators, which detailed the facts that there had been secret modifications to the ET-Plus, that the modifications had never been presented to or approved by the FHWA, and that the modified ET-Plus had demonstrated a poor safety track record.  In reality, however, the Defamation Lawsuits were ***not*** about getting to the truth, but rather were another vehicle Defendants used in their efforts to conceal the truth regarding their dangerous modifications to the ET-Plus, continuing Defendants' deception of the FHWA and the general public and further endangering innocent drivers.

101.    In the Texas defamation complaint, Trinity emphasized the importance of its highway products line and that Trinity's reputation and good will were "almost entirely" dependent on whether its products, including the ET-Plus, were federally approved and confirmed to be crashworthy.  Trinity stated as follows:

> Trinity has earned and maintained . . . goodwill and a positive reputation in the community of roadside highway hardware purchases, suppliers, and manufacturers. This community includes federal and state highway authorities, as well as commercial customers and road contractors.  ***Trinity's . . . goodwill and reputation are based almost entirely upon the proven and federally accepted "crashworthiness" (an FHWA term) of its products, including the ET-Plus***.

102.    Defendant Wallace personally approved the filing of the Defamation Lawsuits. According to McWhirter, Defendants Wallace and Perry were two of the few non-attorneys at Trinity involved in the Defamation Lawsuits.  Ultimately, Wallace approved the voluntary dismissal of each of the Defamation Lawsuits.

### 2. Trinity Continues to Mislead the Public and Downplay the Secret Modifications to the ET-Plus

103.     Confronted with Harman's accusations, Defendants' next steps reflected their willful intention to prevent the truth from becoming public.  Instead of immediately contacting the FHWA or requesting a meeting at the agency's D.C. office to explain its conduct, Trinity waited weeks until a trade association meeting in Florida provided an opportunity for a closed-door meeting with Artimovich.

104.     In advance of the conference, Smith contacted Artimovich via e-mail and requested an "intimate" meeting.  Pursuant to Smith's request, Artimovich met with numerous Trinity and TTI representatives on February 14, 2012, in Tampa, Florida.  The private meeting was held in a quiet room at the hotel, away from the rest of the conference.

105.     Trinity's representatives at the meeting included numerous high-level executives, including Defendant Mitchell, Smith, Trinity's Senior Vice President of Engineering Barry Stephens (who reported directly to Mitchell), and TTI's Dr. Bligh.

106.     During the meeting and in their subsequent communications with the FHWA, Trinity's representatives attempted to explain away the undisclosed changes to the secretly redesigned ET-Plus as "inadvertent" omissions from Trinity's submissions to the FHWA.  This assertion was, of course, directly contrary to Trinity's internal correspondence planning to make the changes "with no announcement," and also in stark contrast to Trinity's track record of submitting even the most minor changes for FHWA review over the course of many years.

107.     Also on February 14, 2012, Trinity responded to Artimovich's e-mail and falsely denied that the ET-Plus had been secretly redesigned.  Trinity tried to explain away Harman's concerns as simply the accusations of a competing company, characterizing the presentation as Harman's "latest effort to create a distraction in the Virginia patent litigation by attacking the design of the ET-Plus."  Nowhere in the letter did Trinity address its affirmative decision to secretly modify the ET-Plus without informing the FHWA.

108.     Despite Trinity's failure to disclose these changes, Trinity's representatives at the February 14, 2012 meeting insisted that the guardrail height crash tests in 2005 involved the modified

- 29 -

ET-Plus.  Critically, however, Trinity could not provide to Artimovich *any evidence* – no drawing, no photograph, no list of specifications – showing that the unit tested was, in fact, the secretly modified ET-Plus.  Not surprisingly, Trinity also did not tell Artimovich about the *five failed crash tests* over the course of 2005 and 2006.

109.    The FHWA left the February 14, 2012 meeting with the half-truths supplied by Trinity, but certainly without all of the information necessary to determine whether the redesigned ET-Plus had ever been properly tested, and thus properly approved.  The FHWA also left with significant concerns regarding the safety performance of the ET-Plus.  In a draft letter to Trinity from Mike Griffith, the director of the FHWA's Office of Safety Technologies (and Artimovich's superior), the FHWA distilled this concern, stating in part:

> It has come to our attention from various sources that w-beam guardrail terminals using the ET-PLUS head may not be performing as intended.  [E]ven though it appears that the ET-PLUS terminal can still meet crash testing requirements, the number of highway crashes with fatal injuries involving the ET-PLUS terminals does not match the excellent history of the original ET-2000 terminal.

> FHWA letter CC-12G, dated January 18, 2000, is our initial letter to Trinity Industries on the ET-Plus design, and the drawings attached to that letter show the width of the c-channel feeder rails to be 5 inches in both the ET-2000 and ET-Plus designs.  In support of FHWA Letter CC-94 dated September 2, 2005, [TTI] conducted two tests of the ET-PLUS terminal for the 31-inch Midwest Guardrail System (MGS).  The information contained in our files for these two letters do acknowledge a number of improvements you made to the ET-2000 to develop the ET-PLUS, but make no mention of one of the more visible differences between the older extruder heads and the ones you are currently selling:  the change in width of the feeder rails from 5 inches down to 4 inches.

110.    The draft letter, which was never sent to Trinity, requested that Trinity provide the following to help address the FHWA's growing concern:  (1) "Drawings of the extruder head used in the 2005 tests at TTI, specifically those used in TTI Test No. 220601-1&2"; (2) "If available, you locate the extruder head(s) used in the 2005 tests and document the internal and external dimensions"; and (3) "You conduct an in-service performance evaluation of the current Trinity extruder terminals to determine their performance."  The draft letter also requested that Trinity "include an investigation into the crashes documented by [Harman]."

111.    Trinity has never provided items (1) and (2) above to the FHWA; indeed, the extruder head used in the 2005 crash test was *destroyed* shortly after the test was conducted.  With regard to

- 30 -

item (3), according to Defendant Mitchell, Trinity has never investigated *any* of the accidents documented by Harman.

112.    Rather, Trinity's response to Harman's revelations was a series of evasive written responses.  First, Dr. Bligh of TTI sent a letter continuing the claims that the one-inch reduction in the width of the guide channel was "inadvertently" omitted from ET-Plus crash test documentation submitted to the FHWA in August 2005.  Then, on March 15, 2012, Trinity submitted a letter to the FHWA asserting that an ET-Plus with a four-inch guide channel was crash tested in May 2005, but again without providing any supporting documentation or other corroboration of any kind.

113.    At the same time, Trinity was fielding growing concerns by the FHWA that it was falsely championing its compliance records to the public.  For example, Trinity's February 16, 2012 Form 10-K filed with the SEC stated, in part:  "If our products were found not to be in compliance with [FHWA] standards and specifications, we would be required to re-qualify our products for installation on state and national highways.  We believe that our highway products are in substantial compliance with all applicable standards and specifications."

114.    After the modification to the ET-Plus was discovered by Harman, Defendant Mitchell asserted in a "To Whom It May Concern" letter to customers and state transportation agencies, dated March 14, 2012, that the modification of the ET-Plus guide channels from five inches to four inches had been the subject of the May 2005 crash tests that were addressed in the July 2005 report.  Mitchell's letter did not disclose, however, that the report that Trinity had submitted to the FHWA related to these crash tests nowhere mentioned this change and that the FHWA had no way of knowing that the change had occurred until alerted by the Whistleblower in 2012.  In a follow-up letter to the FHWA, dated February 21, 2013, Mitchell and Dr. Bligh wrote that the secretly modified extruder head "was utilized in a May 27, 2005 crash test" and that "TTI inadvertently omitted a drawing showing the 5-inch to 4-inch detail."  Trinity and TTI further sought to minimize all of the secret modifications (other than the adjustments to the guide channel width) as "simply reflect[ing] fabrication adjustments in the Trinity Highway system for Trinity Highway's manufacturing employees building the product."

115.    Indeed, Trinity **never** disclosed certain critical details to the FHWA, even after Harman's discovery came to light.  For instance, Trinity never informed the FHWA that the modified ET-Plus had failed five separate tests conducted over the course of 2005 and 2006, as described in ¶¶73-75, *supra*.  In addition, Trinity did not disclose – and to this day has not admitted – that it made many of the other secret modifications, including the narrower exit gate and the shorter channels.

116.    As a result of this continued manipulation of the FHWA – combined with an ineffective, at best, investigative effort from the FHWA – the agency erroneously maintained that the ET-Plus had been crash tested in accordance with NCHRP criteria.

117.    Beginning in 2012, as a result of Harman's accusations to Trinity and the FHWA, and the products liability and personal injury cases discussed *supra*, the FHWA began fielding e-mails from state officials, plaintiffs' lawyers and others asking about the changes to the ET-Plus.  For example,

- On July 18, 2012, on behalf of the state of South Carolina, Dan Hinton wrote: "The SCDOT asked a question regarding the ET-Plus terminal for use on the NHS.  Their question concerns the channel chute.  In FHWA's January 18, 2000 letter the detail for the terminal show a 5" width for the channel chute . . . .  However FHWA's September 2, 2005 (attached) letter does not provide any details showing the width of the channel chute. . . . SCDOT would like to verify that the change from 5" to 4" has been crash tested under MASH TL-3 conditions and is eligible for reimbursement under the Federal-aid highway program."

- On October 5, 2012, on behalf of the state of Illinois, Dave Piper wrote:  "We have heard of changes to the ET Plus terminal that reduce the opening in the extruder head. . . .  Our specifications require that guardrail terminals be accepted by FHWA, on the Department's list of approved devices and be according to manufacturer's specifications.  We have been unable to confirm that this change to the insertion of the channels into the extruder head and apparent reduction of the opening was accepted by FHWA.  Has FHWA accepted this modification?"

118.    During discovery in one of the product liability actions, Ted Leopold, an attorney for the plaintiff, raised specific concerns and questions with Artimovich about whether the modified ET-Plus was approved by the FHWA.  In a March 1, 2012 e-mail, Leopold asked:  "Does FHWA consider the 4" inch feed rail on the ET-Plus an approved design as of 2005 or not?"  Artimovich responded:  "I have not yet reviewed the 2005 crash test information to determine if the tested ET-

Plus head did, indeed, have 4" or 5" rails.  All we can say now is that the device that was tested is acceptable."

119.    Leopold also pressed Artimovich about the failed tests.  For example, in a February 27, 2012 e-mail, Leopold wrote to Artimovich:  "Are you telling me the government would really certify based on 'what the photos look like'?  That is crazy! . . . Clearly there is no evidence that they tested the 4" and we see failures around the country."  Artimovich responded:  "Our acceptance of the device in 2005 was based on the successful crash test results noted in CC-94.  The width of the feeder rails was not specified on the drawings.  Whether they were 4" wide or 5" wide did not have a bearing on our review as the tests were successful."  Leopold questioned how the CC-94 acceptance could have been appropriate when "[t]he test was not to test the end terminal.  In fact, looking at the test report it specifically states the test related to the end terminal 'failed.'  So in fact by the FHWA's own test review the end terminal was not certified, only the posts height, was deemed 'acceptable.'"  Artimovich's response about the failed test was, inexplicably, that the "evaluation criteria is not mandatory."

### 3.    Harman Files a *Qui Tam* Lawsuit Against Trinity Under the False Claims Act, Which Ends in a Mistrial After Trinity Is Suspected of Witness Tampering

120.    On March 6, 2012, Harman filed suit under seal against Trinity under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§3729-32.  *See United States ex rel. Harman v. Trinity Indus., Inc.*, No. 12-89 (E.D. Tex.).  By this suit, Harman sought to recover for the benefit of the United States the federal dollars that were paid to Trinity to purchase the secretly redesigned (and faulty) ET-Plus terminal head based on Trinity's deception and false statements.

121.    The Whistleblower Action made several damning allegations about Trinity's unrepentant fraudulent concealment of the modified ET-Plus.  Much of what happened during the case was not a matter of public record (except for the testimony presented during trial and the exhibits used before the jury and admitted into evidence during the second trial in October 2014, *see infra*) until the complete record was unsealed by a court order dated March 4, 2015.

122.    Trinity executives, including Defendant Mitchell, confirmed that Trinity did not in fact test the covertly redesigned ET-Plus in May 2005, and lied to the FHWA when it said that the "standard" ET-Plus terminal head would be installed on 31-inch guardrails in the future.

123.    Trinity executives, including Smith, confirmed that Trinity did not in fact tell the FHWA that the covertly redesigned ET-Plus terminal head had failed crash tests of a flared configuration five times over the course of 2005 and 2006.

124.    Trinity employees, including Malizia, testified that no engineer was involved in the secret redesign of the ET-Plus in 2005, and that, in any event, the proof of the engineering plan behind the redesign (in the form of a prototype head or any schematics, to the extent those existed) had long since been destroyed.

125.    Perhaps most egregiously, however, Trinity witnesses, including Dr. Bligh, confirmed that **_no adequate crash testing_** of the secretly redesigned ET-Plus had **_ever_** been done, even after its widespread safety issues were revealed to the Company.  In other words, after learning that the ET-Plus was killing motorists, Trinity **_never_**:  (1) ran the critical 3-31 pickup truck test; (2) ran any computer simulations to confirm that the ET-Plus was performing as expected; or (3) modeled for the crashworthiness of the secretly modified ET-Plus terminal head.

126.    Trinity's continued obfuscation of the truth resulted in the FHWA, **_on the eve of trial_**, issuing a memorandum affirmatively representing that the covertly modified ET-Plus was properly tested (when it was not) and still eligible for federal aid reimbursement (when it could not have been, for the reasons discussed in §IV.E., *supra*).  This memorandum, dated June 17, 2014, and sent by Michael Griffith, the Director of FHWA's Office of Safety Technologies, stated that the ET-Plus with a four-inch guide channel "was crash tested in May 2005" and "became eligible for Federal reimbursement under FHWA letter CC-94 on September 2, 2005"; and that, as a result, "[a]n unbroken chain of eligibility for Federal-aid reimbursement has existed since September 2, 2005 and the ET-Plus continues to be eligible today."

127.    Notably, the June 17, 2014 memorandum was issued **_more than two years after_** the FHWA first learned of Trinity's secret modifications to the ET-Plus.  For more than two years, the

FHWA took no action, and then only did so in a transparent effort to cover its own previous failures on the eve of trial.  In addition, the FHWA memo fully adopted Trinity's false version of events, specifically that the reduction in the width of the guide channel was a "design detail *inadvertently* omitted from the documentation submitted to FHWA" in May 2005.  Of course, the truth, as revealed by contemporaneous internal Trinity e-mails, was that the change to the ET-Plus was intentionally made "with no announcement."

128.    The June 17, 2014 memorandum was also limited by the (somewhat misleading) critical proviso that it was "based upon all of the information available to the agency (including a re-examination of the documentation from ET-Plus crash tests)."  In other words, the assertion that the secretly modified ET-Plus terminal head was properly submitted and approved for testing, and thus remained eligible for federal reimbursement, was based on faulty and incomplete information, and still subject to Trinity's manipulations.  Among other things, Trinity had *never* submitted (and the FHWA had never reviewed or analyzed):  (1) the design drawings of the ET-Plus head that was crash tested in 2005; (2) a model of that particular head itself; (3) the particulars of the failed flare tests; or (4) any of the other undisclosed modifications to the ET-Plus head, including the narrower exit gate and the shorter channels.[17]

129.    Meanwhile, Harman was not the only person to contact the FHWA regarding Trinity's ET-Plus cover-up.  In addition, Dr. Sicking, an engineering professor at the University of Alabama-Birmingham and inventor of the ET-2000, the predecessor to the ET-Plus, contacted Artimovich in March 2012 after reading a press release regarding litigation against Trinity.  Specifically, Dr. Sicking sent Artimovich an e-mail questioning whether the "claim about making changes [to the ET-Plus] without testing or gaining FHWA acceptance" was true.  Artimovich responded that he believed that the modified ET-Plus was performing as expected, but that "*it's hard to ignore the fatal results.*"

---

[17]    The flawed basis for, and inherent limitations of, the June 17, 2014 FHWA memorandum were not lost on Judge Gilstrap, who oversaw the Whistleblower Action.  Indeed, in a June 9, 2015 order denying Trinity's renewed motion for judgment as a matter of law, Judge Gilstrap *rejected* Trinity's attempts to rely on the June 17, 2014 memorandum to negate its fraud, specifically noting, *inter alia*, that "[t]his letter, which issued on the eve of the first trial in this action . . . merely recites *Trinity's representations* . . . [and, as a result, was] based on *incomplete, misleading, and even false information*."  (Emphasis in original and added.)

130.    Dr. Sicking "took that to mean that [the FHWA was] going to look into it."  But the agency never did.  Dr. Sicking's independent research, however, confirmed that the secretly redesigned ET-Plus terminal head was not performing as it was supposed to.  Indeed, at one point Dr. Sicking documented 20 crashes where he believed that the ET-Plus terminal heads had not performed as intended.

131.    In 2013 and 2014, Dr. Sicking uncovered that Trinity was manufacturing and installing what appeared to be an undisclosed third version of the ET-Plus (in addition to the versions with 5-inch and 4-inch guide channels).  This version was equipped with a 4.25-inch guide channel, and appeared to perform better than those terminal heads with 4-inch guide channels – like the ones uncovered by Harman – that had malfunctioned.  In other words, Trinity had designed (and was selling) a new version of the ET-Plus in response to lawsuits, including the Whistleblower Action, that had exposed the danger of the secretly modified ET-Plus terminal with the 4-inch guide channel.

132.    Dr. Sicking shared the above revelation on a phone conference with state and FHWA officials in February 2014, before the Whistleblower Action was scheduled to go to trial.  Thereafter, Defendant Mitchell reached out to Dr. Sicking and requested a meeting because he had heard "industry rumors" that Dr. Sicking had been sharing concerns about the dangers of the ET-Plus. Mitchell traveled to Birmingham, Alabama in March 2014 to meet with Dr. Sicking in person.  Given the timing of and impetus for the meeting, Mitchell's true motive in contacting Dr. Sicking was to strong arm him out of testifying at the Whistleblower Action.  And indeed, Dr. Sicking has said that he did not originally plan to appear at the July 2014 trial.

133.    During Defendant Mitchell's testimony at trial in the Whistleblower Action, however, one of Harman's attorneys asked Mitchell whether he had threatened in the March 2014 meeting to "smear" Dr. Sicking "and make sure that he *never worked in the industry again*" if Dr. Sicking testified against Trinity.  Mitchell's response to the question was "[a]bsolutely not."

134.    In response to Defendant Mitchell's blatant misrepresentation, Dr. Sicking travelled overnight from Birmingham, Alabama to Marshall, Texas, specifically to testify that Mitchell had told him that he would attempt to ruin the reputation of witnesses who spoke against Trinity,

including Dr. Sicking.  Upon hearing this testimony, Judge Gilstrap deposed Dr. Sicking in his chambers.  Following the deposition, Judge Gilstrap declared a mistrial, highlighting "[s]erious concerns . . . with respect to Trinity's conduct and the veracity of [Mitchell's] testimony."  Judge Gilstrap stated to the jury that he had questions over whether Mitchell "intentionally attempted to intimidate [Dr. Sicking] from appearing in this case," and that those questions were at the heart of the decision to declare a mistrial.

135.    In the months following the mistrial, and leading up to the second trial, Trinity continued to falsely and misleadingly cite its safety record and compliance with the FHWA.  For example, on September 22, 2014, Trinity stated in the preliminary prospectus supplement to the issuance of $400,000,000 in securities:  "The Federal Highway Administration, which determines product eligibility for cost reimbursement using federal funds, has approved many of our products as eligible for cost reimbursement based on requirements set forth by the National Cooperative Highway Research Program."

**I.      The Truth Begins to Emerge Regarding Trinity's Fraudulent Scheme**

136.    The second trial in the Whistleblower Action began on October 13, 2014.  In the months preceding the trial, the parties submitted several pre-trial motions and appeared at multiple pre-trial hearings, the last of which was held on Friday, October 10, 2014.  Shortly thereafter, on the eve of trial, details regarding Defendants' years-long fraudulent scheme began to be revealed to the public.

137.    Specifically, on October 12, 2014, the *Times* published an article entitled, "Highway Guardrail May Be Deadly, States Say," disclosing several troubling facts regarding Trinity's fraudulent modifications to the ET-Plus and the cover-up that followed.  First, the article disclosed that three states – Missouri, Nevada and Massachusetts – had banned further installations of the ET-Plus due to safety concerns.  In addition, the article noted that "[l]awsuits say the guardrails were to blame for five deaths, and many more injuries, in at least 14 accidents nationwide."  Perhaps most notably, the article disclosed several remarkable facts regarding the FHWA's deference to the

Company and the agency's failure to adequately monitor and enforce ET-Plus's compliance with

applicable safety requirements, stating in part:

> [I]nternal communications and documents from the highway administration show that a senior engineer charged with examining the guardrails expressed reservations about their safety, before he signed off on their continued use about two years ago.
>
> At one point, agency officials drafted a letter asking the manufacturer to conduct additional testing, but the letter was never sent, according to interviews and a review of the documents by The New York Times.
>
> "*There does seem to be a valid question over the field performance*," the senior engineer, Nicholas Artimovich, wrote in an e-mail to his colleagues in February 2012, after an agency engineer based in South Carolina raised questions about the guardrails.
>
> In a separate e-mail to an outside safety expert a month later, Mr. Artimovich wrote that it was "*hard to ignore the fatal results*."
>
> \*　　\*　　\*
>
> [Q]uestions are being raised about the close ties between federal safety agencies and the companies they are charged with overseeing.  The internal communications at the Federal Highway Administration show that *Mr. Artimovich endorsed the Trinity guardrails after meeting privately with company officials* and being assured the tests were adequate.
>
> \*　　\*　　\*
>
> [O]n March 14, Mr. Artimovich wrote to a highway safety expert, asking for advice about rail heads.  *His letter suggested that agency officials had long harbored doubts about the ET-Plus*.
>
> "Before these allegations came to our attention earlier this year, we have become concerned about other unexpected performance issues with ET heads," he wrote.  Also that day, he corresponded with the engineer at the Connecticut Transportation Department who inquired about a possible moratorium.
>
> By May, the agency had drafted the letter that sought additional testing from Trinity.
>
> "Even though it appears that the ET-Plus terminal can still meet crash testing requirements," the draft said, "*the number of highway crashes with fatal injuries involving the ET-Plus terminal does not match the excellent history of the original ET-2000 terminal*."
>
> \*　　\*　　\*
>
> *But by October, the agency had not sent the letter*.  An agency spokesman said that at the time, the agency did not have enough evidence independent of Mr. Harman's allegations that there were problems.

- 38 -

138.    A week later, on October 20, 2014, the jury in the Whistleblower Action reached a unanimous verdict, finding after deliberating for only three hours that Trinity had deliberately withheld information from the U.S. government in connection with the Company's secret modifications to the ET-Plus.  Specifically, the jury found that Trinity "***knowingly made, used, or caused to be made or used, a false record or statements material to a false or fraudulent claim***," and further found that such conduct had caused $175 million in damages to the U.S. government, which would be trebled (for total liability of $525 million) and added to any civil penalty imposed by the court pursuant to the False Claims Act.[18]

139.    That same day, several media outlets reported on the verdict, revealing previously unknown facts related to Trinity's fraudulent modification of the ET-Plus – and the impact thereof. The *Times*, for example, published an article entitled, "Guardrail Maker Trinity Liable for Fraud in Texas," which noted the size of the verdict and stated in part:

> At least 14 other lawsuits blame the guardrails for five deaths and more injuries. Trinity is a major guardrail supplier nationwide.  According to internal company documents, the change was expected to save about $2 on every rail head. And Mr. Harman said that the change made the guardrails impossible to reuse.
>
> *            *            *
>
> [T]hree states – Missouri, Massachusetts and, most recently, Virginia – have banned further purchase of the ET-Plus, citing safety concerns. A fourth, Nevada, prohibited them in January, citing Trinity's failure to disclose the change when it was made.
>
> ***During the trial, it emerged that Trinity may have misled some states about its product***.  In a February 2006 letter, for example, Trinity told the state of Vermont that the design of the ET-Plus was identical to the system that had been approved by the state agency and the Federal Highway Administration, according to court documents.  ***Gregg Mitchell, president of Trinity's highway products subsidiary, testified that while at the time the company thought that statement was correct, he now considered it inaccurate***.

140.    Also on October 20, 2014, *Bloomberg* published an article entitled, "Guardrail Maker's Secret Changes Defrauded Government," which stated in part:

---

[18]    Several months later, on June 9, 2015, Judge Gilstrap denied Trinity's renewed motion for judgment as a matter of law and entered Final Judgment in the Whistleblower Action, imposing an additional civil penalty of $138,360,750 on Defendants, for a ***total final judgment amount of $663,360,750, plus costs and attorneys' fees***.

- 39 -

Trinity Industries Inc. duped the U.S. government by hiding changes to its guardrail systems, a jury found, exposing the company to $1 billion in liability and sending shares plummeting at a time when several states are scrutinizing the safety of the company's products.

The verdict comes as scrutiny of Trinity's ET-Plus device intensifies across the country after it's been blamed for multiple deaths. The Federal Highway Administration this month asked all states to start submitting information on crashes involving the ET-Plus to the agency's safety office.

The agency, which approves products for use on federal highways, will evaluate the findings of the case and "consider whether it affects the continued eligibility of the ET-Plus," Brian Farber, a spokesman for the Department of Transportation, said in an e-mail after yesterday's verdict by jurors in Marshall, Texas federal court.

141. Over the next several days, additional news about the business impact of the facts revealed by the Whistleblower Action – namely, the significant safety concerns associated with Trinity's secret modifications to the ET-Plus – continued to surface. For example, on October 23, 2014, the *Times* published an article entitled, "Three More States Ban a Type of Highway Guardrail," which stated in part:

On Thursday, as concerns about the safety of Trinity's guardrails continued to mount, Vermont, Hawaii and Colorado said they had placed moratoriums on buying and installing the ET-Plus rail heads. A rail head is a flat piece of steel at the front of a guardrail that is meant to slide along the rail on impact, pushing the metal safely out of the way.

Ten states have now banned the guardrail units; the others are Massachusetts, Mississippi, Missouri, New Hampshire, Nevada, Oregon and Virginia.

The Federal Highway Administration demanded two days ago that the Trinity guardrail unit be retested for safety. The federal agency had defended the product for more than two years, even after it learned that Trinity had changed the design in 2005 without notifying the agency, as required.

142. The next day, on October 24, 2014, the *Times* published another article entitled, "Producer of Highway Guardrails to Halt Sales," which stated in part:

Trinity Industries, facing mounting criticism that its guardrails can impale drivers in crashes, said on Friday that it would ***stop selling the product that 13 states have now banned***.

The announcement is a sharp reversal for the company, which had continued to sell the guardrails even as state after state this week said that they had banned further installations.

\*     \*     \*

- 40 -

"***The right thing to do is to stop shipping the product*** until the additional testing has been completed," said Gregg Mitchell, the president of Trinity's highway products subsidiary.  Mr. Mitchell said the company was still confident in the product, known as the ET-Plus.

Trinity will also not fulfill any orders that are on the books; it did not say how many of those orders it had.

The reversal came as three additional states – Arizona, Connecticut and Louisiana – joined 10 other states in barring further installations of the ET-Plus.

**J.     Trinity's Fraudulent Scheme Continues Following the Whistleblower Action Verdict**

143.    Even in the wake of the Whistleblower Action's unanimous jury verdict saddling Trinity with ***at least $525 million of liability*** – and the public scrutiny and disruption to Trinity's business operations that followed – the Company remained defiant and committed to its fraudulent scheme, stridently (and falsely) maintaining that the ET-Plus was a safe product that met all applicable safety requirements and guidelines.

144.    For example, on October 20, 2014 – the same day the jury reached its verdict in the Whistleblower Action – Trinity issued a press release, stating, among other things, that "Trinity believes the decision cannot and will not withstand legal scrutiny," and that "[t]he Company strongly believes the courts will affirm its position."

145.    The following day, October 21, 2014, the FHWA sent Trinity a letter, which contained a mandate requiring the Company to complete additional crash testing of the ET-Plus.  The letter set forth eight specific tests that needed to be completed and required Trinity to submit a "crash testing plan" to the FHWA by October 31, 2014.  The letter further noted that "[s]hould Trinity not comply with this request, the FHWA may suspend and/or revoke the eligibility of the ET-Plus."

146.    As detailed *supra*, up until this point, the FHWA had accepted Trinity's explanations and assertions regarding the modifications to and testing of the ET-Plus at face value – regardless of how flawed, untenable or demonstrably false those explanations and assertions were – and had failed to conduct a truly thorough and objective investigation of the ET-Plus and its safety qualifications. On its face, the October 21, 2014 letter – which was sent ***more than two and a half years*** after the FHWA first learned about Trinity's dangerous and undisclosed modifications to the ET-Plus –

appeared to represent a potential shift in the FHWA's approach to the issue.  Unfortunately, as further detailed below, the FHWA's supposedly heightened level of scrutiny lacked any rigor.

147.    On October 24, 2014, Trinity issued another press release, this time announcing that the Company would be ceasing further shipments of the ET-Plus until the FHWA-mandated additional crash testing was completed.  At the same time, however, ***Trinity continued to offer false reassurances*** regarding the safety and compliance of the ET-Plus, with Defendant Mitchell specifically stating:

> We have confidence in the ET-Plus® System as designed and crash tested by Texas A&M Transportation Institute. It has met all tests previously requested by FHWA. We take the safety of the products we manufacture very seriously.

148.    On October 27, 2014, United States Senator Charles E. Schumer of New York issued a news release, calling on the FHWA to "conduct a top-to-bottom review" of the ET-Plus.  Specifically, Senator Schumer stated, in part:

> Guardrails are there to protect us during a car accident, not to become lethal weapons that put drivers and passengers further in danger.  ***These "ET-Plus" guardrail end terminals cause more harm than good***, and the Federal Highway Administration should work with New York State to identify where these dangerous guardrails are located and provide guidance for whether and how to replace them.

149.    Despite the public outcry, Trinity remained defiant and steadfast in its misstatements to investors.  For example, on October 29, 2014, Trinity held its third quarter 2014 earnings conference call.  During the call, Wallace stated, in part:  "It is our belief that since its introduction in 2000, including all additional improvements to the product, the ET-Plus system has been in compliance with the governing standards."

150.    Notwithstanding the purportedly heightened level of concern from the FHWA, the additional scrutiny from politicians and state officials, and the rapidly increasing negative impact on Trinity's ET-Plus business operations, Trinity remained undeterred.  Indeed, instead of coming clean about the dangerous risks associated with the modified version of the ET-Plus and developing a plan to reduce the future harm of such risks, Trinity spent the next several months ***continuing to manipulate and exploit the FHWA's flawed procedures and lack of objectivity***, in order to perpetuate the Company's lie that the ET-Plus was still a safe highway product that met all applicable

- 42 -

safety tests and requirements.  Over this same period, the FHWA continued to demonstrate a highly questionable lack of concern over Trinity's fraudulent modifications to the ET-Plus and the dangerous impact those changes had on the safety and efficacy of the deadly product.  Indeed, as further detailed below, the manner in which the additional crash testing requested by the FHWA's October 21, 2014 letter was carried out all but confirmed that the FHWA's true concern was *not* a fair and objective evaluation of the safety and efficacy of the ET-Plus.  Instead – as evidenced by the FHWA's decision to, in the words of  United States Senator Richard Blumenthal of Connecticut, allow Trinity to "*conduct sham tests rife with flaws*" – the agency's actual objective in requiring additional crash testing of the ET-Plus was apparently just to create evidence for the FHWA to use in response to criticism that the agency had previously failed to properly monitor and enforce Trinity's compliance with federal safety regulations.

151.    On October 31, 2014, the FHWA announced that it had received, but was refusing to disclose, the crash testing plan submitted by Trinity in response to the FHWA's October 21, 2014 letter.  That same day, *ABC News* published an article entitled, "Guardrail Co. Avoids Nationwide Ban With Crash Test Plan."  In addition to discussing the FHWA's receipt of, and refusal to disclose, Trinity's crash testing plan, the article also noted that, at the time of publication, *30 states* had banned installation of the ET-Plus, but that *Trinity was continuing to stand by the ET-Plus*, citing the Company's "*high degree of confidence in the performance and integrity*" of the product.  The article also noted concerns voiced by two industry professionals regarding the FHWA's continued shortcomings and lack of objectivity in its approach to the issue, stating in part:

> "The public should be able to review these materials," said Sean Kane, founder of The Safety Institute.  "*We can't tell the difference between the regulators and the regulated here.  This coziness has been part of the problem since the beginning.*"

> \*          \*          \*

> Dean Sicking, a renowned guardrail engineer who authored manuals for crash testing – and who also testified against Trinity Industries in the federal trial – wrote to the agency, questioning the type of tests it may conduct, concerned that there has been an "*ongoing deception of the FHWA*" by Trinity Industries.

- 43 -

152.    On November 12, 2014, in a remarkable showing of continued deference to the Company, the FHWA announced its decision to accept Trinity's proposed crash testing plan. At the same time, the FHWA finally released the details of the plan, which tended to confirm that the FHWA was more concerned with defending its own previous actions (and inaction), than it was with ensuring that the fraudulently modified ET-Plus was actually safe for use on the nation's highways. Most egregiously, the plan required the ET-Plus to satisfy *only* the much more lenient testing standards *applicable in 2005* (NCHRP Report 350), as opposed to the more stringent requirements that had been adopted for all such highway devices in 2011 (MASH). In addition, the plan contained curious limitations on the overall transparency of the process, including, for example, restrictions on media access and a provision preventing individuals in attendance from recording the tests with cameras or video equipment.

153.    Internal FHWA documents generated around this time – including, for example, "*murderboard*" question-and-answer documents – are also consistent with a view that the FHWA's primary focus was defending and/or justifying its own previous actions (and inaction), as opposed to conducting a fair and objective evaluation of the potential safety concerns associated with the fraudulently modified ET-Plus.

154.    The crash testing plan was immediately met with criticism. For example, on November 12, 2014, Senator Blumenthal wrote a scathing letter to the FHWA, calling the testing plan "*woefully inadequate and far too deferential to Trinity*," noting in particular the agency's failure to require the ET-Plus to meet current safety standards, despite the well-documented safety concerns associated with the device and the fact that the Company had been found by a jury to have intentionally defrauded the federal government. Other critics noted that a large number of injuries and/or deaths had resulted from drivers impacting the ET-Plus guardrail end terminals at a slight angle, but that such crashes would *not* be examined under the plan adopted by the FHWA.

155.    On November 13, 2014, Senator Schumer issued another news release criticizing the FHWA-approved crash testing plan, specifically focusing on the FHWA's unfathomable decision to "grandfather[]" the ET-Plus into less stringent out-of-date testing standards, notwithstanding the well-

- 44 -

documented safety concerns associated with the product.  The news release included a copy of a letter Senator Schumer had sent to the FHWA, which stated, in part, that "the testing plan laid out by Trinity and approved by FHWA leaves ***significant gaps in oversight*** and as a result will continue to leave unanswered questions about the safety of the guardrail end terminal."  In addition, Senator Schumer's letter noted that "given Trinity's track record and the significant and documented concerns with the ET-Plus end terminal, FHWA should be exhaustive in efforts to determine the performance of the ET-Plus."

156.    On November 26, 2014, two Illinois counties filed a lawsuit against Trinity, on behalf of all counties in the state of Illinois.  Among other things, the lawsuit accused the Company of engaging in a "fraudulent cover up" and deceptive trade practices in connection with Trinity's fraudulent and unsafe modifications to the ET-Plus.

157.    Notwithstanding the above concerns and public outcry, the flawed crash testing plan proposed by Trinity and accepted by the FHWA commenced on December 10, 2014.

158.    Over the next several months, however, questions and concerns continued to percolate regarding the safety of the ET-Plus, and the adequacy of the FHWA's efforts to evaluate and assess the same.  All the while, Trinity continued its efforts to perpetuate the Company's lie that the ET-Plus was still a safe highway product that met all applicable safety tests and requirements.

159.    On December 11, 2014, the Commonwealth of Virginia filed a Complaint-in-Intervention assuming control of an existing *qui tam* action against Trinity, which was filed in 2013 by Harman pursuant to the Virginia Fraud Against Taxpayers Act.  Trinity, of course, continued to deny any wrongdoing.  That same day, the *Times* published an article entitled, "Virginia Sues Maker of Potentially Risky Guardrail," which stated in part:

> "It is shocking that a company would think they could secretly modify a safety device in a way that may actually pose a threat to Virginia motorists," [Virginia Attorney General Mark Herring] said.  "Trinity had an obligation to test and seek approval for its equipment, but instead, they sold the commonwealth thousands of unapproved products that had not been properly tested to ensure they would keep motorists safe."

> Trinity said it would defend itself against Virginia's lawsuit.  "***Trinity did not commit fraud against the Commonwealth of Virginia***," said Jeff Eller, a spokesman for Trinity.

- 45 -

*     *     *

Virginia officials attended Wednesday's test, *but Trinity did not allow them to inspect the ET-Plus test unit before the crash*. Only federal officials were provided such access, according to a company spokesman.

Virginia had also originally asked that Trinity test guardrail units that were actually installed on roads, being used in service.  The units used in Wednesday's test, and planned for the next seven crash tests, came from the inventory of the California Department of Transportation, not from the state's roads, Mr. Furst said Wednesday.

160.    On December 12, 2014, *Bloomberg* published an article entitled, "Company Denied Its Guardrails Turned Into Spears. Meanwhile, Was It Making a Quiet Fix?"  Among other things, the article noted Dr. Sicking's discovery in 2013 (described in ¶¶131-132, *supra*) that Trinity had "quietly produced a third version of its ET-Plus with dimensions [that] make it less prone to malfunctioning."  The article also noted that, in addition to the modified units discovered by Dr. Sicking in Alabama, "*Bloomberg News* measured dozens of Trinity devices *installed last year in southeastern Arizona* . . . finding dimensions similar to those Sicking outlined."  The article further noted that Harman had "seen versions with similar measurements in Texas, Tennessee and California," and Dr. Sicking had also seen similar units "in Texas as well as Mississippi."  The article further noted that the ET-Plus units being used in the current FHWA-mandated crash testing were "ordered [by the state of California] in June, and they were among two dozen that arrived in September," leaving open the possibility that the units being tested were the "quietly produced," "third version[s]" of the ET-Plus, and *not* the deadly product that had been secretly modified in 2005 and installed on state highways for the better part of the past decade.

161.    On December 24, 2014, the FHWA published a Federal Register notice requesting "data and information regarding the ET-Plus guardrail end terminal (ET-Plus) manufactured by Trinity Industries, Inc. (Trinity)," before determining whether the product should continue to remain "eligible for Federal-aid highway funding."  Notably, this request came *almost three years after* the FHWA first learned about Trinity's dangerous and undisclosed modifications to the ET-Plus.

162.    On January 16, 2015, Senators Schumer and Blumenthal submitted a joint letter to the FHWA, again detailing their criticism of the FHWA's ongoing examination of the ET-Plus.  Among other things, the letter stated that the FHWA had failed "to answer many of the questions we have

raised," leaving the senators to "find it *difficult to maintain confidence that [the FHWA] is taking proper action* to ensure that the device meets the highest safety standards."  The letter also reiterated the senators' concerns regarding the FHWA's decision to employ outdated testing standards, stating that by doing so, the "*FHWA fails to grasp the primary goal of testing* and its role as a federal safety agency."  The letter further asserted that the FHWA's approach indicated the agency was "attempting to answer whether the agency received credible information from Trinity in past years," while failing to recognize that "the ultimate inquiry is whether this device is safe for today's roads."  In addition, the senators' letter correctly noted that "[f]ocusing on whether or not this product should have been approved per old standards is *irrelevant* if the ET-Plus remains a danger."

163.    Criticism of the FHWA's testing process continued following the completion of the tests in late-January 2015, as evidence emerged regarding what appeared to be a *failed test*.  For example, on January 30, 2015, the *Times* published an article entitled, "Assessment of Guardrails May Hinge on Final Crash Test," which noted, with regard to the eighth and final FHWA-mandated test, that "[t]here appeared to be substantial damage to the driver's-side door, which collapsed inward and, in the aftermath, hung open, revealing the test dummy."  The article also quoted Dr. Sicking as noting, after reviewing the video, that the guardrail had "*clearly failed*" the test, and further quoted Senator Blumenthal as describing the video of the final test as "*very disturbing*."  In addition, the article stated that "the federal testing guidelines say that 'deformations of, or intrusions into, the occupant compartment that could cause serious injuries *should not be permitted*" and that fragments or other debris from the device should not 'show potential for penetrating the occupant compartment.'"  According to Dr. Sicking, such "potential" was evident in the video of the final ET-Plus crash test.[19]

164.    Also on January 30, 2015, Dr. Sicking submitted a letter to the Members of the American Association of State Highway and Transportation Officials' Standing Committee on Highways.  As noted *supra*, Dr. Sicking is a renowned guardrail engineer from the University of

---

[19]   As detailed *infra*, other industry professionals subsequently confirmed that the eighth and final test, in fact, should have been deemed a failure.

Alabama-Birmingham.  Moreover, as the second author of NCHRP Report 350 and the principal author of MASH, as well as the inventor of the original ET-2000, Dr. Sicking is one of the preeminent authorities on highway safety, and perhaps the single most qualified person to opine on the safety of the ET-Plus and the efficacy of the FHWA's procedures for investigating the same.  In his January 30, 2015 letter, Dr. Sicking outlined several "concerns regarding FHWA's efforts to determine whether the ET-Plus with a 4-inch guide channel provides sufficient safety performance to merit its continued use along the nation's highways."  Indeed, according to his letter, the substantial flaws in the FHWA's approach to its supposed "investigations" of the ET-Plus led Dr. Sicking to the conclusion that "the most likely outcome of these investigations is that the ***FHWA will give the transportation community a false impression*** that the ET-Plus with a 4-inch channel provides adequate levels of safety to allow existing installations to remain in place and allow new installations along the National Highway System."  As further detailed in Dr. Sicking's letter, the flawed nature of the FHWA's approach was destined to "undoubtedly produce a finding that ***greatly overstates the safety performance of the ET-Plus***."

165.    Among other things, Dr. Sicking's January 30, 2015 letter identified the following problems with the FHWA's testing protocol:

- A number of devices used in the testing had "critical dimensions higher than the acceptable manufacturing tolerance," which made those units more likely to pass the tests;

- The testing was limited to wood posts, despite the fact that "more than 90% of guardrails installed across the nation now incorporate steel posts;" and

- The testing was closed to the public.

166.    Notwithstanding the outspoken criticism against the FHWA's inadequate testing procedures, the FHWA announced on February 6, 2015, that the ET-Plus had passed the ***first four*** of the FHWA's crash tests.  That same day, the *Times* published an article addressing the FHWA's announcement.  The article, entitled, "Guardrail System Passes First Tests, U.S. Agency Says," stated in part:

A summary of the results of the first four of eight tests, which involved guardrails about 28 inches in height, showed the guardrails with passing marks for all of the evaluation factors, ***except one: "vehicle trajectory,"*** in which the vehicle is not

- 48 -

supposed to move into an adjacent lane after the crash.  But the agency noted that *meeting that criterion was not a requirement for passing the test*.

167.   On February 9, 2015, The Safety Institute submitted a letter in response to the FHWA's December 24, 2014 Federal Register notice.  Among other things, the letter outlined the results of a recent study sponsored by The Safety Institute in connection with the University of Alabama-Birmingham, which found that the ET-Plus was significantly more likely to produce injuries and/or fatalities than the previous ET-2000 end terminal design.  The February 9, 2015 letter also provided a detailed basis for determining that the eighth and final FHWA-mandated crash test was a "failed" test, noting, *inter alia*, NCHRP 350's requirement that "the test article not penetrate the occupant compartment and that there be *no deformations of or intrusions into the occupant compartment that could cause a disabling injury*."  In addition, the letter referenced a declaration from engineer Brian Coon stating that the eighth and final test was a "*clear failure* under NCHRP Report 350 guidelines."  The Safety Institute letter also stated in part:

> Given that Trinity has proven to be deceitful several times since 2005, that dozens of injuries and deaths have been linked to the ET-Plus, that states have reported incidents involving the ET-Plus and removed it from their approved-products lists and that the ET-Plus has now failed one of the tests it was predicted to pass, it is time for the FHWA to require all of the tests it has in its arsenal, following the MASH criteria. The FHWA should use every tool it possesses to ensure the ET-Plus end terminals that are currently on the nation's roadways do not reduce safety for motorists.

168.   Unfortunately, as detailed below, the FHWA declined The Safety Institute's compelling request to "use every tool it possesses to ensure the ET-Plus end terminals that are currently on the nation's roadways do not reduce safety for motorists."

169.   Later in February, news began to emerge about Trinity's extensive "lobbying campaign," aimed at currying favor amongst lawmakers investigating the ET-Plus.  Specifically, on February 12, 2015, the *Times* published an article entitled, "Troubled Guardrail Maker Goes on a Lobbying Blitz."  Among other things, the article described Trinity as a "once low-profile company [that] has mounted an *increasingly aggressive lobbying campaign* in recent years as concerns over its guardrails have grown."  According to the article, "[i]n the last two years, [Trinity had] contributed $300,000 to the Democratic Attorneys General Association and the Republican Attorneys General Association, after not donating in the two previous years."  The article further stated that, "*[t]he flow*

- 49 -

*of money started only after federal and state officials, in 2012, became aware of possible defects in the guardrail design*, after a whistle-blower lawsuit was filed." The article also stated that the Company had "made direct campaign donations to the 2014 political accounts of attorney general candidates in Oklahoma, Ohio, Alabama, New Mexico, Colorado, Utah, Georgia, Florida, South Carolina and South Dakota, among other states," further noting that Trinity had become "a Platinum sponsor" to the Republican Attorneys General Association, which secured for Trinity invitations to VIP dinners and other "private briefing" opportunities. The article also described in detail Trinity's efforts to secure face-to-face meetings with attorneys general from Florida and Ohio, respectively, following the filing of two lawsuits against Trinity, noting that each meeting was subsequently followed by campaign contributions to the respective attorney general.

170. Just one week after the *Times* article was published, Trinity filed its Form 10-K with the SEC for the fourth quarter and full year ended December 31, 2014. Completely ignoring the intense media scrutiny, Trinity continued to champion its products as "*eligible for Federal-aid reimbursement based on satisfactory performance testing*" in the Form 10-K.

171. On February 20, 2015, *ABC News* published an article entitled, "Senator Calls Guardrail Test Video 'Hideously Shocking,'" detailing, among other things, Senator Blumenthal's reaction to video of the ET-Plus's apparent failure in the FHWA's eighth and final crash test. More specifically, the article quoted Senator Blumenthal as saying, "[t]he damage done to the driver's side is very simply supposed to not happen and so *that final test is deeply disturbing and gives me strong reason to say there ought to be more testing*." In addition, the article noted that "*Trinity has maintained that their guardrail system is safe*," and that "company officials say the 'pass' results of the first four tests 'validate' the company's 'long standing position' that if installed and maintained correctly on the highway, the ET-Plus it will perform as intended." The article further noted that "[t]he company says it *remains confident in the performance of its product*."

172. On March 3, 2015, a group of six U.S. senators – consisting of Senator Blumenthal, Senator Cory A. Booker of New Jersey, Senator Edward J. Markey of Massachusetts, Senators Mark Warner and Tim Kaine of Virginia, and Senator Sheldon Whitehouse of Rhode Island – sent a joint

letter to the Government Accountability Office requesting an investigation of the FHWA's processes and procedures in light of the recent developments involving the ET-Plus evaluation.

173.    On March 13, 2015, notwithstanding the outspoken criticism against the FHWA's inadequate testing procedures and the apparent failure of the eighth and final test, the FHWA announced that the ET-Plus *had passed all eight crash tests* mandated by the FHWA.  Criticism of the FHWA's processes immediately followed.

174.    For example, on March 13, 2015, the *Times* published an article entitled "Guardrails Said to Pass Safety Tests."  Among other things, the article noted that the FHWA's approval of the eighth and final test *appeared to contradict the agency's own guidelines*.  Specifically, according to the article, "[t]he agency said its  measurements showed that the driver's door was *pushed in only 6.75 inches* and it did not believe the damage was likely to cause serious injury."  However, the article also noted that "[i]n 2003, the National Highway Traffic Safety Administration published a study at the request of the Federal Highway Administration saying that *the threshold for such damage had been set at six inches*," and the study also found that "when there were intrusions of six inches or more in the crashes it analyzed, *36 percent of injuries were of moderate to maximum severity*."  The article also noted the continued criticism of Senator Blumenthal, who was quoted as saying that the FHWA had "'*given the ET-Plus a passing grade after allowing the manufacturer to conduct sham tests rife with flaws*.'"

### K.    The DOJ Initiates a Criminal Investigation of Trinity

175.    Defendants' efforts to perpetuate their fraud and suppress the well-documented safety concerns regarding their dangerously modified ET-Plus ultimately came to a head in April 2015 when the DOJ announced it was initiating a criminal investigation concerning the Company.

176.    Specifically, on April 21, 2015, *Bloomberg* published an article entitled "U.S. Opens Criminal Probe Into Highway Guardrails Alleged to Turn Into Spears on Impact," which stated in part:

> The U.S. Justice Department is conducting a criminal investigation into the use of a highway guardrail system linked to at least eight deaths, according to people familiar with the matter, signaling a new wave of potential woes for manufacturer Trinity Industries Inc.

- 51 -

Word of the inquiry comes weeks after Trinity appeared poised to move on from more than a year of scrutiny in courts and from states over the performance of its embattled ET-Plus, a product meant to blunt the impact of cars that crash headlong into guardrails. In March, Trinity's system passed a closely watched series of crash tests ordered by the Federal Highway Administration, the government agency that certifies the safety of roadside hardware.

Now, federal investigators are interviewing potential witnesses about issues *including Trinity's relationship with the FHWA*, according to these people. Investigators from a public corruption and special prosecutions unit of the Justice Department have subpoenaed documents from court battles involving Trinity's ET-Plus on behalf of a grand jury, according to one of these people.

\*     \*     \*

*The investigation indicates that the most serious turn in Trinity's guardrail saga may be yet to come, adding the specter of criminal wrongdoing to previous allegations of fraud and deadly design changes*.

177.    On April 24, 2015, without providing any substantive details, Chief Legal Officer Rice confirmed the commencement of the DOJ investigation in an earnings conference call, stating that the Company "intend[ed] to cooperate in [the] investigation."

178.    On April 29, 2015, Trinity confirmed in a Form 8-K filing signed by Defendant Perry that "[o]n April 28, 2015, [Trinity] received a subpoena from the U.S. Department of Justice," requesting "documents from 1999 through the present relating to the ET 2000 and ET Plus guardrail end-terminal products." The Form 8-K also stated that "[t]he Company intends to cooperate with this request."

179.    Also on April 29, 2015, *Bloomberg* published an article entitled "Trinity Gets Subpoena in Probe of Guardrail Safety Device." The article stated in part:

Trinity Industries Inc. has been subpoenaed by the U.S. Justice Department over its allegedly defective guardrail safety system.

The subpoena, issued by U.S. Attorney Carmen Ortiz in Boston, seeks documents from 1999 and later regarding Trinity's guardrail end terminals, which are designed to absorb the impact of a crash, the company said in a regulatory filing. The subpoena, which Trinity said it received on April 28, comes one week after Bloomberg News first reported a federal criminal investigation involving the company's ET-Plus guardrail system.

180.    The initiation of the DOJ's criminal investigation into Trinity's fraudulently modified ET-Plus and the Company's relationship with the FHWA represented a tipping point for the investing public. As detailed above, in the months following the jury verdict in the Whistleblower Action,

- 52 -

Trinity embarked on a relentless campaign to convince the public that the jury in the Whistleblower Action had got it wrong, and that the ET-Plus was, and always had been, a safe product that met all applicable safety requirements and guidelines.   Prior to the initiation of the DOJ's criminal investigation, Trinity's campaign of deception – enabled by the FHWA's lack of objectivity and failure to adequately evaluate the safety profile of the modified ET-Plus – had been relatively successful.   However, the initiation of the DOJ's criminal investigation provided the investing public with a new perspective regarding Trinity's fraudulent scheme and allowed investors to appreciate the severity of the problems facing Trinity.   As a result, the investing public reacted, driving Trinity's stock price down, as further detailed in §VII., *infra*.

## V.   DEFENDANTS' FALSE AND MISLEADING MATERIAL MISSTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   Defendants' Affirmative Misstatements

181.   Throughout the Class Period, Defendants made the following affirmative statements regarding Trinity's Construction Products Group, THP, the ET-Plus and/or litigation the Company was facing as a result of its fraudulent modifications to the ET-Plus, including, specifically, the Whistleblower Action.   All of these statements were materially false and misleading at the time they were made, as further detailed below.

182.   On February 15, 2012, after the market closed, Trinity issued a press release announcing its fourth quarter and full year 2011 financial results.   Among other things, the press release stated in part:

> Revenues in the Construction Products Group were $142.4 million in the fourth quarter of 2011 compared to revenues of $129.1 million in the fourth quarter of 2010. The group recorded an operating profit of $11.2 million in the fourth quarter of 201 compared to an operating profit of $6.7 million in the fourth quarter of 2010. ***The increase in revenues and profits for the three month period ended December 31, 2011 compared to the same period in 2010 was primarily attributable to higher volumes in the Highway Products business*** partially offset by lower shipments in the Concrete and Aggregates business due to the divestitures of several ready mix concrete facilities located in Central Texas in April 2011.

183.   Trinity's February 15, 2012 press release was false and misleading, as it failed to disclose the truth concerning, among other things: (1) Trinity's intentional concealment of the Company's secret modifications to the ET-Plus; (2) Trinity's manipulation and exploitation of the

- 53 -

regulatory approval process; and (3) the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

184.    The Company made similarly misleading statements – all of which also failed to disclose the omitted information described in ¶183, *supra* – in its press releases on the following dates throughout the Class Period: April 25, 2012; July 25, 2012; October 24, 2012; February 20, 2013; April 30, 2013; July 31, 2013; October 30, 2013; February 19, 2014; April 29, 2014; July 29, 2014; October 28, 2014; February 18, 2015; and April 23, 2015.

185.    On February 16, 2012, Trinity filed its Form 10-K with the SEC for the 2011 fourth quarter and full year, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-K stated in part:

> Our highway products businesses are leading U.S. manufacturers of highway products. We manufacture guardrail, crash cushions, and other protective barriers. ***The Federal Highway Administration . . . has approved most of our products as acceptable permanent and construction zone highway hardware according to requirements of the National Cooperative Highway Research Program***.
>
> Our crash cushions and other protective barriers include multiple proprietary products manufactured through various product license agreements with certain public and private research organizations and inventors.  ***We hold patents and are a licensee for certain of our guardrail and end-treatment products, which enhances our competitive position for these products***.
>
> \*          \*          \*
>
> The primary regulatory and industry authorities involved in the regulation of highway products business are the United States Department of Transportation, the Federal Highway Administration, and various state highway departments.
>
> These organizations establish certain standards and specifications related to the manufacture of our highway products.  ***If our products were found not to be in compliance with these standards and specifications, we would be required to re-qualify our products for installation on state and national highways.***
>
> ***We believe that our highway products are in substantial compliance with all applicable standards and specifications***.  We cannot predict whether future changes in these standards and specifications would have a material adverse effect on our financial condition and operations.

186.    The Form 10-K filed on February 16, 2012, also contained certifications pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), which were signed by Defendants Wallace and Perry.  The SOX Certifications

stated, among other things, that the filing "fully complies" with the applicable requirements of the Exchange Act, and that the information in the filing "fairly presents, in all material respects, the financial condition and result of operations of the Company." In addition, the Form 10-K stated in part:

### Disclosure Controls and Procedures

The Company maintains controls and procedures designed to ensure that it is able to collect the information it is required to disclose in the reports it files with the SEC, and to process, summarize, and disclose this information within the time periods specified in the rules of the SEC. The Company's Chief Executive and Chief Financial Officers are responsible for establishing and maintaining these procedures and, as required by the rules of the SEC, evaluating their effectiveness. Based on their evaluation of the Company's disclosure controls and procedures which took place as of the end of the period covered by this report, the Chief Executive and Chief Financial Officers believe that these procedures are effective to ensure that the Company is able to collect, process, and disclose the information it is required to disclose in the reports it files with the SEC within the required time periods.

### Management's Report on Internal Control over Financial Reporting.

Management of the Company is responsible for establishing and maintaining effective internal control over financial reporting as defined in Rules 13a-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States.

*       *       *

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2011. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control — Integrated Framework*. Based on our assessment, we believe that, as of December 31, 2011, the Company's internal control over financial reporting was effective based on those criteria.

187.    Virtually identical statements to those set forth in ¶186, *supra*, were contained in all of Trinity's Form 10-K filings with the SEC throughout the Class Period, all of which included SOX Certifications signed by Defendants Wallace and Perry. The SOX Certifications represented to investors, among other things, that Defendants Wallace and Perry had ensured that Trinity's internal controls were adequate to ensure accurate financial reporting. As detailed herein, Defendants' Class Period SOX Certifications were materially false and misleading, as Trinity's SEC filings throughout

- 55 -

the Class Period each failed to disclose at least some of the omitted information described in ¶183, *supra*, in addition to violating GAAP and SEC disclosure rules, as detailed in §V.C., *infra*.

188.    On April 26, 2012, Trinity filed its Form 10-Q for the first quarter of 2012, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  In addition, the Form 10-Q also included SOX Certifications signed by Defendants Wallace and Perry, which stated, among other things, that the filing "fully complies" with the applicable requirements of the Exchange Act, and that the information in the filing "fairly presents, in all material respects, the financial condition and result of operations of the Company."  The Form 10-Q also stated in part:

**Disclosure Controls and Procedures**

The Company maintains controls and procedures designed to ensure that it is able to collect the information it is required to disclose in the reports it files with the SEC, and to process, summarize, and disclose this information within the time periods specified in the rules of the SEC. The Company's Chief Executive and Chief Financial Officers are responsible for establishing and maintaining these procedures and, as required by the rules of the SEC, evaluating their effectiveness. Based on their evaluation of the Company's disclosure controls and procedures which took place as of the end of the period covered by this report, the Chief Executive and Chief Financial Officers believe that these procedures are effective to ensure that the Company is able to collect, process, and disclose the information it is required to disclose in the reports it files with the SEC within the required time periods.

**Internal Controls**

The Company maintains a system of internal controls designed to provide reasonable assurance that: transactions are executed in accordance with management's general or specific authorization; transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles, and (2) to maintain accountability for assets; access to assets is permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

During the period covered by this report, there have been no changes in the Company's internal controls over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting.

189.    Virtually identical statements to those set forth in ¶188, *supra*, were contained in all of Trinity's Form 10-Q filings with the SEC throughout the Class Period, all of which included SOX Certifications signed by Defendants Wallace and Perry.  The SOX Certifications represented to investors, among other things, that Defendants Wallace and Perry had ensured that Trinity's internal

controls were adequate to ensure accurate financial reporting.  As detailed herein, Defendants' Class

Period SOX Certifications were materially false and misleading, as Trinity's SEC filings throughout

the Class Period each failed to disclose at least some of the omitted information described in ¶183,

*supra*, in addition to violating GAAP and SEC disclosure rules, as detailed in §V.C., *infra*.

190.    On July 26, 2012, Trinity filed its Form 10-Q for the second quarter of 2012, which

again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-Q stated

in part:

> ***For the six month period ended June 30, 2012, revenues increased compared to the
> same period last year due to higher volumes in our Highway Products business*** offset by slightly lower revenues in our Concrete and Aggregates business resulting
> from the divestiture of our Central Texas Region ready mix concrete facilities in April
> 2011.

191.    On October 25, 2012, Trinity filed its Form 10-Q for the third quarter of 2012, which

again failed to disclose any of the omitted information detailed in ¶183, *supra*.

192.    On February 21, 2013, Trinity filed its Form 10-K with the SEC for the 2012 fourth

quarter and full year of 2012, which again failed to disclose any of the omitted information detailed in

¶183, *supra*.  The Form 10-K also contained statements virtually identical to those quoted in ¶185,

*supra*.

193.    In addition, the 2012 Form 10-K filed on February 21, 2013, also announced, ***for the

first time***, that the Company was a defendant in the Whistleblower Action.  At the same time, the

Company: (1) stated that it did not believe a loss was "probable"; (2) falsely asserted that it had

satisfied all required testing criteria and "product approval requirements"; and (3) failed to disclose

any of the omitted information detailed in ¶183, *supra*.  Specifically, the Company stated in part:

> In a related matter, on January 28, 2013, the Company was advised that the
> United States filed a "Notice of Election to Decline Intervention" in a False Claims
> Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States
> District Court for the Eastern District of Texas, Marshall Division styled JOSHUA
> HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator
> ("Mr. Harman") V. TRINITY INDUSTRIES, INC., DEFENDANT, Case 2:12-cv-
> 00089-JRG.  Although the Company has not received service of process in this
> litigation, it has obtained a copy of the complaint.  Mr. Harman alleges that the
> Company presented false or fraudulent claims, records or statements to the United
> States to obtain payment or approval, ostensibly related to the ET-Plus, and seeks
> damages equaling the cost to recall and replace all installations of the ET-Plus plus
> treble civil penalties, costs, and interest.  ***The Company notes that since its
> introduction in 2000, including all improvement modifications thereafter, the ET-***

*Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration*.  The Company intends to vigorously defend Mr. Harman's allegations which will likely result in certain legal expenses.  *We do not believe that a loss is probable nor can a range of losses be determined*.  Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.

194.     On May 1, 2013, Trinity filed its Form 10-Q with the SEC for the first quarter of 2013, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-Q contained statements regarding the Whistleblower Action that were virtually identical to those quoted in ¶193, *supra*.

195.     On August 1, 2013, Trinity filed its Form 10-Q with the SEC for the second quarter of 2013, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-Q contained statements regarding the Whistleblower Action that were virtually identical to those quoted in ¶193, *supra*.

196.     On October 31, 2013, Trinity filed its Form 10-Q with the SEC for the third quarter of 2013, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-Q contained statements regarding the Whistleblower Action that were virtually identical to those quoted in ¶193, *supra*.

197.     On February 20, 2014, Trinity filed its Form 10-K with the SEC for the fourth quarter and full year of 2013, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-K contained statements virtually identical to those quoted in ¶¶185 and 193, *supra*.

198.     On April 30, 2014, Trinity filed its Form 10-Q with the SEC for the 2014 first quarter, which again failed to disclose any of the omitted information detailed in ¶183, *supra*.  The Form 10-Q contained statements regarding the Whistleblower Action that were virtually identical to those quoted in ¶193, *supra*.  In addition, the Form 10-Q noted that the Whistleblower Action was scheduled to go to trial on July 14, 2014.

199.     On July 30, 2014, Trinity held an earnings conference call for the second quarter of 2014.  During the call, McWhirter stated in pertinent part:

> We are currently defending the Company in a false claims complaint related to our Highway Products business. ***The trial began on July 14 and ended in a mistrial on July 18 of this year***. The Company intends to vigorously defend itself against the allegations. Our second quarter 10-Q, which will be filed this morning, will provide more information on this matter.

200.    During the July 30, 2014 earnings conference call, Defendants again failed to disclose any of the omitted information detailed in ¶183, *supra*, or the fact that the mistrial had resulted from Judge Gilstrap's concerns over Trinity's improper conduct, including the improper witness intimidation described in ¶¶133-134, *supra*.

201.    On July 30, 2014, Trinity filed its Form 10-Q with the SEC for the second quarter of 2014. The Form 10-Q contained statements regarding the Whistleblower Action similar to those quoted in ¶193, *supra*. In addition, the Form 10-Q noted that the first trial in the Whistleblower Action had ended in a mistrial, and that the case was expected to be retried in the fall of 2014. The Form 10-Q also noted the FHWA's June 17, 2014 memo, described in ¶¶126-128, *supra*. Once again, however, Defendants failed to disclose any of the omitted information detailed in ¶183, *supra*, or the fact that the mistrial had resulted from Judge Gilstrap's concerns over Trinity's improper conduct, including the improper witness intimidation described in ¶¶133-134, *supra*.

202.    On October 20, 2014, the jury in the Whistleblower Action reached its unanimous verdict that Trinity "made, used, or caused to be made or used, a false record or statements material to a false or fraudulent claim," and further found that such conduct had caused $175 million in damages to the U.S. government, which would be trebled (for total liability of $525 million) and added to any civil penalty imposed by the court pursuant to the False Claims Act. In response, Trinity issued a press release entitled "Statement by Trinity Industries, Inc.," which stated in part:

> Earlier today a jury in the U.S. District Court for the Eastern District of Texas returned a verdict against Trinity Industries, Inc. . . . in a False Claims Act case. The jury awarded $175 million in damages.
>
> The Company respects the jury's decision. However, Trinity believes the decision cannot and will not withstand legal scrutiny. The Company strongly believes the courts will affirm its position.

203.    Trinity's October 20, 2014 press release was false and misleading, as it failed to disclose the full truth concerning, among other things: (1) Trinity's manipulation and exploitation of

- 59 -

the regulatory approval process; and (2) the significant financial liabilities and exposure created by
Trinity's fraudulent modifications to the ET-Plus.

204.    On October 24, 2014, Trinity issued a press release entitled "Trinity Highway Products
to Stop Shipments of ET-Plus® System."  The press release once again failed to disclose the full truth
concerning the omitted information detailed in ¶203, *supra*, and stated in part:

> Trinity Highway Products, LLC announced today that it will stop the shipment of the
> ET-Plus® System until additional crash testing can be completed.
>
> The Federal Highway Administration (FHWA) recently requested additional
> crash testing of the ET-Plus® System in support of its ongoing evaluation of the ET-
> Plus® System.  The Company will continue working with FHWA related to further
> testing and will stop shipment of the product until requested testing is completed.
>
> "In light of FHWA's request, the right thing to do is to stop shipping the product until
> the additional testing has been completed," said Gregg Mitchell, President, Trinity
> Highway Products, LLC.  "***We have confidence in the ET-Plus® System as designed
> and crash tested by Texas A&M Transportation Institute.  It has met all tests
> previously requested by FHWA.  We take the safety of the products we manufacture
> very seriously***," Gregg Mitchell said.

205.    Then, on October 28, 2014, Trinity issued a press release announcing its financial
results for the third quarter of 2014.  In the press release, Defendants addressed the jury verdict in the
Whistleblower Action, but once again failed to disclose the full truth concerning the omitted
information detailed in ¶203, *supra*, while making the false and misleading assertion that the
Whistleblower Action allegations were "without merit," and maintaining the untenable position that a
loss was *still* not probable.  Specifically, the press release stated in part:

> On October 20, 2014, a jury in a federal district court in Marshall, Texas
> returned a verdict stating that the Company and its subsidiary, Trinity Highway
> Products, LLC, "knowingly made, used or caused to be made or used, a false record
> or statement material to a false or fraudulent claim," awarding $175 million in
> damages based on such finding.  The jury's damages award, to the extent it survives
> the Company's challenge in post-trial motions or on appeal, is automatically trebled
> under the False Claims Act (the "Act") to $525 million.  Additionally, the district
> court is required to impose civil penalties for each violation of the Act (which
> penalties are not automatically trebled).  The district court has not yet entered a final
> judgment or determined a civil penalty amount.  ***The Company maintains that the
> allegations are without merit*** and intends to vigorously defend its positions in post-
> trial motions and on appeal to the United States Court of Appeals for the Fifth Circuit.
> Pending entry of a final judgment and completion of the Company's post-trial and
> appellate activities in this matter, the Company currently does not believe that a loss is
> probable, therefore no accrual has been included in the consolidated financial
> statements.

- 60 -

206.   On October 29, 2014, Trinity held its earnings conference call for the third quarter of 2014. During the call, Defendants once again failed to disclose the full truth concerning the omitted information detailed in ¶203, *supra*. Defendant Wallace, however, stated in part:

> **The Company maintains that the allegations are without merit** and the damages awarded were based on insufficient evidence. The court has not yet entered a final judgment in this case. We intend to vigorously defend our position in post-trial motions and on appeal to the US Court of Appeals for the Fifth Circuit.

> \*       \*       \*

> In order to keep things simple, I'm going to refer to both entities as Texas A&M. Trinity Highway Products manufactures and markets the ET-Plus according to an exclusive license agreement granted by Texas A&M. According to our license agreement, Texas A&M is responsible for the research, design, and development of the ET-Plus. Texas A&M conducted crash testing of the ET-Plus to demonstrate compliance with the required federal highway standards. In addition, Texas A&M prepared the ET-Plus test reports reviewed by the Federal Highway Administration in their consideration of product acceptance.

> **It is our belief that since its introduction in 2000, including all additional improvements to the product, the ET-Plus system has been in compliance with the governing standards**. On October 21, after the adverse trial verdict, the Federal Highway Administration requested that Trinity Highway Products perform a series of additional test to support their ongoing evaluation of the ET-Plus. On October 24, Trinity Highway Products issued a press release stating it will stop shipment of the ET-Plus until the additional testing has been completed.

207.   On October 29, 2014, Trinity filed its Form 10-Q with the SEC for the third quarter of 2014. The Form 10-Q addressed, among other things, the Whistleblower Action verdict and potential range of loss. At the same time, however, the Company continued to maintain that the allegations were "without merit" and that a loss was not "probable" and continued to fail to disclose the full truth concerning the omitted information detailed in ¶203, *supra*. Specifically, the Form 10-Q stated in part:

> On October 20, 2014 a trial of [the Whistleblower Action] concluded with a jury verdict stating that the Company and its subsidiary, Trinity Highway Products, LLC, "knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million. Additionally, the District Court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The District Court has the discretion to establish the civil penalty amount between $5,500 and $11,000 per violation. In this regard, the Relator contended during trial that certain invoices submitted to purchasers of the ET-Plus certified that the product was accepted by the Federal Highway Administration ("FHWA") and was therefore eligible for federal-aid reimbursement. Based on Relator's damages model in this

- 61 -

respect, the range of possible civil penalties is $5,500 (if the District Court determines there has been a single violation) to $184 million (if the District Court determines that each invoice for the product was a violation).

The District Court has not yet entered a final judgment or determined a civil penalty amount.  While the Company believes the District Court does not have the evidence required under the law to quantify civil penalties, the range of loss in this case, based on the jury's verdict and Mr. Harman's damage model for civil penalties, is $525 million to $709 million, exclusive of attorney's fees, costs, and interest.

208.    The Form 10-Q filed on October 29, 2014, also addressed the FHWA-mandated additional crash testing, the Company's decision to cease shipments of ET-Plus, and the potential recall of all ET-Plus units by the Commonwealth of Virginia.  At the same time, however, Defendants continued to fail to disclose the full truth concerning the omitted information detailed in ¶203, *supra*, stating in part:

On October 21, 2014, the FHWA advised the Company that in light of the jury's finding the Company must perform additional crash testing of the ET-Plus to support the FHWA's ongoing evaluation of ET-Plus performance.  On October 24, 2014, the Company issued a press release stating that it will stop shipments of the ET-Plus until additional crash testing of the ET-Plus can be completed.  Prior to the Company's press release, certain states had either removed the ET-Plus from their respective qualified products list or suspended further purchases of the ET-Plus pending the outcome of the FHWA-requested crash tests.  The state of Virginia is also evaluating a potential recall of all ET-Plus products installed on Virginia roadways.  Other states could take similar or different actions.  While the financial impacts of such actions are currently unknown, they could be material.  The Company is working with the FHWA to develop a plan for performing the requested crash testing and analysis.

209.    In addition, the Form 10-Q filed on October 29, 2014, generally acknowledged, *for the first time*, the numerous product liability lawsuits the Company was facing in connection with its fraudulently modified ET-Plus, and the possibility that more similar cases would be filed in the future.  At the same time, however, Defendants continued to fail to disclose the full truth concerning the omitted information detailed in ¶203, *supra*, stating in part:

The Company is currently defending a number of product liability lawsuits in several different states that are alleged to involve the ET-Plus.  These cases are diverse in light of the randomness of collisions in general and the fact that each accident involving roadside devices such as an ET-Plus, or any other fixed object along the highway has its own unique facts and circumstances.  Report 350 recognizes that performance of even the most carefully researched roadside device is subject to physical laws and the crash worthiness of vehicles.  While the Company is vigorously defending these lawsuits, the recent verdict in the Harman matter may affect the ultimate outcome in one or more of these cases.  Moreover, the Company expects the recent verdict, coupled with the media attention the verdict has generated, will prompt the plaintiff's bar to seek out vehicle accident victims involved in collisions with an

- 62 -

ET-Plus as potential clients, which may result in additional product liability lawsuits being filed against the Company. The Company carries general liability insurance to mitigate the impact of adverse verdict exposures in these cases.

210.     On February 18, 2015, Trinity issued a press release announcing its financial results for the fourth quarter and full year of 2014. In the press release, Defendants addressed the jury verdict in the Whistleblower Action with statements virtually identical to those quoted in ¶205, once again failing to disclose the full truth concerning the omitted information detailed in ¶203, *supra*.

211.     On February 19, 2015, Trinity held its earnings conference call for the fourth quarter and full year of 2014. During the call, Chief Legal Officer Rice addressed the additional crash testing mandated by the FHWA and provided purported "background information" on Harman "and his key consultant and witness, Dr. Dean Sicking." Rice also reiterated the Company's "confiden[ce] [that] the ET Plus is in compliance with applicable regulations." Defendants, however, once again failed to disclose the full truth concerning the omitted information detailed in ¶203, *supra*.

212.     On February 19, 2015, Trinity filed its Form 10-K with the SEC for the fourth quarter and full year of 2014. Once again, Defendants failed to disclose the full truth concerning the omitted information detailed in ¶203, *supra*. The Form 10-K did, however, contain statements virtually identical to those quoted in ¶¶185 and 207, *supra*, and further noted that "pending litigation in our Highway Products business [has] negatively impacted the results of our Construction Products Group."

213.     The Form 10-K filed on February 19, 2015, also addressed the additional crash testing mandated by the FHWA, without disclosing the full truth concerning the omitted information detailed in ¶203, *supra*, stating in part:

> On January 27, 2015, Trinity Highway Products completed the eighth, and final, test. On February 6, 2015, the FHWA released the crash test results of the first four tests conducted at the 27 3/4" installation height of the ET Plus. This release reports that the ET Plus passed Report 350 crash test criteria at the 27 3/4" guardrail height. The vast majority of guardrails installed on the roadways in the U.S. and Canada are at the 27 3/4" height. ***These test results validate Trinity Highway Products' long standing position that when installed, maintained and impacted within the Report 350 standards, the 27 3/4" height ET Plus performs to Report 350 criteria***. When all eight test results are reviewed and released by the FHWA, the company will perform a thorough analysis before resuming any shipments of the ET Plus to its customers.

- 63 -

214.   The Form 10-K filed on February 19, 2015, also addressed concerns raised  by Virginia and many other states, without disclosing the full truth concerning the omitted information detailed in ¶203, *supra*, stating in part:

> As of the date on which the eighth test was concluded, Trinity is aware of 42 states that had removed the ET Plus from their respective qualified products list.  The state of Virginia, in addition to evaluating a potential recall of all ET Plus products installed on Virginia roadways, has joined Mr. Harman's Virginia state action alleging the same false claims as were alleged in the false claims act case pending in the Eastern District of Texas.   Other states could take similar or different actions regarding recall, and could be considering similar state false claims litigation against the Company.  While the financial impacts of such actions are currently unknown, they could be material.

215.   On April 1, 2015, Chief Legal Officer Rice sent a letter addressed to "Our Stakeholders," on behalf of Trinity.[20]  The letter once again failed to disclose the full truth concerning the omitted information detailed in ¶203, *supra*.  Among other things, the letter stated in part:

> The ET Plus System is now the most crash-tested guardrail end-terminal system available. It has been crash-tested more times than any highway roadside product of its type. Devices like the ET Plus are designed to address an identified highway safety need while meeting applicable regulatory standards. ***Throughout the testing process, the ET Plus unequivocally demonstrated satisfactory performance in compliance with applicable crash-testing criteria***. Professional engineers at the FHWA and an independent engineering expert retained by FHWA both determined that the ET Plus passed all crashtesting and has met all Federal safety standards.

*        *        *

> Since 2012, TTI and Trinity Highway have been the targets of this malicious and unsubstantiated attack on their honesty, integrity, ethical principles, and commercial motives pertaining to the ET Plus. These attacks are fabricated based on an alleged "deception" ***resulting from the inadvertent omission of a one page drawing*** of a slightly modified ET Plus from the 90-plus-page crash-test report prepared by the research engineers at TTI and submitted to the FHWA for review. The omission was simply the unintentional administrative error of a TTI clerk in preparation of the final report package, which error a TTI research engineer admitted to under oath. The FHWA has thoroughly reviewed the modifications and has repeatedly confirmed that the ET Plus is crashworthy and meets Federal safety criteria.

---

[20]   Trinity's "Corporate Governance Principles" defines the term "Stakeholders" to include, among others, "stockholders, customers, company associates, communities, suppliers, creditors, governments, and corporate partners."

**B.** **Defendants' Insider Trading Gave Rise to a Duty to Disclose the Secret Modifications to the ET-Plus**

216.    Throughout the Class Period, Defendants Wallace and Perry repeatedly sold their holdings of Trinity common stock, as confirmed by numerous Form 4 filings with the SEC. Specifically, these transactions occurred on the following dates: February 27, 2012; October 31, 2012; November 1, 2012; November 2, 2012; February 27, 2013; May 16, 2013; May 21, 2013; February 27, 2014; August 1, 2014; August 4, 2014; and August 5, 2014.

217.    Each one of these transactions gave rise to an affirmative duty for Defendants to disclose any "material nonpublic information" in their possession at that time.  *See SEC v. Cuban,* 620 F.3d 551, 553-54 (5th Cir. 2010) ("The classical theory of insider trading prohibits a 'corporate insider' from trading on material nonpublic information obtained from his position within the corporation without disclosing the information."); *see also Steinberg v. BPO Mgmt. Servs.*, No. 3:09-cv-02291-K, 2010 U.S. Dist. LEXIS 34467, at *19-*20 (N.D. Tex. Mar. 12, 2010) ("An affirmative duty [to disclose] arises when . . . 'a corporate insider trades on confidential information . . . .'") (citation omitted).  Defendants, however, failed to disclose, among other things, the omitted information described in ¶183 *supra*, in connection with *any* of their many insider trading transactions throughout the Class Period.

**C.** **Defendants' Financial Statements Violated GAAP and SEC Disclosure Rules**

218.    Defendants concealed material amounts of financial exposure from litigation and the foreseeable negative financial impact stemming from the Company's unlawful and unauthorized design changes to the ET-Plus in 2005.  As detailed herein, Trinity's secret modifications to the ET-Plus led to significant issues regarding the safety and efficacy of the product, which created a host of issues for the Company – including, among other things, the fallout from numerous incidents where failure of the secretly modified ET-Plus caused serious injury or death to the very citizens the product was supposedly designed to protect.

219.    Throughout the Class Period, Defendants were well aware of the substantial financial exposure Trinity faced in connection with litigation related to the fraudulently modified ET-Plus.  By

- 65 -

at least February 2012, Company officials were secretly discussing the unapproved ET-Plus design changes with federal regulators.  In March 2012, the Whistleblower Action was filed (under seal), seeking to hold the Company liable for *three times* the cost of replacing all fraudulently modified ET-Plus units then on the road (plus civil penalties, expenses and attorneys' fees).[21]  By March 2014, at least 12 product liability and/or personal injury lawsuits concerning the secretly modified ET-Plus had been filed against Trinity.  All of the above lawsuits centered on the unlawful changes Defendants knowingly made to the ET-Plus in 2005.

220.    Defendants were also aware, throughout the Class Period, that Trinity's dangerous modifications to the ET-Plus would reasonably be expected to have a material negative financial impact on the Company's Highway Products business.

221.    As discussed below, Trinity was obligated under GAAP[22] and SEC rules to disclose the Company's litigation exposure and the expected negative financial impact to its business.  By concealing such exposure, each of Trinity's Class Period financial statements were in material violation of GAAP and SEC disclosure rules, for at least the following reasons:

(a)    Trinity failed to disclose the growing number of lawsuits related to the fraudulently modified ET-Plus, or the financial exposure of those lawsuits, in violation of FASB Accounting Standards Codification ("ASC") 450 and SEC Regulation S-K Item 303 ("Item 303");

(b)    Trinity understated and failed to properly accrue litigation reserves for the verdict and judgment rendered in the Whistleblower Action, in violation of ASC 450; and

(c)    Trinity failed to disclose the expected material negative financial impact to its Construction Products Group regarding the safety and performance issues created by its fraudulent modifications to the ET-Plus, in violation of Item 303.

---

[21]    As noted *supra*, this amount was ultimately determined to be $663 million plus costs and attorneys' fees.

[22]    GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

- 66 -

222.    All of the above misstatements were material to the Company's Class Period financial statements.  The Whistleblower Action resulted in a final judgment of $663 million (plus expenses and attorneys' fees), numerous product liability and/or personal injury lawsuits involving serious allegations of death and dismemberment have been filed, government investigations have been initiated, and revenue for the ET-Plus guardrail fell from approximately $46 million in 2014 to virtually zero in 2015.

223.    As depicted in the following chart, however, Trinity's financial statements during the Class Period failed to properly disclose these material issues in accordance with GAAP and SEC disclosure rules:

| | Product Liability/Personal Injury Litigation Exposure (ASC 450 and Item 303 Reg S-K) | Negative Business Impact (Item 303) | Whistleblower Action (ASC 450) |
|---|---|---|---|
| **Form 10-K** *filed on Feb. 16, 2012* | *none* | *none* | *none* |
| **Form 10-Q/A** *filed on Apr. 27, 2012* | *none* | *none* | *none* |
| **Form 10-Q** *filed on July 26, 2012* | *none* | *none* | *none* |
| **Form 10-Q** *filed on Oct. 25, 2012* | *none* | *none* | *none* |
| **Form 10-K (2012)** *filed on Feb. 21, 2013* | *none* | *none* | *partial* |
| **Form 10-Q** *filed May 1, 2013* | *none* | *none* | *partial* |
| **Form 10-Q** *filed Aug. 1, 2013* | *none* | *none* | *partial* |
| **Form 10-Q** *filed Oct. 31, 2013* | *none* | *none* | *partial* |
| **Form 10-K (2013)** *filed on Feb. 20, 2014* | *none* | *none* | *partial* |
| **Form 10-Q** *filed on Apr. 30, 2014* | *none* | *none* | *partial* |
| **Form 10-Q** *filed on July 30, 2014* | *none* | *none* | *partial* |
| **Form 10-Q** *filed on Oct. 29, 2014* | *partial* | *disclosed* | *partial* |
| **Form 10-K (2014)** *filed on Feb. 19, 2015* | *partial* | *disclosed* | *partial* |

### 1.    GAAP Violations: ASC 450

224.    ASC 450 requires disclosure of material loss contingencies and/or significant risks and uncertainties in the footnotes to the financial statements.  The occurrence, or non-occurrence, of a

future event, such as the revelation of unlawful acts or litigation related to such unlawful acts, meets the definition of a loss contingency that must be disclosed under GAAP.[23]  In fact, ASC 450 specifically addresses the disclosure of "Litigation, Claims, and Assessments," and the SEC has notably stated that these rules apply to *pending* litigation or proceedings.  The SEC has further noted that companies are often exposed to financial loss *prior* to the commencement of a formal claim.

225.    The threshold for requiring *disclosure* of loss contingencies is exceedingly low.  Specifically, under ASC 450, a loss contingency must be disclosed in the notes to the financial statements if "[t]he chance of the future event or events occurring is *more than remote but less than likely*."  ASC 450 further provides that "[t]he disclosure . . . shall include the nature of the contingency" and "[a]n *estimate* of the possible loss or range of loss or a statement that such an estimate cannot be made."

226.    In addition, ASC 450 requires that a loss contingency must not only be disclosed but also *accrued* if the "[i]nformation available . . . indicates that it is *probable* that . . . a liability had been incurred at the date of the financial statement," and "[t]he amount of loss can be reasonably estimated."  Specifically, ASC 450-20-30-1 requires:

> If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.  Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount.

227.    The SEC has specifically noted that ASC 450 has different objectives and requirements than Regulation S-K, and thus, must be approached separately from Regulation S-K, in order to ensure compliance.  *See AICPA National Conference on Current SEC and PCAOB Development* (Dec. 2010).  Stressing the importance of this concept, the SEC staff has noted that management needs to "*take back the financial statements*" (to provide the disclosures required by GAAP) from the lawyers who may want to restrict litigation disclosures.

---

[23]    ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

228.     As detailed below, Trinity's financial statements during the Class Period failed to adequately disclose the Company's litigation exposure and/or properly accrue litigation losses, in violation of ASC 450.[24]

**a.     Defendants Violated ASC 450 by Failing to Adequately
Disclose Trinity's Litigation Exposure**

229.     By February 2012, numerous product liability and/or personal injury lawsuits concerning the fraudulently modified ET-Plus had been filed against Trinity.  At  this same time, Company officials were secretly discussing the unapproved ET-Plus design changes with federal regulators, in response to concerns recently raised to the FHWA by the Whistleblower.  Yet, Defendants failed at that time to disclose any potential litigation risk related to their fraudulently modified ET-Plus product, in violation of ASC 450.

230.     Shortly thereafter, in March 2012, the Whistleblower Action was filed, seeking to hold the Company liable for three times the cost of replacing all fraudulently modified ET-Plus units then on the road.  Yet, Defendants continued to remain silent regarding any potential litigation risk or exposure related to the ET-Plus product, in violation of ASC 450.

231.     Indeed, Trinity waited ***almost an entire year*** before finally disclosing ***the existence*** of the Whistleblower Action in the Company's 2012 Form 10-K, filed on February 21, 2013.  As noted *supra*, however, this disclosure failed to accurately disclose the ET-Plus litigation risk by falsely representing to investors that the Company was facing essentially ***no financial exposure*** due to the Whistleblower Action.  Specifically, Trinity stated, "[w]e do not believe that a loss is probable nor can a range of losses be determined," ***despite*** the Company's affirmative knowledge, as detailed herein, that it had: (1) failed to properly test the modified ET-Plus unit in accordance with FHWA requirements; (2) failed to properly disclose the material design changes they had fraudulently made to the ET-Plus; (3) falsely represented to Trinity's customers that the ET-Plus had been adequately tested and approved by the FHWA; (4) actively engaged in a years-long effort to conceal the full

---

[24]     SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that any financial statements filed with the SEC that do not conform to GAAP's requirements are presumed to be misleading.

extent of the dangerous changes they had made to the ET-Plus; and (5) failed to disclose Trinity's manipulation of the regulatory approval process.

232.    Moreover, despite the Company's partial and misleading disclosure regarding the existence of the Whistleblower Action in February 2013, Trinity continued to remain silent regarding even the *existence* of the numerous product liability and/or personal injury lawsuits relating to the fraudulently modified ET-Plus – which, by that time, had reached at least 5 in number.  Because Trinity knew at that time that the chances of the Company incurring a financial loss related to the ET-Plus litigation were much greater than "*remote*," its failure to disclose the issue violated ASC 450. By July 30, 2014, the number of product liability and/or personal injury lawsuits relating to the Company's fraudulently modified ET-Plus product had reached at least 14.  At that point, it had to have been clear to Defendants that the chances of the Company incurring some financial loss related to the ET-Plus litigation were much greater than "*remote*" (if not likely).  Yet, Defendants continued to remain silent regarding even the *existence* of the numerous product liability and/or personal injury lawsuits relating to the fraudulently modified ET-Plus product, in violation of ASC 450.

233.    Indeed, it was not until October 29, 2014 – nine days after the jury reached its unanimous verdict in the Whistleblower Action – that Defendants' financial statements acknowledged the existence of the numerous product liability and/or personal injury lawsuits relating to the fraudulently modified ET-Plus product, stating only:

> The Company is currently defending a number of product liability lawsuits in several different states that are alleged to involve the ET-Plus. . . .  The Company carries general liability insurance to mitigate the impact of adverse verdict exposures in these cases.

234.    This partial disclosure continued to violate ASC 450 by failing to: (1) disclose Defendants' knowledge, as detailed herein, that they had failed to properly test the safety of their secretly modified ET-Plus product; (2) disclose that Defendants had, as detailed herein, actively concealed the dangerous modifications to the ET-Plus from the FHWA and other public safety officials; and (3) provide an "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

- 70 -

**b.      Defendants Violated ASC 450 by Failing to Accrue a
Loss for the Whistleblower Action**

235.    By as early as February 2012, Defendants knew there was a reasonable chance they

would face litigation exposure related to the Whistleblower's complaints concerning Trinity's

fraudulently concealed modifications to the ET-Plus.  Moreover, Defendants also knew – or should

have known – that such exposure would likely lead to an unfavorable result for the Company, given

Defendants' knowledge that they had, in fact, defrauded the federal government and state DOTs,

among others, by: (1) failing to properly test the modified ET-Plus unit in accordance with FHWA

requirements; (2) failing to properly disclose the material design changes they had fraudulently made

to the ET-Plus; (3) falsely representing to Trinity's customers that the ET-Plus had been adequately

tested and approved by the FHWA; (4) actively engaging in a years-long effort to conceal the full

extent of the dangerous changes they had made to the ET-Plus; and (5) failing to disclose their

manipulation of the regulatory approval process.

236.    By March 2012, Defendants' awareness that they were likely to incur a material loss in

connection with the Whistleblower's claims increased when the Whistleblower Action was filed.

Given Defendants' knowledge regarding the underlying facts in the case – which made a material loss

"probable" – ASC 450 required them to not only disclose the existence of the Whistleblower Action

(as detailed above), but also to *accrue* the estimated loss expected to ultimately be paid in the

Whistleblower Action (or, at a minimum, disclose the range of potential loss).  As noted above,

however, Defendants failed to do or say *anything* about the Whistleblower Action until February

2013, in violation of ASC 450.

237.    As detailed above, when Defendants finally did disclose the Whistleblower Action in

February 2013, they falsely asserted that a loss was *not* probable and continued to fail to accrue or

disclose any estimated loss, in continued violation of ASC 450.

238.    It was not until October 29, 2014 – nine days *after* the jury verdict in the

Whistleblower Action – that Defendants finally disclosed a range of losses ($525 million to $709

million) to be incurred as a result of the Whistleblower Action.  However, despite the jury's

unanimous verdict, the Company unbelievably continued to assert that a loss was *still not probable*

and continued to fail to accrue any such loss.  Defendants' failure to accrue an estimated loss at this point was a clear violation of ASC 450, as the jury's unanimous finding that Trinity had "made, used, or caused to be made or used, a false record or statements material to a false or fraudulent claim" clearly made it more than "probable" that the Company had incurred a material liability.  Indeed, as noted *supra*, this probable liability was ultimately confirmed on June 9, 2015, when Judge Gilstrap entered Final Judgment against Trinity in the amount of $663,360,750, plus costs and attorneys' fees.

### 2.   SEC Regulation S-K Item 303: Management's Discussion and Analysis

239.    Similar to the disclosure requirements of ASC 450, which pertain to the footnotes of the financial statements, SEC Regulation S-K Item 303 requires disclosure of contingent liabilities in the "Management's Discussion and Analysis" ("MD&A") section of the financial statements. Specifically, Item 303 requires a Company to disclose "uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . income."  The SEC has consistently commented that these disclosure rules cover contingent liabilities, such as government investigations and contemplated or pending legal proceedings.

240.    Item 303 also requires a discussion of liquidity, capital resources, results of operations, and other information necessary for an understanding of a registrant's financial condition, changes in financial condition, and results of operations.  As part of this discussion, Item 303(a)(3) specifically requires companies to disclose any known trends or uncertainties that had, or could reasonably be expected to have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

241.    The SEC has described the purpose of the MD&A requirements as "not complicated," stating that it is to "provide readers information 'necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations.'"  Moreover, the SEC has stated that the MD&A requirements are intended to satisfy the following three principle objectives:

- provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- 72 -

- enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.[25]

242.    Accordingly, the SEC has clarified that the MD&A requires not only "discussion" but also "*analysis*" of known material trends, and that such analysis should *not* be merely a restatement of the financial statement information in a narrative form.[26]

243.    The Company's MD&A during the Class Period violated these requirements by failing to adequately disclose and analyze the litigation exposure and negative business impact associated with the Company's fraudulent modifications to the ET-Plus, as detailed below.

### a.    Defendants' MD&A Failed to Adequately Disclose Trinity's Financial Exposure to ET-Plus Litigation

244.    In a speech during the 2004 AICPA National Conference on Current SEC and PCAOB Developments, Scott A. Taub, Deputy Chief Accountant in the SEC's Office of the Chief Accountant, addressed SEC Regulation S-K Item 303, stating in part:[27]

> Given these requirements, the recording of a material accrual for a contingent liability related to an event that occurred several years before should not be the first disclosure regarding that contingency.  Rather, disclosures regarding the nature of the contingency and the amounts at stake should, in most cases, have already been provided.  Disclosures should discuss the nature of the contingency and the possible range of losses for any item where the maximum reasonably possible loss is material. Vague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific kinds of loss contingencies being evaluated are not sufficient.

245.    During the same speech, Taub elaborated on this point, stating: "I find it somewhat surprising how often 'zero' is the recorded loss [*i.e.*, a no loss exposure at all has been disclosed] right up until a large settlement is announced."

---

[25]    Financial Reporting Release 72, Dec. 19, 2003 ("FR 72").

[26]    Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities and Exchange Commission 17 C.F.R. Parts 211, 231 and 241 (Release Nos. 33-8350, 34-48960; FR-72).

[27]    Similar remarks have also been made at subsequent conferences, including the 2010 AICPA National Conference on Current SEC and PCAOB Developments.

246.     As detailed above, that is precisely what Trinity did in connection with the litigation exposure stemming from its fraudulent modifications to the ET-Plus.  Throughout the Class Period, Trinity failed to mention or made only vague references to such litigation exposure, and it repeatedly asserted that it faced no real financial exposure from such litigation, without providing any true analysis, as required by Item 303, notwithstanding: (1) the rapidly growing number of lawsuits being filed against the Company; (2) the fact that such lawsuits centered on accidents involving deaths and severe injuries; (3) the Company's exposure to liability arising from Defendants' manipulation of the regulatory approval process; and (4) Defendants' knowledge that they had failed to properly test and disclose the secret design changes they had fraudulently made to the ET-Plus, falsely represented to Trinity's customers that the ET-Plus had been adequately tested and approved by the FHWA and actively engaged in a years-long effort to conceal the full extent of the dangerous changes they had made to the ET-Plus.  By failing to disclose and analyze the above facts, Defendants violated Item 303.

> **b.      Defendants' MD&A Failed to Adequately Disclose the Negative Business Impact of Trinity's Fraudulent Modifications to the ET-Plus**

247.     By the beginning of the Class Period, the financial effects of Defendants' fraudulent modifications to the ET-Plus – and the cover-up that followed – had become a known event, as described in Item 303 of Regulation S-K.  Clearly, the Company was aware that the lawsuits and catastrophic accidents being reported in connection with Defendants' fraudulently modified ET-Plus units were likely to have a dramatic impact on Trinity's business reputation and future prospects, and could thus be reasonably expected to have a material unfavorable financial impact on Trinity's Highway Products business.  As such, these items were required to be disclosed and analyzed in Defendants' MD&A.  Yet, throughout the Class Period, they never were.

248.     By October 24, 2014, 13 states had affirmatively banned the ET-Plus from further installation and Trinity had announced that it was ceasing *all* shipments of the ET-Plus until the Company completed additional crash testing mandated by the FHWA, signaling an obviously negative impact on Trinity's Highway Products business.  This development was obviously

something Trinity did or should have seen coming, but yet it was not until five days later, on October 29, 2014, that Trinity first mentioned the negative business impact of its fraudulent ET-Plus modifications in its financial statements, stating:

> On October 24, 2014, the Company issued a press release stating that it will stop shipments of  the ET-Plus until additional crash testing of the ET-Plus can be completed.  Prior to the Company's press release, certain states had either removed the ET-Plus from their respective qualified products list or suspended further purchases of the ET-Plus pending the outcome of the FHWA-requested crash tests. The state of Virginia is also evaluating a potential recall of all ET Plus products installed on Virginia roadways.  Other states could take similar or different actions. While the financial impacts of such actions are currently unknown, they could be material.

### 3.    Defendants' Violations of GAAP and Item 303 Were Material

249.    In SEC Staff Accounting Bulletin No. 99 ("SAB 99"), the SEC makes clear that determinations regarding the materiality of misstatements in violation of GAAP and SEC disclosure rules involve both qualitative and quantitative factors.  Specifically, the SEC notes that "exclusive reliance on . . . any percentage or numerical threshold has no basis in the accounting literature or the law."  Instead, SAB 99 cites to the definition of materiality from Statement of Financial Accounting Concepts No. 2, which states:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

250.    Consistent with this definition, the disclosure and accrual violations detailed above were clearly material.  From a qualitative perspective, any reasonable investor would consider it important to know that Trinity – a company that is deeply entrenched in the *safety industry* and is heavily dependent upon contracts from *government entities* – had defrauded federal and state authorities by selling secretly modified and untested products that were *causing death and severe dismemberment* to the very citizens they were supposedly designed to protect.

251.    From a quantitative perspective, the materiality of Trinity's failure to accrue litigation reserves in connection with the Whistleblower Action is clearly evidenced by the size of the Final Judgment ultimately entered on June 9, 2015: *$663,360,750, plus costs and attorneys' fees*.  The quantitative materiality of the negative business impact caused by Defendants' fraudulent

- 75 -

modifications to the ET-Plus is also evidenced by the impact it had on Trinity's Highway Products revenues, which plunged from $314.6 million in 2014 to $277.9 million in 2015.

252.    Indeed, Trinity itself acknowledged the materiality of the Company's fraudulent modifications to the ET-Plus in its 2014 Form 10-K (filed on February 19, 2015) by stating that the "pending litigation in our Highway Products business have negatively impacted the results of our Construction Products Group."

253.    Trinity further confirmed the material impact of these issues in its 2015 Form 10-K, filed on February 19, 2016, where the Company acknowledged that 36 states and the District of Columbia have removed the ET-Plus guardrail from their respective qualified products list and that the suspension of shipments was still having a material financial impact on its business:

> There were no revenues from the sales of ET Plus systems for the nine months ended September 30, 2015 as a result of the Company's action to suspend shipments of the product. The Company resumed shipment of the product in the fourth quarter of 2015 generating an insignificant amount of revenue from the shipment of ET Plus systems for the year ended December 31, 2015.

## VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

254.    As detailed throughout this Complaint, Defendants engaged in a decade-long scheme to defraud investors through numerous materially false and misleading representations and omissions, as well as to defraud the FHWA and state regulators, including by concealing significant misconduct. The misconduct alleged above is expressly incorporated herein by reference and provides powerful evidence of Defendants' scienter. Other facts evidencing Defendants' scienter are alleged below.

255.    At all relevant times, Defendants were aware or recklessly disregarded that (i) their statements regarding the ET-Plus system's compliance with federal regulations, and (ii) their failure to disclose the multi-faceted financial exposure caused by the fraudulent modification to the ET-Plus, were false and misleading, and omitted material information necessary to properly evaluate the Company and its financial condition and prospects.

256.    *First*, Defendants Wallace, Mitchell and Perry were personally aware of the issues regarding the ET-Plus and Trinity's manipulation of the FHWA and the regulatory process in general.

257.    Trinity personnel have confirmed in testimony under oath that Defendants Wallace, Mitchell and Perry were aware of the undisclosed changes to ET-Plus as early as 2011, yet staunchly (and falsely) defended that product's compliance with federal and state regulations.  According to McWhirter's deposition testimony from the Whistleblower Action, McWhirter became aware of the changes to the ET-Plus in 2012, and reported on those changes to "senior management," including Wallace and Perry.  McWhirter also testified that he "talked to Tim Wallace" about the "alleged problems with the ET-Plus terminal."  By the time McWhirter had shared information regarding the ET-Plus with Wallace and Perry, McWhirter had also personally met with Harman in January or February 2012, who told McWhirter at that meeting that he was "going to sue [Trinity] with *qui tam*" over the secretly modified ET-Plus.

258.    McWhirter further testified that a "group" of Trinity senior executives, including himself, Vice President of Legal Affairs Heather Randall, Director of Public Affairs Jack Todd, Chief Technical Officer Stephen Smith, and Chief Legal Officer Rice met "regularly" ("once a week") and in person to discuss the issues with the ET-Plus.  McWhirter testified that the meetings started "slightly before" the Whistleblower Action was unsealed.  Also present at these meetings was Defendant Mitchell, the President of THP, the Trinity subsidiary at the center of the Company's fraudulent scheme.  According to McWhirter, Defendant Wallace was present at meetings regarding the Whistleblower Action trial as well.  By virtue of attending these weekly meetings, Trinity's senior executives had information regarding the covertly modified ET-Plus that rendered the Company's contrary statements knowingly or recklessly false and misleading.

259.    By virtue of his personal involvement in the myriad of lawsuits filed by and against Trinity relating to the secretly modified ET-Plus, Defendant Wallace was also aware of facts that rendered his (and Trinity's) contrary public statements false and misleading, and gave rise to a duty to disclose material facts.  For example, Defendant Mitchell testified under oath during his deposition at the Whistleblower Action that Wallace authorized THP to sue Harman for patent infringement in Virginia.  In addition, it was Wallace – along with McWhirter – who authorized THP to settle that

suit. During the course of settlement negotiations, Wallace personally met with Harman as the parties tried to resolve the dispute.

260.    McWhirter, meanwhile, testified that Defendant Wallace was intimately involved in the Defamation Lawsuits filed against Harman, described at ¶¶99-102, *supra*. Wallace was the "key" person at Trinity responsible for the filing and resolution of the Defamation Lawsuits. Defendant Perry was also a part of the internal team, and one of the most "senior people in the room." Defendant Mitchell confirmed in sworn deposition testimony that Wallace "ultimately" authorized the Defamation Lawsuits against Harman. By virtue of their intimate involvement with the Defamation Lawsuits, which were central to Trinity's scheme to keep the modified ET-Plus a secret, Wallace and Perry had access to and did in fact learn of information about the non-compliant ET-Plus and the legal and other financial risks to the Company caused thereby.

261.    Finally, Defendants' knowledge of the falsity of their statements and their desire to further their cover-up is further evidenced by their secret introduction of a third ET-Plus variant with a 4.25" guide channel, which, as described above in ¶¶131-132, *supra*, was discovered by Dr. Sicking.

262.    ***Second***, Defendants' specific statements about the ET-Plus, as well as the vehemence of Defendants' denials throughout the Class Period, supports a strong inference of scienter. By choosing to make public, specific statements such as Defendant Wallace's October 29, 2014 statement that "since its introduction in 2000 . . . the ET-Plus system has been in compliance with the governing standards," Defendants evidenced their knowledge about the ET-Plus (including its problems and Trinity's related exposure). Alternatively, Defendants were severely reckless if they lacked such knowledge but still made specific statements about the ET-Plus, particularly in the face of serious allegations concerning safety, efficacy, and regulatory compliance, along with the jury verdict in the Whistleblower Action.

263.    Despite knowledge of the secretly modified ET-Plus – acquired through the Individual Defendants' intimate involvement in the litany of ET-Plus-related products, patent, defamation, and *qui tam* lawsuits – Defendants steadfastly and ardently denied any issues with the redesigned ET-

Plus.  Defendants touted the ET-Plus's track record of safety and compliance, when they knew the truth to be otherwise.  Defendants did so by, among other things, issuing multiple "To Whom It May Concern" style letters in 2012 and 2013 broadly denying any problems with the secretly redesigned ET-Plus (which was killing motorists on their watch), and any regulatory compliance issues (when those issues were in fact rampant, and known throughout Trinity).  For example, in 2012, Defendant Mitchell sent a letter to customers and state transportation agencies falsely stating that the secret modifications to the ET-Plus guide channels were addressed in the Company's July 2005 report to the FHWA, and Mitchell falsely claimed in a 2013 letter to the FHWA that Trinity merely inadvertently omitted drawings that showed "the 5-inch to 4-inch detail."

264.    Defendants in fact doubled-down on their "deny at all costs" strategy, by making it appear as if Trinity faced no potential liability related to the secretly modified ET-Plus.  It is facially absurd to believe that Defendants, including CFO Perry, at no point until the October 2014 verdict in the Whistleblower Action (which led to more than $660 million of liability), deemed it likely that the Company would incur some material loss from the Whistleblower Action, or that the likelihood of incurring losses from the other liabilities created by the secret ET-Plus modifications was "more than remote."  Rather, the inference from this strident refusal to acknowledge accounting reality is that Defendants (falsely) kept their books "clean" for as long as possible to keep the true scope of the ET-Plus issues buried.  This conduct is entirely consistent with Defendants' efforts to bury the truth by scorching the earth with litigation against Harman, *see* ¶¶99-102, *supra*.  At bottom, it was at least reckless for the Defendants to deny the potential for any liability or business interruption related to the ET-Plus issues until the judgment in the Whistleblower Action.

265.    ***Third***, while in possession of material, nonpublic information regarding Trinity's misrepresentations and omissions concerning the ET-Plus, Defendants Wallace and Perry sold substantial amounts of Trinity common stock at artificially inflated prices, reaping enormous profits.

266.    In total, during the Class Period, Defendant Wallace sold 1,141,016 (split-adjusted) shares of Trinity common stock for proceeds of more than $28 million, which was approximately 28 times Wallace's base salary (of $1 million) for 2014.  Moreover, Wallace's sales during the Class

Period far exceeded both his pre- and post-Class Period sales (including both direct and indirect sales). Specifically, in a control period of the same length prior to the Class Period, from December 11, 2008 until February 15, 2012, Wallace sold 413,746 (split-adjusted) shares of Trinity stock for proceeds of approximately $5.95 million – meaning that his Class Period sales were nearly three times greater in number and nearly five times greater in proceeds as during the same period of time immediately prior to the Class Period. Moreover, since the end of the Class Period, beginning April 25, 2015 until April 25, 2016 Wallace has not sold *any shares* of Trinity common stock.

267. Similarly, Defendant Perry made very substantial and opportunistic sales of Trinity common stock at artificially inflated prices during the Class Period. Specifically, Defendant Perry sold 67,568 (split-adjusted) shares of Trinity stock for proceeds of more than $2.5 million, which was approximately five times Perry's base salary for 2014. Moreover, Perry's sales during the Class Period stand in stark contrast with the fact that he *sold no shares* of Trinity common stock during either the control period or the year since the end of the Class Period.

268. Moreover, Defendants Wallace and Perry each made significant insider sales shortly after Judge Gilstrap declared a mistrial in the first *qui tam* trial, and shortly before the second *qui tam* trial commenced. Specifically, the first trial ended in a mistrial on July 18, 2014; with the second trial looming, Wallace made sales on August 4 and 5, 2014, totaling more than $6.5 million, and Perry made sales on August 1, 2014, totaling nearly $2.2 million.

269. These massive, irregular and highly lucrative stock sales paint a clear picture of two knowledgeable Trinity insiders looking to cash out before the truth regarding the secretly modified ET-Plus and the legal liabilities and negative business impact resulting therefrom – emerged and caused the Company's stock price to plummet.

270. *Fourth*, Defendants' scienter is further demonstrated by numerous civil lawsuits against and federal investigations of Trinity related to the secretly modified ET-Plus. Much of the trial record in the Whistleblower Action supports a strong inference of scienter. Among other things, Defendant Mitchell admitted in sworn testimony that Trinity did not disclose to the FHWA its secret structural changes to the ET-Plus in advance of the July 2005 crash tests (which instead tested only

the new guardrail height), that Trinity did not investigate any of the accidents that Harman had documented, and that Mitchell had misrepresented to a Vermont regulator in 2006 that there had not been any changes to the ET-Plus.  And it was Mitchell who intimidated and threatened Dr. Sicking, who invented the ET-Plus's predecessor product, causing Judge Gilstrap to declare a mistrial in the first trial of the Whistleblower Action.  On retrial, the action ended with a jury unanimously finding that Trinity engaged in fraudulent misconduct in connection with its secret modifications to the ET-Plus – specifically, that Trinity knowingly "made, used, or caused to be made or used, a false record or statements material to a false or fraudulent claim."

271.    In addition, the Company has faced numerous products liability suits related to the modified ET-Plus, dating back as early as June 2006, alleging dangerous and undisclosed changes to the ET-Plus.  If these red flags were not sufficient, Defendant Mitchell confirmed that the Company's response when it learned about Harman's investigation in January 2012 was "all hands on deck," including a meeting shortly thereafter between Harman, Mitchell, and McWhirter, as well as numerous cloak-and-dagger meetings between Trinity personnel and the FHWA.  The ET-Plus (and in particular the covert modifications to it and their intentional cover-up) was not some obscure piece of highway equipment, squirreled away in a dusty factory and relevant only to machinists and engineers.  Rather, it was the very centerpiece of a far-reaching and very public-facing campaign that was orchestrated at the highest reaches of Trinity management.

272.    *Fifth*, Trinity's Construction Products Group was one the Company's key business segments, and the Highway Products division the heart of that group.  An inference that THP President Defendant Mitchell, and Trinity senior executives, including Defendants Wallace and Perry, would be aware of (or recklessly disregard) a fraud afoot in that key segment follows as a matter of course.  For the year ended 2012, Highway Products was responsible for $376.1 million of the Construction Products Group's $483.7 million in revenues, or 78%.  Defendants understood, or where reckless in not understanding, the goings on at Highway Products, including the covert modifications to the ET-Plus, and cover up in the aftermath of their revelations.  Similarly, Trinity's various integrated businesses were heavily dependent on government revenues while also being subject to

- 81 -

substantial government regulation.  Indeed, one of the key risks Trinity identified during the Class Period was "extensive regulation by governmental regulatory and industry authorities," including, as to the Construction Products Group in particular, the FHWA.  How to balance this tension – dependence on revenue from goods and services to government customers (including reimbursement payment related to the ET-Plus) on the one hand, and the constant risk to that revenue stream by virtue of potential noncompliance with regulation on the other – would have been of the utmost importance to Trinity's senior executives during the Class Period.  The fraud involving the ET-Plus strikes at the heart of this tension.

273.  *Sixth*, Defendants' scienter is evidenced by the fact that Defendants Wallace and Perry signed SOX Certifications in each of Trinity's Class Period annual and quarterly reports filed with the SEC on Forms 10-K and 10-Q.  In their Certifications, Wallace and Perry represented that the Company's financial statements were accurate and in accordance with GAAP, and that Wallace and Perry had designed and implemented internal controls that provided reasonable assurance that Trinity's financial reporting complied with GAAP.  However, as discussed in §V.C., *supra*, either Trinity's financial reporting and GAAP compliance were willfully misrepresented, or Trinity's internal controls were insufficient to prevent materially misleading financial reports.

274.  Defendants Wallace and Perry knew that their SOX Certifications, which represented to investors that they could rely on Trinity's financial reporting, when in fact the opposite was true, were materially misleading.  Alternately, if Wallace and Perry did not know that their SOX Certifications were false when they signed them, they were severely reckless in doing so given that the purpose of the certifications is to assure investors as to the soundness of the Company's GAAP compliance and financial reporting.

275.  *Seventh*, Defendants' scienter is evidenced by the grave public safety consequences of Trinity's failures to properly notify the FHWA of design changes to the ET-Plus, perform safety testing on the ET-Plus, and secure all requisite regulatory approvals free of the taint of collusion with the FHWA.  The more than 40 reported deaths resulting from collisions involving the ET-Plus, and the significant number of serious injuries in such collisions, were stark and deserving of serious

- 82 -

attention. The failures of Trinity's top executives, including Defendants Wallace, Perry and Mitchell, to take swift action to ensure that the ET-Plus was safe and properly tested and approved demonstrates a callous disregard for public safety, not to mention the Company's disclosure obligations to its public investors.

276.    *Eighth*, an inference of scienter is supported by the legal relationship between THP, the subsidiary at the center of Trinity's fraud, and Trinity.  THP is a manager-managed Delaware LLC whose 100% member is Trinity.  Defendants Wallace and Perry, along with Trinity's Chief Legal Officer Rice, are two of the three managers of THP.  Through their positions as managers of a Delaware manager-managed LLC, Wallace and Perry owed fiduciary duties of care to THP and Trinity during the Class Period.  These duties required Wallace and Perry to stay informed of all material developments at THP, including, of course, the issues caused by the secret modifications to the ET-Plus and significant Company-wide liabilities that were a result of those issues.  By virtue of this information, furnished in the first instance by Defendant Mitchell, the President of THP, all of the Individual Defendants knew, or were reckless in not knowing, that their statements about the ET-Plus's regulatory compliance, and Trinity's failure to disclose its risks of legal liability and business disruption, were false and misleading when made, and omitted material facts.

277.    Trinity and THP were highly interrelated entities, and important information would not have remained segregated at THP exclusively.  Trinity and THP shared an address, 2525 Stemmons Freeway, Dallas, Texas.  Defendant Mitchell, the President of THP, worked out of that office, and often met in person with Defendants Wallace and Perry to discuss issues related to the ET-Plus. Indeed, Mitchell was hired directly by Wallace, and Trinity Senior Vice President Mark Stiles testified in the Whistleblower Action that Trinity personnel generally oversaw the hiring and retention of senior personnel at THP.  Trinity's fraudulent certifications of compliance to the FHWA were signed on behalf of both Trinity and THP.  In addition, the nearly $700 million judgment in the Whistleblower Action was levied against Trinity, and not THP, for Trinity's knowingly fraudulent violation of the False Claims Act.  Moreover, under the personal direction of Wallace and Perry, "Trinity Industries, Inc." was the named plaintiff in the Defamation Lawsuits and the Patent Case.

Wallace personally authorized filing the Patent Case and the Defamation Lawsuits, approved the voluntary dismissal of the Defamation Lawsuits, and authorized the settlement of the Patent Case.

278.    Furthermore, THP was a core aspect of Trinity's "Construction Products Group," featured prominently on Trinity's website and in Trinity's Class Period annual reports.  Indeed, Trinity's guardrail business is heavily touted as a "leading U.S. manufacturer" of guardrails and other protective barriers.  Because THP, and the guardrail division in particular, was a centerpiece of Trinity's Construction Products Group, there is a strong inference that Defendants Wallace and Perry, the Company's two most senior executives, were aware (or reckless in not knowing) of the pernicious fraud emanating from therein.

279.    *Ninth*, Trinity acted with scienter because the scienter of its CEO Wallace and CFO Perry, along with the scienter of other corporate employees, including Mitchell, are imputed to Trinity.  Defendants Wallace and Perry were Trinity's most senior executives during the Class Period, and Mitchell served as THP's President.  Defendant Mitchell, among other Trinity employees, knowingly furnished false information, including that the secretly modified ET-Plus was compliant with FHWA regulations, which information was included in the false statements to investors set forth in §V., *supra*.  As the head of THP during the Class Period, all materially false and misleading information regarding the secretly redesigned ET-Plus necessarily passed through Mitchell on its way to Trinity senior management and then, eventually, to Trinity's investors.  Indeed, Mitchell has confirmed his core role in the Company's response to the ET-Plus issue, stating under oath at trial that he directed an "all hands on deck" response when Harman confronted Trinity in 2012 with evidence of their fraud.

## VII.    LOSS CAUSATION

280.    The Class was damaged as a result of Defendants' materially false and misleading statements and omissions of material fact, as set forth herein.  As described further above, during the Class Period, Defendants issued a series of misrepresentations (and omitted material facts) relating to, among other things: (1) Trinity's intentional concealment of the Company's secret modifications to the ET-Plus; (2) Trinity's manipulation and exploitation of the regulatory approval process; and (3)

- 84 -

the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

281.    As a result of Defendants' misrepresentations and omissions of material facts, the prices of Trinity's common stock were artificially inflated throughout the Class Period.

282.    As such, the Class purchased Trinity's common stock at artificially inflated prices during the Class Period.  But for Defendants' misrepresentations and omissions, members of the Class would not have purchased Trinity's common stock at artificially inflated prices.

283.    As Defendants' various misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on October 12, 2014, the price of Trinity's common stock steadily declined.  These declines, including the declines summarized below,[28] are largely attributable to the market absorbing information partially correcting Defendants' prior misrepresentations and omissions.  The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions regarding, *inter alia*, Trinity's purported regulatory compliance, Defendants' manipulation and exploitation of the regulatory approval process, the purported safety and efficacy of the ET-Plus, Trinity's purported GAAP compliance and the Company's purported financial exposure.

284.    The Class suffered economic losses as the price of Trinity's common stock fell in response to the issuance of partial corrective disclosures, as summarized below.

A.    **October 13, 2014: the *Times* Reveals Significant Details Regarding Defendants' Fraudulent Misconduct**

285.    On Sunday, October 12, 2014, the *Times* published an article reporting some of the details of Defendants' fraudulent scheme described above, including the Company's manipulation of the FHWA regulatory process, while further noting that three states had already banned the ET-Plus due to safety concerns and that the ET-Plus had been blamed for multiple deaths and numerous injuries.  Among other things, the article stated that, according to Missouri officials, "guardrail heads

---

[28]    Lead Plaintiffs reserve the right to assert additional disclosures and/or loss-causation events, including as supported by expert analysis and/or evidence adduced through discovery.

had apparently malfunctioned, in essence turning the rails into spears when cars hit them and injuring people rather than cushioning the blow."

286.    This disclosure partially corrected certain of Defendants' prior statements and omissions.

287.    Investors reacted strongly to the news when markets opened on October 13, 2014, causing a statistically significant drop (after considering market and peer-group factors) in the price of Trinity's common stock on October 13, 2014, from $36.07 per share to $33.10 per share, a decline of 8.2%.

288.    However, because the *Times* article only revealed some of the information concerning Defendants' fraudulent scheme, and because Defendants continued to deny any wrongdoing and affirmatively concealed the truth regarding their fraudulent scheme, as detailed *supra*, the price of Trinity's common stock remained artificially inflated following the market's reaction on October 13, 2014.

289.    The decline in the price of Trinity's stock would have been far more severe had Defendants revealed the complete truth regarding, among other things: (1) Trinity's intentional concealment of the Company's secret modifications to the ET-Plus; (2) Trinity's manipulation and exploitation of the regulatory approval process; and (3) the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

**B.    October 20, 2014:  Coverage of the Whistleblower Action Reveals Additional Facts of Trinity's Fraud**

290.    On October 20, 2014, during trading in the financial markets, multiple media outlets, including the *Times*, reported that after a six-day trial, the jury in the Whistleblower Action found Trinity liable for defrauding the U.S. government in violation of the False Claims Act, and determined that Trinity's misconduct caused $175 million in damages to the U.S., which were "trebled" under governing law to at least $525 million.  These news reports focused on Trinity's years-long failure to disclose ET-Plus design changes to the FHWA, and the dangers that those changes posed.  Among other things, the *Times* reported that Trinity's 2005 changes to the ET-Plus, which would save the Company approximately $2 on every guardrail head, were improperly not

- 86 -

disclosed to states or the federal government for seven years, and as a result of those changes "the rail can pierce an oncoming vehicle like a harpoon, endangering occupants." The *Times* further reported that "[a]t least 14 other lawsuits blame the guardrails for five deaths and more injuries" and that THP President Mitchell admitted in his testimony that he considered Trinity's prior statements concerning the ET-Plus's design to be "inaccurate."

291.   Similarly, *Bloomberg* reported on October 20, 2014, that "Trinity Industries Inc. duped the U.S. government by hiding changes to its guardrail systems, a jury found, exposing the company to $1 billion in liability and sending shares plummeting at a time when several states are scrutinizing the safety of the company's products." *Bloomberg* further discussed allegations in the Whistleblower Action that, "[i]nstead of acting like a shock absorber, Trinity's secretly revised version locks up, transforming the guardrail into a giant shiv."

292.   These disclosures partially corrected certain of Defendants' prior statements and omissions.

293.   Investors reacted strongly to the October 20, 2014 disclosures, causing a statistically significant drop (after considering market and peer-group factors) in the price of Trinity's common stock on October 20, 2014, from $36.25 per share to $31.63 per share, a decline of 12.7%.

294.   However, because these disclosures only revealed some of the information concerning Defendants' fraudulent scheme, and because Defendants continued to deny any wrongdoing and affirmatively concealed the truth regarding their fraudulent scheme, as detailed *supra*, the price of Trinity's common stock remained artificially inflated following the market's reaction on October 20, 2014.

295.   Indeed, analysts took note of Trinity's defensive comments, with KeyBanc Capital, UBS, and Stephens repeating the Company's "belie[f] the decision cannot and will not withstand legal scrutiny." UBS maintained its prior earnings-per-share estimates in anticipation of Trinity's appeal of the judgment against it, and Wells Fargo "stress[ed] that this is only the initial phase of what we view to be a long process," such that "the recent sell-off on the verdict [is] overdone."

Further, Stephens touted Trinity's response to the verdict, writing that "this unfavorable ruling was unexpected, but TRN remains confident the issue will ultimately get resolved."

296.     The decline in the price of Trinity's stock would have been far more severe had Defendants revealed the complete truth regarding, among other things: (1) Trinity's manipulation and exploitation of the regulatory approval process; and (2) the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

### C.    October 23-24, 2014:  News Continues to Emerge Regarding the Fallout from Defendants' Fraud

297.     On Thursday October 23, 2014, after the close of the markets, the state of Vermont announced that it had banned use of the ET-Plus.  The next day, prior to the opening of the financial markets, the *Times* reported that "[o]n Thursday, as concerns about the safety of Trinity's guardrails continued to mount, Vermont, Hawaii and Colorado said they had placed moratoriums on buying and installing the ET-Plus rail heads."  The *Times* reported that "[t]en states have now banned the guardrail units; the others are Massachusetts, Mississippi, Missouri, New Hampshire, Nevada, Oregon and Virginia."  Moreover, on October 24, 2014, Trinity disclosed that it would halt the sale of the ET-Plus pending further safety evaluations.  This information leaked into the market and affected Trinity's stock price during the trading day on October 24, 2014.

298.     These disclosures partially corrected certain of Defendants' prior statements and omissions.

299.     Investors reacted strongly to the above disclosures, causing a statistically significant drop (after considering market and peer-group factors) in the price of Trinity's common stock between October 23, 2014 at closing to October 24, 2014, from $36.46 per share to $35.54 per share, a decline of 2.5%.

300.     However, because these disclosures only revealed some of the information concerning Defendants' fraudulent scheme, and because Defendants continued to deny any wrongdoing and affirmatively concealed the truth regarding their fraudulent scheme, as detailed *supra*, the price of Trinity's common stock remained artificially inflated following the market's reaction on October 24, 2014.

1139665_1

301.    The decline in the price of Trinity's stock would have been far more severe had Defendants revealed the complete truth regarding, among other things: (1) Trinity's manipulation and exploitation of the regulatory approval process; and (2) the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

### D.    October 29, 2014:  Third Quarter 2014 Earnings Results Disclose Details Regarding the Fallout from Defendants' Fraud

302.    On October 29, 2014, prior to the opening of the financial markets, Trinity issued a Form 10-Q reporting its quarterly results for the third quarter of 2014.  Trinity reported on the jury verdict in the Whistleblower Action, and further noted that on top of the $525 million verdict, the Company faced civil penalties ranging from $5,500 up to $184 million.  Trinity also acknowledged, for the first time, the numerous product liability lawsuits that it faced in connection with the fraudulently modified ET-Plus, and the possibility that more similar cases would be filed in the future.

303.    Although Trinity reported earnings per share that beat consensus estimates and raised its guidance, the share price of Trinity common stock declined.  Analysts attributed that decline to, as BB&T reported, the "10-Q filing which listed the range of potential civil penalties in the guardrail lawsuit from $5,500 to $184M."

304.    This disclosure partially corrected certain of Defendants' prior statements and omissions.

305.    Investors reacted strongly to the Company's disclosures, causing a statistically significant drop (after considering market and peer-group factors) in the price of Trinity's common stock on October 29, 2014, from $36.29 per share to $34.34 per share, a decline of 5.4%.

306.    However, because these disclosures only revealed some of the information concerning Defendants' fraudulent scheme, and because Defendants continued to deny any wrongdoing and affirmatively concealed the truth regarding their fraudulent scheme, as detailed *supra*, the price of Trinity's common stock remained artificially inflated following the market's reaction on October 29, 2014.

307.     The decline in the price of Trinity's stock would have been far more severe had Defendants revealed the complete truth regarding, among other things: (1) Trinity's manipulation and exploitation of the regulatory approval process; and (2) the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

### E.     April 22, 2015: *Bloomberg* Announces the DOJ's Investigation of Trinity

308.     On April 21, 2015, after the financial markets had closed, *Bloomberg* reported that Trinity was the subject of a criminal investigation by the DOJ related to the ET-Plus, including whether corruption infected the Trinity-FHWA relationship and enabled Trinity's fraud, "signaling a *new wave* of potential woes for manufacturer Trinity Industries Inc." Among other things, the article reported that the DOJ's public corruption and special prosecutions unit would be conducting the investigation, and that the investigation "indicates that the most serious turn in Trinity's guardrail saga may be yet to come, adding the specter of criminal wrongdoing to previous allegations of fraud and deadly design changes."

309.     This disclosure partially corrected certain of Defendants' prior statements and omissions.

310.     Investors reacted strongly to this news when the financial markets opened, causing a statistically significant drop (after considering market and peer-group factors) in the price of Trinity's common stock on April 22, 2015, from $35.00 per share to $32.82 per share, a decline of 6.2%.

311.     However, because these disclosures only revealed some of the information concerning Defendants' fraudulent scheme, and because Defendants continued to deny any wrongdoing and affirmatively concealed the truth regarding their fraudulent scheme, as detailed *supra*, the price of Trinity's common stock remained artificially inflated following the market's reaction on April 22, 2015.

312.     Indeed, analysts expressed surprise at the DOJ investigation in light of Trinity's false reassurances that the ET-Plus had passed all required crash tests.  For example, in a report titled "Just When It Seemed TRN Might Be Out of the Woods on the Guardrail Saga, the Next Chapter Seems To Be DOJ Investigation," Sterne Agee wrote on April 22, 2015, that "[t]his is an unexpected twist in the

- 90 -

highway guardrail saga given that TRN recently having passed all the crash tests the FHWA required it to perform; Highlights legal risk associated with TRN. . . . [T]he allegation seems to be that TRN has undue influence over the FHWA itself."  UBS stated that "[w]e do not believe such suggestions [i.e., FHWA corruption in the testing process] are made lightly," but still noted that it viewed claims that FHWA's testing regime was flawed with "skepticism."  Likewise, Wells Fargo reported on April 22, 2015, that, in light of "TRN's prior comments on the issue from their last earnings call and the successful re-tests of the highway product," the analyst did not believe the DOJ investigation would have a further impact on Trinity.

313.    The decline in the price of Trinity's stock would have been far more severe had Defendants revealed the complete truth regarding among other things: (1) Trinity's manipulation and exploitation of the regulatory approval process; and (2) the significant financial liabilities and exposure created by Trinity's fraudulent modifications to the ET-Plus.

### F.        April 24, 2015:  Trinity Confirms the DOJ's Investigation

314.    Finally, on April 24, 2015, Trinity confirmed that the DOJ had commenced a criminal investigation into its conduct and potential collusion with the FHWA.  That day, the Company issued a Form 10-Q reporting its quarterly results for the first quarter of 2015 and, during the associated earnings conference call earlier that day, Chief Legal Officer Rice noted that "recent news articles have reported the commencement of an investigation out of the Boston, Massachusetts office of the U.S. Department of Justice," and stated that "[w]e intend to cooperate in this investigation."

315.    The markets reacted strongly.  Although Trinity's reported financials for the first quarter of 2015 beat expectations, the Company's share price dropped significantly.  Analysts attributed that drop to confirmation of the DOJ investigation, with Sterne Agee attributing the decline to the "legal risk, [which] may be reasonable given the unknown," and BB&T reporting that "concerns have risen about the Dept. of Justice conducting a criminal investigation regarding TRN's ET-Plus highway guard rail product.  Even though all 8 tests earlier in the year were positive and signed off by the FWHA, the DOJ investigation raised fresh fears."

316.    This disclosure corrected certain of Defendants' prior statements and omissions.

317.   The Company's disclosure of the DOJ's criminal investigation caused a statistically significant drop (after considering market and peer-group factors) in the price of Trinity's common stock on April 24, 2015, from $32.56 per share to $28.70 per share, a decline of 11.9%.

## VIII.   THE PRESUMPTION OF RELIANCE

318.   Lead Plaintiffs and the Class will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)   Lead Plaintiffs and other members of the Class purchased Trinity securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

319.   At all relevant times, the market for Trinity securities was efficient for the following reasons, among others:

(a)   Trinity stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Trinity filed periodic public reports with the SEC; and

(c)   Trinity regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

320.    Many (if not all) of Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or were not identified as such by Defendants, and thus did not fall within any "Safe Harbor."

321.    Trinity's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

322.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Trinity who knew that the FLS was false.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## X.    CLASS ACTION ALLEGATIONS

323.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the Class.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

324.    The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE and there are over 155 million shares of Trinity stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Trinity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

325.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Questions of law and fact that are common to the Class include, among other things:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants publicly omitted and/or misrepresented material facts concerning the ET-Plus;

(c)    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(d)    whether Defendants' material misstatements and/or omissions artificially inflated the prices of Trinity securities during the Class Period; and

(e)    the extent and appropriate measure of damages sustained by members of the Class.

326.    Lead Plaintiffs' claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' unlawful conduct alleged herein.

327.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action securities litigation.  Moreover, Lead Plaintiffs have no interests that conflict with those of the Class.

328.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 94 -

## XI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

329.   Lead Plaintiffs incorporate by reference and expressly reallege all allegations set forth in ¶¶1-328, *supra*, as if fully set forth herein.

330.   This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

331.   During the Class Period, Defendants made or were responsible for the material misstatements and omissions specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

332.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, they:

(a)   Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Trinity securities during the Class Period.

333.   Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Trinity securities during the Class Period.

- 95 -

334. As detailed *supra*, Defendants and the Company's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the ET-Plus guardrail end terminal product.

335. Trinity is liable for all false and misleading material misstatements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Individual Defendants and the Company's other officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

336. The allegations above establish a strong inference that Trinity, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth *supra*, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about the ET-Plus product. By concealing these material facts from investors, Trinity's share price was artificially inflated during the Class Period.

337. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Trinity securities. Lead Plaintiffs and the Class would not have purchased Trinity securities at the prices they paid if they had been aware that the market prices had been artificially and falsely inflated by Defendants' material misstatements and omissions.

338. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Trinity publicly traded securities during the Class Period.

## SECOND CAUSE OF ACTION

### For Violation of §20(a) of the Exchange Act
### Against Defendants Wallace and Perry

339. Lead Plaintiffs incorporate by reference and expressly reallege all allegations set forth in ¶¶1-338, *supra*, as if fully set forth herein.

- 96 -

340.     This cause of action is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

341.     As detailed *supra*, Defendants each violated §10(b) and Rule 10b-5, and Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Trinity common stock as a direct and proximate result of Defendants' wrongful conduct.

342.     In addition, during the Class Period, Defendants Wallace and Perry acted as controlling persons of Trinity within the meaning of §20(a) of the Exchange Act.  Specifically, by virtue of their high-level positions and their ability to control and influence the Company's decision-making and day-to-day operations, Defendants Wallace and Perry had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the content and dissemination of the false and misleading material misstatements and omissions set forth *supra*.  As a result, Defendants Wallace and Perry are liable pursuant to §20(a) of the Exchange Act.

343.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Trinity publicly traded common stock during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiffs as the Class representatives and Lead Plaintiffs' counsel as Class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

- 97 -

D.      Such equitable, injunctive or other further relief as the Court may deem just and

proper.

## XIII.   JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  May 11, 2016                     KENDALL LAW GROUP, PLLC
                                         JOE KENDALL (State Bar No. 11260700)
                                         JAMIE J. McKEY (State Bar No. 24045262)


                                         _____
                                              */s/ Joe Kendall*


                                         3232 McKinney Avenue, Suite 700
                                         Dallas, TX  75204
                                         Telephone:  214/744-3000
                                         214/744-3015 (fax)
                                         jkendall@kendalllawgroup.com
                                         jmckey@kendalllawgroup.com

                                         JACKSON WALKER LLP
                                         DAVID FOLSOM (State Bar No. 07210800)
                                         CHARLES L. BABCOCK (State Bar No. 01479500)
                                         DAVID T. MORAN (State Bar No. 14419400)
                                         KPMG Plaza at Hall Arts
                                         2323 Ross Avenue, Suite 600
                                         Dallas, TX  75201
                                         Telephone:  214/953-6000
                                         214/953-5822 (fax)
                                         dfolsom@jw.com
                                         dmoran@jw.com

                                         Co-Liaison Counsel for the Class

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         DARREN J. ROBBINS (Admitted *Pro Hac Vice*)
                                         NATHAN R. LINDELL (Admitted *Pro Hac Vice*)
                                         SARA B. POLYCHRON (Admitted *Pro Hac Vice*)
                                         HILLARY B. STAKEM (Admitted *Pro Hac Vice*)
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-8498
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         darrenr@rgrdlaw.com
                                         nlindell@rgrdlaw.com
                                         spolychron@rgrdlaw.com

LOWENSTEIN SANDLER LLP
MICHAEL B. HIMMEL (Admitted *Pro Hac Vice*)
MICHAEL T.G. LONG (Admitted *Pro Hac Vice*)
JAMIE GOTTLIEB FURIA (Admitted *Pro Hac Vice*)
JOSEPH A. FISCHETTI (Admitted *Pro Hac Vice*)
BRANDON M. FIERRO (Admitted *Pro Hac Vice*)
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  973/597-2500
973/597-2400 (fax)
mhimmel@lowenstein.com
mlong@lowenstein.com
jfuria@ lowenstein.com
jfischetti@ lowenstein.com
bfierro@ lowenstein.com


BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
JAMES A. HARROD (Admitted *Pro Hac Vice*)
ADAM HOLLANDER (Admitted *Pro Hac Vice*)
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)
jim.harrod@blbglaw.com
adam.hollander@blbglaw.com


Co-Lead Counsel for the Class

THE LAW OFFICE OF BALON B. BRADLEY
BALON B. BRADLEY (State Bar No. 02821700)
5473 Blair Road, Suite 100
Dallas, TX 75231
Telephone: 972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com


O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
4748 Wisconsin Avenue, N.W.
Washington, DC 20016
Telephone: 202/362-0041
202/362-2640 (fax)


Additional Counsel for the Class

- 99 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of May, 2016, a copy of the foregoing was served electronically and notice of the service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.

*/s/ Joe Kendall*

JOE KENDALL

1139665_1